Eric Stephenson (9779)
STEPHENSON LAW FIRM
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
(844) 529-2112
eric@utahjustice.com

Lester Perry (2571)
HOOLE & KING L.C.
4276 Highland Drive
Salt Lake City, Utah 84124
Telephone: (801) 272-7556
Facsimile: (801) 272-7557

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| ROBYN YOUNG,<br><br>        Plaintiff,<br><br>vs.<br><br>NPAS, INC. and MEDICREDIT, INC.,<br><br>        Defendants. | **FIRST AMENDED COMPLAINT**<br><br><br>Case Number: 2:16-cv-01104<br><br>Judge: Paul M. Warner |
|---|---|

For cause of action, the plaintiff alleges against the defendants as follows:

**I.     Parties and Jurisdiction.**

1. Robyn Young is an individual and resident of Salt Lake County, State of Utah.

2. NPAS, Inc. ("NPAS") is believed to be a corporation doing business in the state of Utah. NPAS is a collection agency or company whose primary business is the collection of medical debt.

3. Medicredit, Inc. ("Medicredit") is believed to be a corporation doing business in the state of Utah. Medicredit is a collection agency or company whose primary business is the collection of medical debt.

4. The cause of action herein arose in Salt Lake County, State of Utah

## II. Factual Allegations.

5. Ms. Young was employed with Granite School District as a teacher of special needs children, particularly autistic children. Ms. Young had significant training in her profession, including a degree from the University of Utah. She was especially suited to teaching severe autistic children.

6. Ms. Young accepted assignments from the District to teach severe autistic children and to supervise paraprofessionals at schools within the District.

7. In the Spring of 2013, Ms. Young was attacked by one of her students and suffered a concussion. She could not work for several weeks because of the concussion.

8. In the 2013/2014 school year, Ms. Young was assigned by the District to work at an elementary school who had an autistic student known to be particularly violent. The student should not have been in a public school, but the child's parents threatened the District with legal action if it did not accept their child in the school. The District caved to the threats of the parents and allowed the child in its system.

9. In the Spring of 2014, the student attacked Ms. Young from behind, punching her face, pulling her hair, jerking back and forth her neck, and pulling Ms. Young down to the ground.

10. Ms. Young suffered for many months with constant migraine headaches, paralysis of portions of her body, inability to focus her eyes and withstand normal sunlight and indoor lighting, and other physical ailments because of the attack and the concussions. She has been unable to work at a 40 hour per week job with set work hours since the latter attack because she does not know when a migraine will occur forcing her to bed.

11. At the time of the latter attack, Ms. Young was finishing her master's degree at Westminster College in Education. She had completed her dissertation and was almost finished with required classes. Because of the attack, Ms. Young was unable to complete the final work on her master's degree.

12. On February 12, 2015, Ms. Young filed a worker's compensation claim with the State of Utah against the District. The District defended against the claim and it is presently proceeding through the Utah Department of Labor administrative court system. After a trial, the administrative law judge issued Interim Findings of Fact, Conclusions of Law and Order on February 11, 2016. Because of conflicting medical reports submitted by Ms. Young and the District, the judge ordered that a medical panel be created to advise the court about medical causation, the date of medical stability and other medical issues. On September 8, 2016, the medical panel ruled against the District and the appeal period for such ruling is presently running.

13. For a number of months after the latter attack, Ms. Young required significant medical treatment. Some of that treatment was provided by St. Marks Hospital and its doctors.

14. St. Marks Hospital and its doctors were advised that the treatment was for a work related injury that fell under the Utah Worker's Compensation Act and that there was an open claim pending before the Utah Department of Labor.

15. The majority of the medical bills incurred by St. Marks Hospital and its doctors were paid by the District which was self insured for Worker's Compensation claims or by Ms. Young's health insurance that remained in place for a number of months after the attack.

16. Portions of the medical bills were not paid by the District or Ms. Young's health insurance. St. Marks Hospital sought payment of these remaining portions from Ms. Young.

17. During all periods after the latter attack, Ms. Young was unable to work and had no other source of income. She was, therefore, unable to pay the portions of the medical bills sought by St. Marks Hospital.

18. Utah Code Ann. § 34A-2-401 provides that:

"(2) The responsibility for compensation and payment of medical, nursing, and hospital services and medicines, and funeral expenses provided under this chapter shall be:
   (a) on the employer and the employer's insurance carrier; and
   (b) not on the employee

19. St. Marks Hospital turned Ms. Young's accounts over to Medicredit and NPAS for collection.

20. Medicredit sent letters to Ms. Young seeking to collect the monies owed to St. Marks Hospital, including the letter dated March 8, 2016, a copy of which is attached hereto as **Exhibit "A"**.

21. Upon information and belief, Medicredit sent Ms. Young additional letters to collect the monies owed to St. Marks Hospital after Medicredit knew Ms. Young was

represented by counsel and that payment for Ms. Young's medical treatment fell under the Worker's Compensation Act and was therefore not Ms. Young's responsibility to pay.

22. Medicredit also made a number of collection calls to Ms. Young's cell phone during the Spring and Summer of 2016.

23. On July 5, 2016, Ms. Young's present counsel sent a letter to Medicredit regarding all debts that it was seeking to collect from Ms. Young including St. Marks account Nos. 500904683, 502106966 and 501934604. The letter is attached hereto as **Exhibit "B"**. In the letter, Medicredit was informed that Ms. Young was represented by counsel; requested all documents signed by Ms. Young at the time services were provided to her; requested all documents in which Ms. Young notified the Hospital that it was treating her for work related injuries that fell under the Worker's Compensation Act; and for all documents that authorized the hospital or its agents to make collection calls to her cell phone.

24. Medicredit did not respond to the letter or the requests therein.

25. During the week of September 21, 2016, a number of collection calls were made to Ms. Young seeking to collect the amounts owed to St. Marks Hospital.

26. NPAS sent a number of letters to Ms. Young seeking to collect the monies owed to St. Marks Hospital. The letters include one dated October 26, 2015 attached hereto as **Exhibit "C"**; one dated August 26, 2016 attached hereto as **Exhibit "D"** and one dated September 23, 2016 attached hereto as **Exhibit "E"**.

27. Upon information and belief, NPAS sent Ms. Young additional letters to collect the monies owed to St. Marks Hospital after NPAS knew Ms. Young was represented by counsel

and that payment for Ms. Young's medical treatment fell under the Worker's Compensation Act and was therefore not Ms. Young's responsibility to pay.

28. NPAS also made a number of collection calls to Ms. Young's cell phone during the Spring, Summer and Autumn of 2016 seeking to collect the St. Marks Hospital debt. The telephone calls included several made during the week of July 5, 2016.

29. On May 13, 2016, one of Ms. Young's attorneys sent letters to NPAS and St. Marks Hospital regarding their attempts to collect medical debts from her, most if not all believed to be St. Mark's Hospital accounts including account No. 501451437, 501934604 and 502106966. The letters are attached hereto as **Exhibit "F"**. The letters informed NPAS that Ms. Young was represented by an attorney and it was seeking to collect medical debt for work related injuries that fell under the Utah Workers Compensation Act and as such the debt was only the responsibility of the employer and the workers compensation insurance carrier.

30. Under UCA Ann. Section 34A-2-401(b), Ms. Young was not responsible for the debt.

31. On July 5, 2016, Ms. Young's present counsel sent a letter to NPAS regarding all debts that it was seeking to collect from Ms. Young including account Nos. 500904683, 502106966, 501934604. The letter is attached hereto as **Exhibit "G"**. In the letter, NPAS was informed that Ms. Young was represented by counsel; requested all documents signed by Ms. Young at the time services were provided to her; requested all documents in which Ms. Young notified the Hospital that it was treating her for work related injuries that fell under the Worker's Compensation Act; and for all documents that authorized the hospital or its agents to make collection calls to her cell phone.

32. NPAS did not respond to the letter or the requests therein.

33. Upon information and belief, either NPAS, Medicredit, or both made additional telephone calls to Ms. Young's cell phone after this lawsuit was filed for the purpose of collecting the St. Marks Hospital debt described herein.

34. Ms. Young never gave NPAS or Medicredit permission to call her cell phone.

35. Upon information and belief, most if not all of the calls NPAS and Medicredit made to Ms. Young's cell phone to collect the St. Marks Hospital debt described herein were made from an automatic dialing system as defined in 47 U.S.C. § 227 or were made using an artificial or prerecorded voice.

36. Medicredit reported the St. Marks Hospital accounts to TransUnion, a credit reporting agency, as an open account in Ms. Young's name that had been placed for collection on April 25, 2016.

37. Medicredit updated the listing of the St. Marks Hospital debt on Ms. Young's TransUnion credit report on June 26, 2016 but continued to report the debt as an open account in her name that had been placed for collection.

38. Upon information and belief, Medicredit also negatively reported the St. Marks Hospital debt to several other credit bureaus, including, among others, Experian and Equifax as an open account in Ms. Young's name that had been placed for collection on April 25, 2016.

39. At the time Medicredit reported the St. Marks Hospital account to the credit reporting agencies Medicredit knew the St. Marks hospital accounts were not Ms. Young's responsibility to pay and that reporting those debts as an open account in her name that had been placed for collection was false.

40. Medicredit did not delete the negative listing of the St. Marks Hospital debt on Ms. Young's credit reports despite being notified Ms. Young did not owe the debt and was represented by an attorney.

41. Medicredit did not delete the negative listing of the St. Marks debt from Ms. Young's credit reports after being served with this lawsuit.

42. As of November 28, 2016 Medicredit was still reporting the St. Marks debt to TransUnion as a negative account in Ms. Young's name.

43. Medicredit reported the St. Marks debt on Ms. Young's credit reports for the purpose of collecting or attempting to collect the St. Marks debt from Ms. Young.

44. Upon information and belief, by knowingly and willfully reporting the St. Marks debt on Ms. Young's credit reports, Medicredit damaged Ms. Young by lowering her credit scores artificially.

45. The actions of Medicredit and NPAS caused emotional distress to Ms. Young, increased the number and severity of the migraines suffered by her and caused problems with Ms. Young's relationship with other members of her family.

46. The actions of Medicredit and NPAS also caused Ms. Young to suffer from panic attacks, depression, fear, confusion, sadness, a sense of hopelessness that the collections would not stop, a sense of injustice, and a sense of helplessness given that even her attorneys could not stop NPAS and Medicredit from collecting the St. Marks debts from her.

47. Ms. Young's emotional distress manifested physically through, among other things, crying, sleeplessness, nausea, withdrawal from loved ones, migraines, and increase in the severity and frequency of her migraines.

48.     Even upon merely seeing the NPAS or Medicredit information on her caller ID or hearing the recorded announcements from NPAS or Medicredit on her telephone caused Ms. Young to suffer from panic attacks, nausea, fear, confusion, a sense of hopelessness, a sense of helplessness, and other forms of emotional distress.

**III.    First Cause of Action - Violation of the Fair Debt Collection Practices Act.**

49.     Ms. Young is a "consumer" as defined by Section 1692a of the FDCPA.

50.     The St. Marks Hospital accounts are "debts" as defined by Section 1692a of the FDCPA.

51.     Each of the defendants are "debt collectors" as defined by Section 1692a of the FDCPA.

52.     Each of the defendants violated Section 1692c of the FDCPA by communicating with Ms. Young about the debts after they were advised and knew that she was represented by an attorney.

53.     Each of the defendants violated Section 1692d of the FDCPA by repeatedly or continuously calling Ms. Young with the intent to annoy, abuse, or harass her and by engaging in conduct the natural consequence of which was to harass, oppress, or abuse Ms. Young in connection with the collection of the alleged debt.

54.     Each of the defendants violated Section 1692e of the FDCPA by using false, deceptive, or misleading representations or means in connection with the collection of a debt. These violations include, but are not limited to: 1) the false representation of the character, amount, or legal status of the debt; 2) the services rendered or compensation which may be lawfully received by these debt collectors for the collection of the alleged debt; 3) the threat to

take an action that cannot legally be taken or that is not intended to be taken; and 4) the use of any false representation or deceptive means to collect or attempt to collect a debt.

55. NPAS further violated Section 1692e of the FDCPA by failing to tell Ms. Young in its initial communication that it was an attempt to collect a debt and that any information obtained would be used for that purpose.

56. Medicredit further violated Section 1692e of the FDCPA by falsely representing the character, amount, or legal status of the debts when it reported the St. Marks accounts to the credit reporting agencies.

57. Medicredit further violated Section 1692e of the FDCPA by reporting information to the credit reporting agencies that it knew was false and by failing to communicate that the disputed debt was disputed.

58. Each of the defendants violated Section 1692f of the FDCPA by using unconscionable or unfair means to collect or attempt to collect the alleged debt. These violations include, but are not limited to, the collection or attempt to collect an amount not expressly authorized by the agreement creating the debt or permitted by law, communicating with Ms. Young after being notified she was represented by an attorney.

59. Medicredit further violated Section 1692f of the FDCPA by negatively reporting the St. Marks debt in Ms. Young's name to the credit reporting agencies knowing that information was false and the debt was disputed.

60. Pursuant to Section 1692k, each of the defendants are liable to Ms. Young for the actual damage caused by their collection actions plus additional damages not exceeding $1,000 for each defendant.

61. The defendants are liable for all court costs and attorney's fees incurred by Ms. Young in this action.

## VI. Second Cause of Action - Violation of the Utah Consumer Sales Practices Act.

62. The medical procedures provided by St. Marks Hospital and its doctors were "consumer transactions" within the meaning of the Utah Consumer Sales Practices Act ("UCSPA").

63. Each of the defendants were a "supplier" within the definition of the UCSPA.

64. The acts of the defendants were deceptive acts and practices within Utah Code Ann. § 13-11-4 that occurred before, during and after the medical procedures. Each of the defendants knew that they were prohibited by the Utah Workers Compensation Act from collecting the debts. St. Marks Hospital, their principal, was advised of such by Ms. Young and they were advised of such by Ms. Young's attorneys. Yet, they continued to attempt to collect the debts, continued communicating with Ms. Young after being notified she was represented by an attorney, and Medicredit continued negatively reporting the St. Marks debt in Ms. Young's name to the credit reporting agencies when it knew the information was false and the debt was disputed. Their acts were, therefore, intentional.

45. The acts and practices of the defendants were unconscionable acts and practices within Utah Code Ann.§ 13-11-5.

46. The Court should enter a declaratory judgment that the actions of the defendants violated the UCSPA. The Court should enjoin the defendants from attempting to collect the debts from Ms. Young including reporting the debts in Ms. Young's name to any credit reporting agencies.

— 12 —

47. Ms. Young suffered a loss and damages by the actions of the defendants as described above. The Court should award her damages but not less than $2,000.00 from each of the defendants pursuant to Utah Code Ann.§ 13-11-19(2) and all attorney's fees, court costs and litigation expenses incurred herein.

**V.      Jury Demand.**

Ms. Young requests that all factual issues be tried to a jury.

Wherefore, Ms. Young prays the Court for judgment against the defendants, jointly and severally, as follows:

1. For all damages caused by the actions of the defendants under the UCSPA;

2. For statutory damages against each of the defendants pursuant to the FDCPA and the UCSPA;

3. For a declaratory judgment that the actions of the defendants violated the FDCPA and the UCSPA;

4. For an injunction enjoining the defendants from collecting the subject debt;

5. For the attorney's fees, litigation expenses and court costs incurred herein; and

6. For such further relief deemed just and equitable.


DATED 3/22/2017                              /s/ Eric Stephenson
                                             *Attorney for Plaintiff*