Jamie Cotter (pro hac vice)
SPENCER FANE LLP
Attorneys for Defendants
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203-4554
Telephone: 303-839-3800
Facsimile:  303-839-3838
jcotter@spencerfane.com

Christian S. Collins (8452)
Christopher S. Hill (9931)
KIRTON McCONKIE
Attorneys for Defendants
36 South State Street, Suite 1900
Salt Lake City, Utah 84111
Telephone: (801) 328-3600
Facsimile: (801) 321-4893
ccollins@kmclaw.com
chill@kmclaw.com

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

---

| | | |
|---|---|---|
| ROBYN YOUNG, | : | **DEFENDANTS' MEMORANDUM IN** |
| | : | **OPPOSITION TO** |
| Plaintiff, | : | **PLAINTIFF'S MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| v. | : | |
| | : | |
| NPAS, INC., and MEDICREDIT, INC., | : | Case No. 2:16-cv-01104-CW-EFJ |
| | : | |
| Defendants. | : | Judge Clark Waddoups |

---

Defendants NPAS, Inc. ("NPAS") and Medicredit, Inc. ("Medicredit" and, collectively with NPAS, "Defendants"), hereby submit their memorandum in opposition to the Motion for Summary Judgment (the "Motion") [Doc. No. 32] filed by Plaintiff Robyn Young ("Plaintiff").[1]

## **INTRODUCTION**

Plaintiff's Motion is limited to a request for partial summary judgment that Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq*. (the "FDCPA"). Plaintiff reserves her other claim—that Defendants violated the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, et seq. (the "UCSPA")—and her damages related to the FDCPA for trial (or other dispositive motion).  However, Plaintiff is ultimately unable to demonstrate that she is entitled to the entry of partial summary judgment even on this limited issue because she refuses to acknowledge the complexity and nuance of the records she puts before the Court on her Motion.  Indeed, although the records relied on by Plaintiff demonstrate numerous accounts—distinguished by service date, placement date, amount and even internal reference numbers—Plaintiff's Motion rests on the (mis)characterization that Defendants have effectively serviced one, large and amorphous, omnibus account.  This mischaracterization is at best neglectful and at worst self-serving.  In either event, as discussed further below, Plaintiff's refusal to treat the record with the accuracy and specificity befitting a request for entry of summary judgment ultimately precludes her from demonstrating the absence of any genuine issue of material fact regarding whether Defendants have violated the FDCPA.  Accordingly, Plaintiff's Motion must be denied.

---

[1] The Court granted Defendants' Request to file this Motion and various accompanying exhibits under seal. However, Defendants were not able to prepare paper copies of all documents required to be filed in paper by the Court's close of business on November 7, 2017 at 4:30 p.m. MST.  Therefore, Defendants have elected to redact the portions of its exhibits that are confidential and simply file this motion with those redactions.  Defendants have effectively abandoned their request to file this Motion under seal.

## RESPONSE TO STATEMENT OF ELEMENTS
## AND UNDISPUTED MATERIAL FACTS

As an initial matter, Plaintiff has failed to comply with DUCivR 56-1(b)(2), because she has not included a section titled "Statement of Elements and Undisputed Material Facts." *See* DUCivR 56-1(b)(2).  In lieu of this section, Plaintiff has provided two sections: the first, entitled "Statement of Elements" and, the second, entitled "Statement of Undisputed Facts." *See* Motion [Doc. No. 32], pp. 3-4.  This misstep is not simply procedural.  Indeed, by splitting the elements and facts into separate sections, Plaintiff attempts to avoid her obligation to provide, under each element, "a concise statement of the material facts necessary to meet *that element* as to which the moving party contends to genuine issue exists." *See* DUCivR 56-1(b)(2)(C) (emphasis added).  This failure subjects Plaintiff's Motion to outright denial. *See* DUCivR 7-1(a)(1) ("Specific instructions regarding Motions for Summary Judgment are provided in DUCivR 56-1.  Failure to comply with the requirements of this section may result in sanctions, including (i) returning the motion to counsel for resubmission in accordance with the rule, (ii) denial of the motion, or (iii) any other sanction deemed appropriate by the court.").  Moreover, Plaintiff's shortcoming compromises Defendants' ability to adequately mount a response under DUCivR 56-1(c), in that Defendants have no way to determine which purported facts relate to which purported elements of Plaintiff's claims.

## I.      Plaintiff's Statement of the Elements and Undisputed Material Facts

<u>Plaintiff's Statement of Elements</u>:  "To prevail on a claim under the Fair Debt Collection Practices Act, Young must demonstrate that the Defendants engaged in any prohibited conduct in attempt to collect a debt."  *See* Motion [Doc. No. 32], p. 3.[2]

<u>Defendants' Response to Plaintiff's Statement of Elements</u>:   As an initial matter, Plaintiff's recitation of "each legal element required to prevail on the motion" violates DUCivR 56-1(b)(2), in that no citation to authority is provided.   *See* DUCivR 56-1(b)(2). Notwithstanding, Defendants agree that, as part of a claim for a violation of the FDCPA, a plaintiff must prove that the "defendant violated a provision of the FDCPA."  *See Wisdom v. Wakefield & Assocs.*, No. 2:16-cv-00303-DB, 2016 U.S. Dist. LEXIS 89768, at *4 (D. Utah July 11, 2016); *Cordova v. Jenkins*, No. 16-460 KG/KBM, 2017 U.S. Dist. LEXIS 60308, at *7 (D.N.M. Apr. 20, 2017); *Rhodes v. Olson Assocs., P.C.*, 83 F. Supp. 3d 1096, 1103 (D. Colo. 2015).

<u>Defendants' Response to Plaintiffs' Undisputed Material Facts</u>:

1.      As of September 29, 2014, NPAS knew payment for Young's medical treatment at issue in this case was subject to worker's compensation claims.

**Response:      Disputed.  In support of this fact, Plaintiff relies on a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (*See* Declaration of Don Wright ("Wright Decl."), a true and accurate copy of which is attached hereto as D-1,**

---

[2]   Plaintiff goes on to enumerate numerous provisions of the FDCPA which she alleges Defendants violated.  These are not elements of a claim alleging violation of the FDCPA, rather, as set forth below; they are examples of how a claimant might establish the final element of an FDCPA claim.

at ¶ 13).  **Accordingly, NPAS has six (6) different sets of records for each account it took action upon.  (*Id*. at ¶¶ 14-19).  The portion of the (erroneously) compiled records citied by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to a debt of $431.76 which, on July 22, 2014, was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on June 3, 2014 and assigned the Account Number 500924860 ("Acct. 500924860").  (*Id*. at ¶ 14; *see also* NPAS Account Notes for Acct. 500924860, a true and accurate copy of which is attached hereto as D-2).**

2.     As of October 13, 2015, NPAS knew liability for the alleged debts was the subject of litigation.

**Response:     Disputed.   In support of this fact, Plaintiff relies on a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  Accordingly, NPAS has six (6) different sets of records for each account it took action upon.  (*Id*. at ¶¶ 14-19).  The portion of the (erroneously) compiled records cited by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to a debt of $181.05 which, on June 11, 2015, was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on February 23, 2015 and assigned the Account Number 501451437 ("Acct. 501451437").  (*Id*. at ¶ 16; *see also* NPAS Account Notes for Acct. 501451437, a true and accurate copy of which is attached hereto as D-3).**

3.     As of October 20, 2015, NPAS knew Young was represented by an attorney.

**Response:     Disputed.  In support of this fact, Plaintiff relies upon a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  As an initial matter, the records relied upon by Plaintiff undercut her very assertions: immediately following the entry "ATTORNEY INVOLVED" the account notes clarify that the correspondence received was actually "FROM TRISTAR NOT ATTY."  (NPAS Account Notes for Acct. 501451437, D-3).  Plaintiff's cited records do not indicate knowledge of attorney representation; they indicate a clerical error.  (*Id*.).  Moreover, Plaintiff's fact is misleadingly overbroad; NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  Accordingly, NPAS has six (6) different sets of records for each account it took action upon.  (*Id*. at ¶¶ 14-19).  The portion of the (erroneously) compiled records cited by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to Acct. 501451437.  (*Id*. at ¶ 16; *see also* NPAS Account Notes for Acct. 501451437, D-3).**

4.      As of November 23, 2015, NPAS knew Young was represented by attorney Dawn Atkin and that payment for Young's medical treatment at issue in this case was subject to worker's compensation claims.

**Response:     Disputed.  In support of this fact, Plaintiff relies upon a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  Accordingly, NPAS has six (6) different sets of records for each account it took action**

upon.  (*Id*. at ¶¶ **14-19**).  **The portion of the (erroneously) compiled records, cited by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to a debt of $2,539.88 which, on February 27, 2015,  was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 23, 2014 and assigned the Account Number 500904683 ("Acct. 500904683").  (*Id*. at ¶ 15; *see also* NPAS Account Notes for Acct. 500904683, a true and accurate copy of which is attached hereto as D-4).**

5.     On January 19, 2016, NPAS attempted to collect the alleged debts by communicating with Young and demanding payment from Young in writing.

**Response:     Disputed.  In support of this fact, Plaintiff relies on a letter from NPAS to Plaintiff which is expressly limited to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  The letter cited by Plaintiff and attached to the Motion as P-1 is expressly limited to a debt of $952.04 which, on December 28, 2015, was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on November 2, 2015 and assigned the Account Number 501934604 ("Acct. 501934604").  (*Id*. a ¶ 17; *see also* NPAS Account Notes for Acct. 501934604, a true and accurate copy of which is attached hereto as D-5).**

6.     On February 3, 2016, NPAS communicated with Young by telephone to collect the alleged debts.

**Response:     Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff testifies she remembers nothing about this alleged call, including its date or who she spoke**

with, and does not know where the information contained in her sworn declaration came from.  (*See* **Deposition of Robyn E. Young ("Young Dep."), a true and accurate copy of which is attached hereto as D-6, at pp. 91:6-92:20).  Moreover, in support of this fact, Plaintiff also relies upon a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  Accordingly, NPAS has six (6) different sets of records for each account it took action upon.  (*Id*. at ¶¶ 14-19).  The portion of the (erroneously) compiled records cited by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to a debt of $847.36 which, on February 29, 2016, was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on February 2, 2016 and assigned the Account Number 502106966 ("Acct. 502106966").  (*Id*. at ¶ 18; *see also* NPAS Account Notes for Acct. 502106966, a true and accurate copy of which is attached hereto as D-7).**

7.  During the February 3, 2016 phone call, Young advised NPAS that she was represented by an attorney, that the debts were supposed to be paid by worker's compensation, and that the debts were the subject of litigation.

**Response:     Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff testifies she remembers nothing about this alleged call, including its date or who she spoke with, and does not know where the information contained in her sworn declaration came from.  (*See* Young Dep., D-6, at pp. 91:6-92:20).  Moreover, in support of this fact, Plaintiff**

8

also relies upon a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  Accordingly, NPAS has six (6) different sets of records for each account it took action upon.  (*Id*. at ¶¶ 14-19).  The portion of the compiled records cited by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to Acct. 502106966.  (*See* NPAS Account Notes for Acct. 502106966, D-7).

8.     During the February 3, 2016 phone call, NPAS represented that Young was required to make a payment toward the alleged debts to receive additional medical treatment.

**Response:     Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff testifies she remembers nothing about this alleged call, including its date or who she spoke with, and does not know where the information contained in her sworn declaration came from.  (*See* Young Dep., D-6, at pp. 91:6-92:20).  Moreover, in support of this fact, Plaintiff also relies upon a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  Accordingly, NPAS has six (6) different sets of records for each account it took action upon.  (*Id*. at ¶¶ 14-19).  The portion of the (erroneously) compiled records cited by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to Acct. 502106966.  (*See* NPAS Account**

Notes for Acct. 502106966, D-7).  **Further, NPAS specifically disputes that it made the representations alleged by Plaintiff.  NPAS' account notes do not support this allegation and in fact undermine it completely.  (*See* NPAS Account Notes for Acct. 502106966, D-7).**

9.     As a result of Defendant's demands for payment and representations that Young could not have any follow-up medical treatment if she did not pay the alleged debts, Young made payments toward the alleged debts on February 3, 2016.

**Response:     Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff testifies she remembers nothing about this alleged call, including its date or who she spoke with, and does not know where the information contained in her sworn declaration came from.  (*See* Young Dep., D-6, at pp. 91:6-92:20).  Moreover, in support of this fact, Plaintiff also relies upon a portion of NPAS's records which pertains only to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  Accordingly, NPAS has six (6) different sets of records for each account it took action upon.  (*Id*. at ¶¶ 14-19).  The portion of the (erroneously) compiled records cited by Plaintiff and attached to the Motion as P-17 (not P-16 as referenced by Plaintiff), pertains solely to Acct. 502106966.  (*See* NPAS Account Notes for Acct. 502106966, D-7).**

10.     On March 9, 2016, NPAS attempted to collect the alleged debts by communicating with Young and demanding payment from Young in writing.

**Response:    Disputed.   In support of this fact, Plaintiff relies on a letter from NPAS to Plaintiff which is expressly limited to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.   NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  The letter cited by Plaintiff and attached to the Motion as P-1 is expressly limited to Acct. 502106966.  Accordingly, Plaintiff's statement that NPAS attempted to collect the "alleged debts" with the March 9, 2016 letter is inaccurate, misleading and not supported by the cited evidence.**

11.    On May 13, 2016, Young's attorney Dawn Atkin notified Defendant's principal St. Marks Hospital that Young was represented by counsel, that a worker's compensation claim had been filed with the Utah Labor Commission, that payment for the alleged debts was not Young's responsibility under the Utah Worker's Compensation Act, and that Young disputed the validity of the alleged debts.

**Response:    Disputed.   Plaintiff's statement that St. Mark's Hospital is NPAS's principal is a legal conclusion to which no response is required.   In support of this fact, Plaintiff relies on a letter from Plaintiff's former counsel which is expressly limited to one account out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts. In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).  The letter cited by Plaintiff and attached to the Motion as P-13 (not P-15 as referenced by Plaintiff), which is dated May 13, 2016, is expressly limited to Acct. 501451437.  Accordingly, Plaintiff's statement that her former**

counsel notified St. Mark's Hospital regarding the "alleged debts" is inaccurate, misleading and not supported by the cited evidence.

12.     On May 13, 2016, Young's attorney, Dawn Atkin, sent NPAS two letters notifying it that she represented Young and that payment for Young's medical treatment at issue in this case was subject to worker's compensation claims.

**Response:     Disputed.  In support of this fact, Plaintiff relies on two letters from Plaintiff's former counsel which are expressly limited to two accounts out of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts.   In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).   The two letters cited by Plaintiff and attached to the Motion as P-15, both of which are dated May 13, 2016, are expressly limited to Acct. 502106966 and Acct. 501394604.**

13.     On May 17, 2016, NPAS attempted to collect the alleged debts by communicating with Young and demanding payment from Young in writing.

**Response:     Disputed.  The letter cited by Plaintiff and attached to the Motion as P-1 is expressly limited to Acct. 500904683, which is just one of the numerous accounts NPAS serviced regarding Plaintiff's unpaid medical debts. In fact, NPAS performed actions upon six (6) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).   Accordingly, Plaintiff's statement that NPAS attempted to collect the "alleged debts" with the May 17, 2016 letter is inaccurate, misleading and not supported by the cited evidence.**

14.     On July 5, 2016, Young's attorney Lester Perry notified NPAS that he represented Young.

**Response:     Disputed.  The letter cited by Plaintiff and attached to the Motion as P-4, which is dated July 5, 2016, is expressly limited to Acct. 500904683, Acct. 502106966, and Acct. 501943604, which together comprise only half of the six (6) different accounts NPAS serviced regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 13).**

15.     NPAS attempted to collect the alleged debts by communicating with Young and demanding payment from Young in writing on the following dates: August 26, 2016; September 23, 2016; and October 24, 2016.

**Response:     Disputed.  Each of the three letters relied upon by Plaintiff for this fact is expressly limited to one account out of the numerous accounts serviced by NPAS regarding Plaintiff's unpaid medical debts.  Indeed, NPAS performed actions upon six (6) different such accounts.  (Wright Decl., D-1, ¶ 13).  The letters dated August 26, 2016; September 23, 2016; and October 24, 2016, each of which is cited by Plaintiff and attached to the Motion as P-5, P-6 and P-7, respectively, are expressly limited to a debt of $713.89 which, on August 2, 2016, was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 29, 2016 and assigned the Account Number 502361159 ("Acct. 502361159").  (Id. at ¶ 19; *see also* NPAS Account Notes for Acct. 502361159, a true and accurate copy of which is attached hereto as D-8.**

16.     NPAS also communicated or attempted to communicate with Young by telephone to collect the alleged debts on the following dates: October 6, 2014; June 30, 2015; July 1, 2015; July 2, 2015; July 7, 2015; July 8, 2015; July 9, 2015; July 10, 2015; September 13, 2015;

February 2, 2016; February 3, 2016; February 4, 2016; September 16, 2016; September 19, 2016; September 20, 2016; September 21, 2016; September 23, 2016; September 24, 2016; October 14, 2016; October 19, 2016; and April 12, 2017.

**Response:     Disputed.  The specific dates identified by Plaintiff are not set forth in Plaintiff's sworn declaration attached to the Motion, P-16 attached to the Motion, nor in NPAS's Answer and Affirmative Defenses to the First Amended Complaint [Doc. No. 28]. Moreover, to the extent these dates can be found in the account notes attached to the Motion as P-17, such calls are not all generally for all "alleged debts," rather P-17 contains compiled records for the following separate accounts: Acct 500924860, Acct. 500904683, Acct. 501451437, Acct. 501934604, Acct. 502106966, and Acct. 502361159.**

17.     NPAS also attempted to communicate with Young on multiple other occasions by telephone after it was notified that Young did not owe the debts and was represented by counsel.

**Response:     Disputed.  Plaintiff's statement that "NPAS also attempted to communicate with Young on multiple other occasions by telephone after it was notified that Young did not owe the debts and was represented by counsel" is inaccurate, misleading, and too vague to be supported by the cited evidence.  Indeed, the cited paragraphs of Plaintiff's sworn declaration, P-5 and P-16, all of which are attached to the Motion, do not support this allegation.**

18.     As of October 11, 2014, Medicredit knew payment for Young's medical treatment at issue in this case was subject to worker's compensation claims.

**Response:     Disputed.  In support of this fact, Plaintiff relies upon an entry in Medicredit's records dated prior to when numerous accounts were placed with Medicredit**

regarding Plaintiff's unpaid medical debts.  In fact, Medicredit performed actions upon four (4) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 20).  The account notes cited by Plaintiff and attached to the Motion as P-16 (not P-17 as referenced by Plaintiff) confirm that only Acct. 500904683 was placed with Medicredit as of October 11, 2014.  (*Id*. at ¶ 21; *see also* Medicredit Account Notes, a true and accurate copy of which is attached hereto as D-9).

19.    As of February 5, 2016, Medicredit knew liability for the alleged debts was the subject of litigation.

**Response:    Disputed. In support of this fact, Plaintiff relies upon an entry in Medicredit's records dated prior to when numerous accounts were placed with Medicredit regarding Plaintiff's unpaid medical debts.  In fact, Medicredit performed actions upon four (4) different accounts regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 20)  The account notes cited by Plaintiff and attached to the Motion as P-16 (not P-17 as referenced by Plaintiff) confirm that only Acct. 500904683 and Acct. 501451437 were placed with Medicredit as of February 5, 2016.  (*Id*. at ¶¶ 21-22; *see also* Medicredit Account Notes, D-9).**

20.    As of February 5, 2016, Medicredit knew Young was represented by an attorney.

**Response:    Disputed.  In support of this fact, Plaintiff relies upon entry in Medicredit's records dated prior to when numerous accounts were placed with Medicredit regarding Plaintiff's unpaid medical debts.  As an initial matter, the records relied upon by Plaintiff undercut her very assertions: immediately following the entry "ATTORNEY INVOLVED" the account notes clarify that the correspondence received was actually**

**"FROM TRISTAR NOT ATTY."   (Medicredit Account Notes, D-9).   Plaintiff's cited records do not indicate knowledge of attorney representation; they indicate a clerical error. (*Id*.).   Moreover, Plaintiff's fact is misleadingly overbroad; Medicredit performed actions upon four (4) different accounts regarding Plaintiff's unpaid medical debts.   (Wright Decl., D-1, ¶ 20)   The account notes cited by Plaintiff and attached to the Motion as P-16 (not P-17 as referenced by Plaintiff) confirm that only Acct. 500904683 and Acct. 501451437 were placed with Medicredit as of February 5, 2016.   (*Id*. at ¶¶ 21-22; *see also* Medicredit Account Notes, D-9).**

21.   Medicredit attempted to collect the alleged debts by communicating with Young and demanding payment from Young in writing on or near the following dates: February 5, 2016; March 4, 2016; March 8, 2016; April 25, 2016; May 1, 2016; May 27, 2016; July 4, 2016; July 11, 2016.

**Response:   Disputed.   Each of these three letters is expressly limited to one account, collectively comprising only a portion of the accounts serviced by Medicredit regarding Plaintiff's unpaid medical debts.   The cited paragraphs from Plaintiff's declaration are limited to P-8, P-9 and P-10 attached to Plaintiff's Motion, which are themselves limited to Acct. 501934604, Acct. 502106966 and Acct. 500904683, respectively. These are not all the "alleged debts" placed with Medicredit.   (Wright Decl., D-1, ¶ 20). Moreover, these specific dates are not set forth P-17, attached to the Motion, nor in Medicredit's Answer and Affirmative Defenses to the First Amended Complaint [Doc. No. 27].**

22.    On March 4, 2016, Medicredit communicated with Young by telephone to collect the alleged debts and demanded payment from Young.

**Response:    Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff testifies she remembers nothing about any such call, including its date, and does not know where the information contained in her sworn declaration came from.  (*See* Young Dep., D-6, at pp. 95:3-97:12).   Moreover, the records from Medicredit's Noble Systems Call History, indicate that no telephone call took place between Plaintiff and Medicredit on March 4, 2016.  (Wright Decl., D-1, ¶ 25; *see also* Noble Systems Call History, a true and accurate copy of which is attached hereto as D-10).**

23.    Sometime on or around March 4, 2016, Medicredit reported to TransUnion that one of the alleged debts was "placed for collection" and was Young's responsibility to pay.

**Response:    Disputed in part.  Medicredit admits only that it made a report to Transunion regarding only Acct. 501934604, which, per P-11 attached to the Motion and Medicredit's account notes, was placed with Medicredit on March 4, 2016.  (Medicredit Account Notes, D-9).**

24.    On April 24, 2016, Medicredit updated the information it reported to TransUnion in an attempt to collect one of the alleged debts from Young and in doing so again reported that the alleged debt was "placed for collection" and was Young's responsibility to pay.

**Response:    Disputed in part.   Medicredit admits that it made a report to Transunion regarding only Acct. 502106966, which, which, per P-11 attached to the Motion**

and Medicredit's account notes, was placed with Medicredit on April 25, 2016.  (Medicredit Account Notes, D-9).

25.     On April 25, 2016, Medicredit communicated with Young by telephone and represented that Young was required to pay a portion of the alleged debts to get additional medical treatment.

**Response:     Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff testifies she remembers nothing about any such call, including its date and who she may have spoken with, and does not know where the information contained in her sworn declaration came from.  (*See* Young Dep., D-6, at pp. 97:19-99:25).  Moreover, the records from Medicredit's Noble Systems Call History, indicate that no telephone conversation took place between Plaintiff and Medicredit on March 4, 2016.  (Wright Decl., D-1, ¶ 25; *see also* Noble Systems Call History, D-10).**

26.     As a result of Defendant's demands for payment and representations that Young could not have any follow-up medical treatment if she did not pay the alleged debts, Young made payments toward the alleged debts on April 25, 2016.

**Response:     Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff testifies she remembers nothing about any such call, including its date and who she may have spoken with, and does not know where the information contained in her sworn declaration came from.  (*See* Young Dep., D-6, at pp. 97:19-99:25).  Moreover, the records from Medicredit's Noble Systems Call History, indicate that no telephone conversation**

took place between Plaintiff and Medicredit on March 4, 2016.  (Wright Decl., D-1, ¶ 25; *see also* Noble Systems Call History, D-10).

27.   Sometime on or around April 25, 2016, Medicredit reported to TransUnion that one of the alleged debts was "placed for collection" and was Young's responsibility to pay.

**Response:   Disputed in part.   Medicredit admits that it made a report to Transunion regarding only Acct. 502106966, which, which, per P-11 attached to the Motion and Medicredit's account notes, was placed with Medicredit on April 25, 2016.  (Medicredit Account Notes, D-9).**

28.   On May 11, 2016, Medicredit updated the information it reported to TransUnion in an attempt to collect two of the alleged debts and in doing so reported that the alleged debts were "placed for collection" and were Young's responsibility to pay.

**Response:   Disputed.  Plaintiff's statement that Medicredit updated information to Transunion on May 11, 2016 is inaccurate, misleading and not supported by the cited evidence.  Indeed, the report cited by Plaintiff and attached to the Motion as P-12 does not reference or otherwise evidence an update submitted by Medicredit on May 11, 2016 for Acct. 502106966 and Acct. 501934604.**

29.   On June 26, 2016, Medicredit updated the information it reported to TransUnion in an attempt to collect one of the alleged debts from Young and in doing so reported that the alleged debt was "placed for collection" and was Young's responsibility to pay.

**Response:   Disputed in part.  Medicredit admits that on June 26, 2016, it updated a report to Transunion regarding only Acct.  502106966, which, which, per P-11 attached**

to the Motion and Medicredit's account notes, was placed with Medicredit on April 25, 2016. (Medicredit Account Notes, D-9).

30.     Neither of the credit reports Young ordered and reviewed report the debts from Medicredit as being in dispute.

**Response:     Undisputed.**

31.     On May 13, 2016, Young's attorney Dawn Atkin notified Defendant's principal St. Marks Hospital that Young was represented by counsel, that a worker's compensation claim had been filed with the Utah Labor Commission, that payment for the alleged debts was not Young's responsibility under the Utah Worker's Compensation Act, and that Young disputed the validity of the alleged debts.

**Response:     Disputed.     Plaintiff's statement that St. Mark's Hospital is Medicredit's principal is a legal conclusion to which no response is required.  In support of this fact, Plaintiff relies on a letter from Plaintiff's former counsel which is expressly limited to one account out of the numerous accounts Medicredit serviced regarding Plaintiff's unpaid medical debts.  Indeed, the letter cited by Plaintiff and attached to the Motion as P-13, which is dated May 13, 2016, was expressly limited to Acct. 501451437.**

32.     On July 4, 2016, Medicredit communicated with Young by telephone and Young told Medicredit she was represented by an attorney, that payment for the alleged debts was not Young's responsibility under the Utah Worker's Compensation Act, and that Young disputed the validity of the alleged debts.

**Response:     Disputed.  The deposition testimony provided by Plaintiff on this issue is directly at odds with her sworn declaration attached to the Motion, in that Plaintiff**

testifies she remembers nothing about any such call.  (*See* **Young Dep., D-6, at pp. 100:1-17).  Moreover, the records from Medicredit's Noble Systems Call History, indicate that no telephone call took place between Plaintiff and Medicredit on July 4, 2016.  (Wright Decl., D-1, ¶ 25;** *see also* **Noble Systems Call History, D-10).**

33.     On July 5, 2016, Young's attorney Lester Perry notified Medicredit that he represented Young.

**Response:     Disputed. The letter cited by Plaintiff and attached to the Motion as P-4, which is dated July 5, 2016, is expressly limited to Acct. 500904683, Acct. 502106966, and Acct. 501943604, which together comprise only a portion of the accounts Medicredit serviced regarding Plaintiff's unpaid medical debts.  (Wright Decl., D-1, ¶ 20).**

34.     Medicredit communicated or attempted to communicate with Young by telephone to collect the alleged debts on the following dates: February 5, 2016; February 11, 2016; February 16, 2016; February 19, 2016; February 25, 2016; March 3, 2016; March 4, 2016; March 8, 2016; March 14, 2016; March 21, 2016; March 28, 2016; April 6, 2016; April 11, 2016; April 19, 2016; April 22, 2016; April 24, 2016; April 25, 2016; April 26, 2016; April 27, 2016; April 28, 2016; May 2, 2016; May 4, 2016; May 5, 2016; May 9, 2016; May 10, 2016; May 11, 2016; May 17, 2016; May 23, 2016; May 25, 2016; May 27, 2016; June 2, 2016; June 7, 2016; June 9, 2016; June 13, 2016; June 14, 2016; June 15, 2016; June 21, 2016; June 22, 2016; June 26, 2016; June 27, 2016; June 28, 2016; June 29, 2016; June 30, 2016; July 4, 2016; July 5, 2016; July 7, 2016; July 14, 2016; and July 21, 2016.

**Response:     Disputed.  As an initial matter, Plaintiff's reliance on P-17 attached to Plaintiff's Motion is misplaced because that document pertains to records maintained by**

NPAS not Medicredit.  Moreover, the deposition testimony provided by Plaintiff in this matter compromises numerous of the foregoing dates.  To wit, in numerous instances Plaintiff could not recall anything specific about the calls or where the dates in her own declaration, attached to Plaintiff's Motion, had come from.  (*See* Young Dep., D-6, at pp. 91:6-92:20; 95:3-97:12; 97:19-99:25; 100:1-17.)   Finally, the records from Medicredit's Noble Systems Call History, indicate that many of these telephone calls never took place. (Noble Systems Call History, D-10).

35.    Medicredit also attempted to communicate with Young on multiple other occasions by telephone after it was notified that Young did not owe the debts and was represented by counsel.

**Response:   Disputed.   Plaintiff's declaration on this point contravenes the deposition testimony provided by Plaintiff in this.  Indeed, in numerous instances Plaintiff could not recall anything specific about the calls or where the dates in her own declaration, attached to Plaintiff's Motion, had come from.  (*See* Young Dep., D-6, at pp. 91:6-92:20; 95:3-97:12; 97:19-99:25; 100:1-17).   Moreover, as noted above, the dates on which Medicredit allegedly knew or was notified of the fact that Plaintiff was represented by counsel and/or did not owe the debts, even if true, were *before* numerous accounts had been placed with Medicredit.  (Medicredit Account Notes, D-9).**

Defendants' Additional Statement of Undisputed Material Facts:

Defendants provide the following Statement of Additional Undisputed Material Facts ("SAUMF") regarding this element of Plaintiff's claim for violation of the FDCPA:

1.      On July 22, 2014, a debt of $431.76 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on June 3, 2014 (i.e., Acct. 500924860).  (Wright Decl., D-1, ¶ 14).

2.      On February 27, 2015, a debt of $2,539.88 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 23, 2014 (i.e., Acct. 500904683).  (Wright Decl., D-1, ¶ 15).

3.      On June 11, 2015, a debt of $181.05 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on February 23, 2015 (i.e., Acct. 501451437). (Wright Decl., D-1, ¶ 16).

4.      On December 28, 2015, a debt of $952.04 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on November 2, 2015 (i.e., Acct. 501934604). (Wright Decl., D-1, ¶ 17).

5.      On February 29, 2016, a debt of $847.36 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on February 2, 2016 (i.e., Acct. 502106966). (Wright Decl., D-1, ¶ 18).

6.      On August 2, 2016, a debt of $713.89 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 29, 2016 (i.e., Acct. 502361159).  (Wright Decl., D-1, ¶ 19).

7.      On October 11, 2014, Acct. 500904683 was first placed with Medicredit. (Medicredit Account Notes, D-9).

8.      On February 5, 2016, Acct. 501451437 was first placed with Medicredit. (Medicredit Account Notes, D-9).

9. On March 4, 2016, Acct. 501934604 was first placed with Medicredit. (Medicredit Account Notes, D-9).

10. ON April 25, 2016, Acct. 502106966 was first placed with Medicredit. (Medicredit Account Notes, D-9).

## II. Defendants' Statement of Additional Elements and Material Facts

In addition to proving that a defendant violated a provision of the FDCPA, a plaintiff seeking to recover for a violation of the FDCPA must also prove the following three additional elements:

First, that plaintiff is a natural person who is a "consumer" within the meaning of the FDCPA. *See* 15 U.S.C. § 1692a(3); *see also Wisdom*, 2016 U.S. Dist. LEXIS 89768, at *4; *Cordova*, 2017 U.S. Dist. LEXIS 60308, at *7; *Rhodes*, 83 F. Supp. 3d at 1103.

Material Facts Regarding This Element: None.

Second, that the "debt" arises out of a transaction entered primarily for personal, family or household purposes. *See* 15 U.S.C. § 1692a(5); *see also Wisdom*, 2016 U.S. Dist. LEXIS 89768, at *4; *Cordova*, 2017 U.S. Dist. LEXIS 60308, at *7; *Rhodes*, 83 F. Supp. 3d at 1103.

Material Facts Regarding This Element: None.

Third, that defendant is a "debt collector" within the meaning of the FDCPA. *See* 15 U.S.C. § 1692a(6); *see also Wisdom*, 2016 U.S. Dist. LEXIS 89768, at *4; *Cordova*, 2017 U.S. Dist. LEXIS 60308, at *7; *Rhodes*, 83 F. Supp. 3d at 1103.

Material Facts Regarding This Element:

Defendants provide the following Statement of Undisputed Material Facts ("SUMF") regarding this element of Plaintiff's claim for violation of the FDCPA:

1.     NPAS is not a debt collection company or in the business of collecting defaulted medical consumer debts.  *See* NPAS's Answer and Affirmative Defenses to First Amended Complaint, a true and accurate copy of which is attached hereto as D-11, at ¶ 2.

2.     NPAS conducts only "early out" collections.  "Early out" collections involve attempts to collect on unpaid accounts prior to the time that the account is deemed to be default. (Wright Decl., D-1, ¶ 2).

3.     As a result, NPAS Inc.'s is not a "debt collector" and not subject to the requirements of the FDCPA.  *See* NPAS's Answer and Affirmative Defenses to First Amended Complaint, D-11, at ¶ D.

4.     Accordingly, NPAS is not required to comply with the FDCPA because it does not meet the definition of a "debt collector" under the FDCPA.  *See* NPAS, Inc.'s Responses to Plaintiff's First Set of Interrogatories, a true and accurate copy of which is attached hereto as D-12, Response to Interrogatory No. 19.

5.     NPAS's performance of "early out" collection services for certain of its clients, including the services provided with regarding to the unpaid medical debts of Plaintiff Robyn Young ("Plaintiff"), is governed, in part, by (1) an Intercompany Services Agreement ("ISA") between NPAS, on the one hand, and HSS Systems, LLC ("HSS"), on the other, and (2) an Amended and Restated Master Services Agreement ("MSA") between non-party Parallon Business Solutions, LLC, on behalf of itself and certain affiliates, on the one hand, and non-party Mountain Division, Inc., on behalf of itself and as a disclosed agent for certain facilities, on the other.  (Wright Decl., D-1, ¶ 3; *see also* MSA, a true and accurate redacted copy of which is

attached hereto as D-13; ISA, a true and accurate redacted copy of which is attached hereto as D-14).

6.      Under the MSA, NPAS and HSS are both affiliates of Parallon Business Solutions, LLC.  (Wright Decl., D-1, ¶ 4; MSA, D-13, § 1.11, p. NP0131).

7.      Under the MSA, St. Mark's Hospital is a facility which receives services from NPAS and HSS.  (Wright Decl., D-1, ¶ 5; MSA, D-13, p. NP0141).

8.      Under the MSA, NPAS provides "Early Out Collections" for St. Mark's Hospital, which are defined as: "Collection of early stage, non-delinquent balances that are due from the patient/guarantor.  Unless prohibited by State law, Service Provider performs these services in the name of the hospital or physician."  (Wright Decl., D-1, ¶ 6; MSA, D-13, p. NP0147).

9.      As part of the services that HSS provides for St. Mark's Hospital, it contracts certain services with NPAS via the ISA.  (Wright Decl., D-1, ¶ 7).

10.      Under the terms of the ISA, NPAS agreed to provide "early out" collection services to facilities, including St. Mark's Hospital.  (Wright Decl., D-1, ¶ 8; ISA, D-14, § 3.1, p. NP0120).

11.      The "early out" collection services provided by NPAS pursuant to the ISA are provided "as an extension of the Client Hospital's business office and not as a 'debt collector' as that term is defined under the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") and analogous state laws."  (Wright Decl., D-1, ¶ 9; ISA, D-14, § 3.2, p. NP0121).

12.      Indeed, the ISA expressly provides that:

Because NPAS, Inc. is providing services on current patient accounts, which are not in default at the time that they are obtained by NPAS, Inc., NPAS, Inc. is not a

debt collector within the meaning of the FDCPA and analogous state laws. HSS understands and agrees that NPAS, Inc. is in the business of servicing accounts that are not in default when NPAS, Inc. takes responsibility for the accounts, and that NPAS, Inc. cannot render services to HSS on Defaulted Accounts.

(Wright Decl., D-1, ¶ 10; ISA, D-14, § 7.1, p. NP0122).

13.     In order to ensure NPAS' status as solely a provider of "early out" collection services, HSS warranted that "it will not place with, transmit to, assign, or otherwise provide to NPAS, Inc. for servicing any Defaulted Accounts" and that HSS would not establish or maintain any practices or procedures "that are inconsistent with the exclusion of NPAS, Inc. as a debt collector, as defined in the FDCPA…" (Wright Decl., D-1, ¶ 11; ISA, D-14, § 7.2, p. NP0122).

14.     As part of the ISA, NPAS "relie[s] upon HSS's representations that any accounts transmitted to NPAS, Inc. for servicing are not in default at the time they are transmitted to NPAS, Inc." (Wright Decl., D-1, ¶ 12; ISA, D-14, § 7.3, p. NP0123).

## ARGUMENT

### I.     Standard For Summary Judgment.

A motion for summary judgment is granted "when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1192-93 (D. Utah 2013) (quoting Fed. R. Civ. P. 56(a)). "In applying this standard, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ditty v. CheckRite*, 973 F. Supp. 1320, 1326 (D. Utah 1997).

"The initial burden of production under Rule 56(c) is on the moving party." *Thompson v. Dulaney*, 838 F. Supp. 1535, 1539 (D. Utah 1993). "That party must make a sufficient 'showing' to the trial court that there is an absence of evidence to support the non-moving party's case." *Id.* at 1539 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The movant

satisfies its burden by producing evidence that is admissible as to content, not form, identifying those portions of the record, including the pleadings and any material obtained during discovery, that demonstrate the absence of any genuine issues of material fact." *Id.*

In the present case, Plaintiff has not met her burden of production under Rule 56(c) of the Federal Rules of Civil Procedure, in that she has not produced evidence which demonstrates the absence of any genuine issue of material fact.  Indeed, Plaintiff has produced no evidence that NPAS is a "debt collector" as that term is defined under the FDCPA.  Moreover, even were this not the case, Plaintiff's self-serving mischaracterizations of the record—which, in almost every instance, seek to collapse all the different accounts serviced by Defendants into one amorphous omnibus account—fail to demonstrate the absence of any genuine issue of material fact. Accordingly, Plaintiff's Motion should be denied.

## II.     Plaintiff Has Failed To Demonstrate The Absence Of Any Genuine Issue Of Material Fact Regarding Whether NPAS Is A "Debt Collector" Under The FDCPA.

Though (strategically) omitted by Plaintiff, an essential element of Plaintiff's FDCPA claim against NPAS is that NPAS is a "debt collector" under the FDCPA.  *Frone v. JP Morgan Chase & Co.*, 2017 U.S. App. LEXIS 9914, at *6 (11th Cir. June 5, 2017).  Here, it is uncontroverted that: NPAS is not a debt collection company or in the business of collecting defaulted medical consumer debts (SUMF, ¶¶ 1-2); NPAS is not a "debt collector" and not subject to the requirements of the FDCPA (SUMF, ¶ 3); and NPAS is not required to comply with the FDCPA because it does not meet the definition of a "debt collector" under the FDCPA (SUMF, ¶ 4).

The FDCPA provides the following definition of a "debt collector" subject to its provisions:

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

*See* 15 U.S.C.S. § 1692a(6).  However, the FDCPA goes on to exclude from the definition of "debt collector" "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity … (iii) concerns a debt which was not in default at the time it was obtained by such person."  *See* 15 U.S.C.S. § 1692a(6)(F)(iii); *Gonzalez v. Wells Fargo Bank, N.A.*, No. 2:12-cv-00286-DN, 2013 U.S. Dist. LEXIS 80245, at *3 (D. Utah June 4, 2013).

Thus, NPAS is not a debt collector for FDCPA purposes if Plaintiff's debts were not in default at the time NPAS obtained it.  *Church v. Accretive Health, Inc.*, No. 14-0057-WS-B, 2015 U.S. Dist. LEXIS 158476, at *30 (S.D. Ala. Nov. 24, 2015); *see also Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1314 (11th Cir. 2015) ("Subsection (F)(iii) excludes any person who is collecting or attempting to collect on any debt owed or due another from the term "debt collector" if the debt was not in default at the time it was acquired. ... Thus, a person who otherwise meets the definition of "debt collector" may be excluded from the term if he obtained a debt from another, he is collecting the debt for another, and the debt was acquired prior to default."); *Fenello v. Bank of Am., NA*, 577 F. App'x 899, 902 (11th Cir. 2014) ("In this case, the district court correctly concluded that Bank of America was not a 'debt collector' for purposes of § 1692g(b) because its debt collection activities involved a debt that was not in default at the time Bank of America became the servicer."); *Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 457 (6th Cir. 2013) (concluding that a servicer was not a "debt collector" within the meaning of

the FDCPA because the defendant began servicing the loan before it was in default); *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) (same).

The dispositive question for Plaintiff's FDCPA claim against NPAS is therefore whether the alleged debts were "in default" when they were assigned to NPAS. *See Ruth v. Triumph Partnerships*, 577 F.3d 790, 796 (7th Cir. 2009) ("Where, as here, the party seeking to collect a debt did not originate it but instead acquired it from another party, we have held that the party's status under the FDCPA turns on whether the debt was in default at the time it was acquired.").

As an initial matter, "[i]n applying the FDCPA, courts have repeatedly distinguished between a debt that is in default and a debt that is merely outstanding, **emphasizing that only after some period of time does an outstanding debt go into default**." *Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 82, 86 (2d Cir. 2003) (emphasis added); *see, e.g., Jones v. InTuition, Inc.*, 12 F. Supp. 2d 775, 779 (W.D. Tenn. 1998) ("Prior to the default period, the unpaid loan installment is considered delinquent."). "Thus, case law rejects the proposition that 'default occurs *immediately* after a debt becomes due.'" *Church*, 2015 U.S. Dist. LEXIS 158476, at *32 (quoting *Alibrandi*, 333 F.3d at 86). The FDCPA's "legislative history is consistent with construing 'in default' to mean a debt that is **at least delinquent**, and sometimes more than overdue." *De Dios v. Int'l Realty & RC Invs.*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011) (emphasis added). The legislative intent behind the "not in default" exception to FDCPA has been described by the Third Circuit as follows:

> If the loan is current when it is acquired, the relationship between the assignee and the debtor is, for purposes of regulating communications and collections practices, effectively the same as that between originator and the debtor. If the loan is in default, no ongoing relationship is likely and the only activity will be collection.

*F.T.C. v. Check Investors, Inc.*, 502 F.3d 159, 174 (3rd Cir. 2007) (quoting *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 538 (7th Cir. 2003); *see also Ruth v. Triumph P'Ships*, 577 F.3d 790, 797 (7th Cir. 2009) ("The purchaser of an already-defaulted debt—like the debt collector, and unlike the originator and servicer of a non-defaulted debt—has no ongoing relationship with the debtor and, therefore, no incentive to engender good will by treating the debtor with honesty and respect.").

The factual circumstances of this case demonstrate, or at least create a genuine issue of material fact, that the debts were not in default at the time they were placed with NPAS. On July 22, 2014, Account No. 500924860 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on June 3, 2014. (SAUMF, ¶ 1). This means the debt was placed with NPAS forty-nine (49) days after services were rendered to Plaintiff by St. Mark's hospital. (*Id*.). On February 27, 2015, Account No. 500904683 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 23, 2014. (SAUMF, ¶ 2). This means the debt was placed with NPAS two-hundred-eighty (280) days after services were rendered to Plaintiff by St. Mark's hospital. (*Id*.). On June 11, 2015, Account No. 501451437 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on February 23, 2015. (SAUMF, ¶ 3). This means the debt was placed with NPAS one-hundred-eight (108) days after services were rendered to Plaintiff by St. Mark's Hospital. (*Id*.). On December 28, 2015, Account No. 501934604 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on November 2, 2015. (SAUMF, ¶ 4). This means the debt was placed with NPAS fifty-six (56) days after services were rendered to Plaintiff by St. Mark's Hospital. (*Id*.). On February 29, 2016, Account No. 502106966 was placed with NPAS for services performed by St. Mark's

Hospital for Plaintiff on February 2, 2016.  (SAUMF, ¶ 5).  This means the debt was placed with NPAS twenty-two (22) days after services were rendered to Plaintiff by St. Mark's Hospital. (*Id*.).  Finally, on August 2, 2016, Account No. 502361159 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 29, 2016.  (SAUMF, ¶ 6).  This means the debt was placed with NPAS sixty-six (66) days after services were rendered to Plaintiff by St. Mark's Hospital.  (*Id*.).

None of the foregoing lengths of time foreclose the existence of a genuine issue of material fact regarding whether NPAS is a "debt collector" under the FDCPA.  Indeed, the Second Circuit has undertaken a review of numerous federal regulations which, although they "reflect inconsistent periods of time preceding default, they all agree that default does not occur until *well after* a debt becomes outstanding."  *Alibrandi*, 333 F.3d at 87 (emphasis added) (citing 7 C.F.R. § 762.141(a) (1999) (30 days for farm loans); 12 C.F.R. § 336.3(c) (1999) (90 days for loans by federal insured depository institutions to Federal Deposit Insurance Corporation employees); 34 C.F.R. § 682.200(b) (1998) (180 days for unpaid loan installments under the Federal Family Education Loan Program); 34 C.F.R. § 685.102(b) (1999) (270 days for certain student loans)).

The existence of a genuine issue of material fact is further elusive where, as here, there are agreements (the ISA and MSA) which specifically limit the services provided by NPAS to St. Mark's Hospital from meeting the definition of a "debt collector" under the FDCPA.  Indeed, under the MSA, NPAS and HSS are both affiliates of Parallon Business Solutions, LLC, who provide services to St. Mark's hospital.  (SUMF, ¶¶ 5-6).  Under the MSA, NPAS provides "Early Out Collections" for St. Mark's Hospital, which are defined as: "Collection of early stage,

non-delinquent balances that are due from the patient/guarantor. (SUMF, ¶ 7). As part of the services that HSS provides for St. Mark's Hospital, it contracts certain services out to NPAS via the ISA. (SUMF, ¶ 9). Under the terms of the ISA, NPAS agreed to provide "early out" collection services to facilities, including St. Mark's Hospital. (SUMF, ¶ 10). The "early out" collection services provided by NPAS for Midtown Medical Center pursuant to the ISA are provided "as an extension of the Client Hospital's business office and not as a 'debt collector' as that term is defined under the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") and analogous state laws." (SUMF, ¶ 11). Indeed, the ISA expressly provides that:

> Because NPAS, Inc. is providing services on current patient accounts, which are not in default at the time that they are obtained by NPAS, Inc., NPAS, Inc. is not a debt collector within the meaning of the FDCPA and analogous state laws. HSS understands and agrees that NPAS, Inc. is in the business of servicing accounts that are not in default when NPAS, Inc. takes responsibility for the accounts, and that NPAS, Inc. cannot render services to HSS on Defaulted Accounts.

(SUMF, ¶ 12). Furthermore, in order to ensure NPAS' status as solely a provider of "early out" collection services, HSS warranted that "it will not place with, transmit to, assign, or otherwise provide to NPAS, Inc. for servicing any Defaulted Accounts" and that HSS would not establish or maintain any practices or procedures "that are inconsistent with the exclusion of NPAS, Inc. as a debt collector, as defined in the FDCPA…" (SUMF, ¶ 13). Accordingly, NPAS "relie[s] upon HSS's representations that any accounts transmitted to NPAS, Inc. for servicing are not in default at the time they are transmitted to NPAS, Inc." (SUMF, ¶ 14).

Based upon the uncontroverted facts set forth above, Plaintiff is unable to demonstrate the absence of a genuine issue of material fact regarding her threshold burden of proof that NPAS has violated the FDCPA: that NPAS is a "debt collector" as that term is defined in the

FDCPA.  The genuine issues of material fact on this point, set forth above, require that Plaintiff's Motion be denied.

**III.     Plaintiff Has Failed To Demonstrate The Absence Of Any Genuine Issue Of Material Fact Regarding Whether Defendants Have Violated The FDCPA.**

In support of her contention that Defendants (generally) violated the FDCPA, Plaintiff alleges that Defendants (1) attempted to collect debts not permitted by law; (2) employed false representations or deceptive means to collect the debts; (3) communicated with Plaintiff after notification of attorney representation; and (4) communicated with Plaintiff after receiving Plaintiff's refusal to pay the debts, all in violation of the FDCPA.  *See* Motion, pp. 14, 16, 19, and 21.

Notably, Plaintiff provides no actual evidence that the unpaid medical debts, which she asserts as grounds for her FDCPA claims, are actually debts regarding which the law prohibits Defendants from taking certain actions.  This oversight jeopardizes *half* of Plaintiff's alleged grounds for a violation of the FDCPA.

Each of these alleged violations rests on Defendants undertaking prohibited conduct on a specific account *after* receiving a certain type of notification (whether of worker's compensation coverage, attorney representation or refusal to pay).  Shockingly, Plaintiff's own deposition testimony seems to suggest that Defendants should simply know (without notification from her or third parties) that all of her unpaid medical debts are subject to coverage by worker's compensation:

> Q:     Is it your position that any debt—any treatment that you received by— received at St. Mark's, that NPAS and Medicredit should know that that treatment is related to your workers' comp claim?
>
> A:     Yes.

(Young Dep., D-6, p. 102:13-17; *see also id*. at pp. 103:1-107:14).  Regardless, and presumably because Plaintiff cannot demonstrate a requisite notification and ensuing violative action on the *same* account, she drafts her Motion to specifically ignore the various accounts, each referencing a different unpaid medical debt, and attempts to blur the record before this Court in her favor.

Indeed, as set forth in the foregoing responses to Plaintiff's "undisputed material facts," Plaintiff's entire Motion is based upon a mischaracterization of the record.  Simply stated, Plaintiff attempts to characterize the numerous accounts serviced by Defendants as one, large and amorphous, omnibus debt.  In fact, the conduct undertaken by Defendants with regard to Plaintiff relates to numerous debts, separated by differing service dates, placement dates, amounts and internal account numbers.  The reason for Plaintiff's mischaracterization is obvious: Plaintiff's theory that Defendants violated the FDCPA requires that the communications received by Defendants on certain accounts be construed as notifications for *other* and even *future* accounts (accounts for which Defendants received no notification of litigation, attorney representation or worker's compensation coverage and, therefore, accounts on which Defendants appropriately took action).  Because Plaintiff has presented no case law to support the position that a notification of worker's compensation coverage (or attorney representation) for one alleged medical debt applies to all future medical debts, Plaintiff instead employs the fiction that all of Plaintiff's different medical debts are all one debt for the purposes of her FDCPA claim. The FDCPA does not treat multiple debts and notifications regarding the same so cavalierly. *See, e.g., Camacho v. Bridgeport Fin., Inc.,* 430 F.3d 1078, 1082 (9th Cir. 2005) ("Additionally, if a consumer owes multiple debts and makes a payment, the debt collector is prohibited from applying such payment to a debt which is in dispute."); *see also Hennington v. Am. Express Co.,*

2010 U.S. Dist. LEXIS 29597, at *10 (S.D. Miss. Mar. 29, 2010) (noting that "imputed and/or constructive knowledge are not legally cognizable under § 1692c(a)(2)" and "had Congress intended to adopt what amounts to constructive knowledge, it would have presumably stated that liability exists when the defendant knew *or should have known* of the representation") (emphasis in original).  As set forth below, this is without support (as well as patently untrue) and thus Plaintiff cannot demonstrate the absence of a genuine issue of material fact regarding whether Defendants have violated the FDCPA.

> **A.** **NPAS Serviced Multiple Debts Resulting From Plaintiff's Unpaid Medical Bills.**

Even if this Court were to find that there were no genuine issues of material fact regarding whether NPAS was a "debt collector" under the FDCPA, Plaintiff has still not demonstrated that she is entitled to summary judgment against NPAS because she refused to properly characterize the record before this Court with specific attention to the numerous accounts serviced by NPAS.

On July 22, 2014, a debt of $431.76 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on June 3, 2014, i.e., Acct. 500924860.  (SAUMF, ¶ 1).  On February 27, 2015, a debt of $2,539.88 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 23, 2014, i.e. Acct. 500904683 (SAUMF, ¶ 2).  On June 11, 2015, a debt of $181.05 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on February 23, 2015, i.e. Acct. 501451437.  (SAUMF, ¶ 3).  On December 28, 2015, a debt of $952.04 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on November 2, 2015, i.e., Acct. 501934604.  (SAUMF, ¶ 4). On February 29, 2016, a debt of $847.36 was placed with NPAS for services performed by St. Mark's

Hospital for Plaintiff on February 2, 2016, i.e., Acct. 502106966.  (SAUMF, ¶ 5).  Finally, on August 2, 2016, a debt of $713.89 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on May 29, 2016, i.e., Acct. 502361159.  (SAUMF, ¶ 6).  Thus, NPAS serviced six (6) accounts regarding Plaintiff's unpaid medical bills, each with different service dates, placement dates, amounts and internal account numbers.  (SAUMF, ¶¶ 1-6).

Because Plaintiff refuses to acknowledge the complexity of debts serviced by NPAS, she is unable to employ the record, with accuracy and specificity, to demonstrate the absence of a genuine issue of material fact regarding whether NPAS violated the FDCPA.  The following are example of how Plaintiff's disengagement with the record (chiefly her refusal to acknowledge the multiple accounts at issue) frustrate her ability to foreclose genuine issues of material fact as to NPAS's alleged violation of the FDCPA:

First, Plaintiff's claim that NPAS knew, as of September 29, 2014, that Plaintiff's medical treatments were covered by worker's compensation is based on account notes for Acct. 500924860.  Notably, Plaintiff never states or cites evidence that indicates NPAS thereafter contacted Plaintiff on this specific account.

Second, Plaintiff's claims that NPAS knew, as of October of 2015, that the alleged debts were the subject of litigation and that Plaintiff was represented by an attorney (are erroneous, as set forth above, but nevertheless) are based upon account notes for Acct. 501451437.  Notably, Plaintiff never states or cites evidence that indicates NPAS thereafter contacted Plaintiff on this specific account.

Third, with regard to Acct. 501934604 and Acct. 502106966, Plaintiff cites two letters from her counsel dated May 13, 2016, which expressly reference each of these accounts and

advise NPAS of attorney representation and worker's compensation coverage. However, Plaintiff's complaints regarding improper collection efforts on January 19, 2016; February 3, 2016; and March 9, 2016 also rely on evidence from account notes for these two accounts (before the May 13, 2016 letter was sent). Stated differently, the conduct complained of was undertaken on two accounts which Plaintiff's counsel had yet to advise NPAS involved attorney representation and/or worker's compensation coverage.

Fourth, Plaintiff's claim that NPAS knew, as of November 23, 2015, that the alleged debts were covered by worker's compensation and that Plaintiff was represented by an attorney, is based on account notes for Acct. 500904683. Notably, Plaintiff fails to allege but *does* cite to evidence that NPAS contacted Plaintiff on this specific account: the letter to Plaintiff dated May 17, 2016 was sent on Acct. 500904683. However, the May 17, 2016 letter to Plaintiff is an "Attorney Representation Form" which seeks to obtain confirmation about Plaintiff's attorney so that NPAS could thereafter communicate with Plaintiff's attorney. This letter was <u>not</u> an attempt to collect a debt.

Finally, Plaintiff claims that NPAS attempted to collect the "alleged debts" with letters dated August 26, 2016; September 23, 2016; and October 24, 2016. Each of these letters was expressly limited to Acct. 502361159. Notably, Plaintiff never states or cites evidence that indicates NPAS was notified and/or had knowledge of litigation, attorney representation or worker's compensation coverage for Acct. 502361159.

These examples are not exhaustive, but they are dispositive. A nuanced approach to the record before this Court on Plaintiff's Motion, which acknowledges the different debts and accounts which comprise NPAS's records and correspondences, actually compels the conclusion

that NPAS did not violate the FDCPA as a matter of law and, at the very least, shows that Plaintiff cannot demonstrate the absence of any genuine issue of material fact regarding whether NPAS violated the FDCPA.  Thus, even if the unlikely event that this Court finds that there is no genuine issue of material fact regarding whether NPAS is a "debt collector" under the FDCPA, denial of Plaintiff's Motion is still appropriate where, as here, Plaintiff cannot demonstrate that NPAS acted improperly with specific regard to each of the accounts it serviced.  Accordingly, the Motion should be denied.

**B.   Medicredit Serviced Multiple Debts Resulting From Plaintiff's Unpaid Medical Bills.**

On October 11, 2014, Acct. 500904683 was first placed with Medicredit.  (SAUMF, ¶ 7). On February 5, 2016, Acct. 501451437 was first placed with Medicredit.  (SAUMF, ¶ 8).  On March 4, 2016, Acct. 501934604 was first placed with Medicredit.  (SAUMF, ¶ 9).  On April 25, 2016, Acct. 502106966 was first placed with Medicredit.  (SAUMF, ¶ 10).  Thus, similar to NPAS, Medicredit serviced four (4) accounts regarding Plaintiff's unpaid medical bills, each with different service dates, placement dates, amounts owed and internal account numbers. (SAUMF, ¶¶ 7-10).

Also similar to Plaintiff's burden with regard to NPAS, Plaintiff's refusal to tailor her allegations to the specific accounts at-issue in this litigation prevent her from using the record to demonstrate the absence of a genuine issue of material fact regarding whether Medicredit violated the FDCPA.  The following are examples of how Plaintiff's mischaracterization of the record dooms her attempt to foreclose genuine issues of material fact as to whether Medicredit allegedly violated the FDCPA:

First, Plaintiff's claim that Medicredit knew, as of October 11, 2014, that Plaintiff's medical treatments were covered by worker's compensation is impossible.   Only Acct. 500904683 has been placed with Medicredit by that date.   Further, Medicredit's records do not support Plaintiff's contention that it knew that Acct. 500904683 was covered by worker's compensation as of October 11, 2014.

Second, Plaintiff's claim that Medicredit knew, as of February 5, 2016, that Plaintiff had attorney representation and that liability of the alleged debts was the subject of litigation is impossible.   Indeed, only Acct. 500904683 and Acct. 501451437 had been placed with Medicredit by that date.   Further, Medicredit's records do not support Plaintiff's contention that it knew that Acct. 500904683 or 501451437 were subject to attorney representation or the subject of litigation as of February 5, 2016.

Third, with regard the alleged reports and updates made to Transunion by Medicredit, each of these reports and/or updates were expressly limited to Acct. 501934604 and Acct. 502106966.   Notably, Plaintiff never states or cites evidence that indicates Medicredit was notified and/or had knowledge of litigation, attorney representation or worker's compensation coverage for Acct. 501934604 and Acct. 502106966.

Finally, with regard to Plaintiff's allegation that her attorney notified Medicredit of representation on July 5, 2016, the letter from Plaintiff's counsel was expressly limited to Acct. 500904683, Acct. 502106966 and Acct. 501943604.   Notably, Plaintiff never states or cites evidence that indicates Medicredit thereafter contacted Plaintiff on these specific accounts after recording receipt of this letter.

Again, these examples are not exhaustive, but they are dispositive.  Plaintiff's refusal to acknowledge the specific accounts serviced by Medicredit, distinguished by amount, placement date, service date and even account reference numbers (located on the very records Plaintiff cites), prevents her from maintaining a credible account that demonstrates the absence of a genuine issue of material fact.  Accordingly and on this point, the Motion should be denied.

## **CONCLUSION**

A nuanced approach to the record before this Court on Plaintiff's Motion, which acknowledges the different debts and accounts which comprise Defendants' records and correspondences, actually compels the resolution that Defendants did not violate the FDCPA as a matter of law and, at the very least, shows that Plaintiff cannot demonstrate the absence of any genuine issue of material fact regarding whether Defendants violated the FDCPA.  Thus at this stage in the litigation, Plaintiff's Motion should be denied.

DATED this 7th day of November, 2017.

Respectfully submitted,

SPENCER FANE LLP

/s/ Jamie N. Cotter
Jamie N. Cotter
*Attorneys for Defendants Medicredit, Inc. and NPAS, Inc.*

## CERTIFICATE OF MAILING

I hereby certify that on the 7th day of November, 2017, I caused a true and correct copy of the foregoing **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** to be electronically served by the Court on all parties.

Lester A. Perry
HOOLE & KING
4276 South Highland Drive
Salt Lake City, Utah 84124

Eric Stephenson
Stephenson Law Firm
299 S. Main Street, Suite 1300
Salt Lake City, Utah 84111

/s/ Jamie Cotter