Scott Dickenson (pro hac vice)
Jamie Cotter (pro hac vice)
Arthur Gregg (pro hac vice)
SPENCER FANE LLP
Attorneys for Defendants
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203-4554
Telephone: 303-839-3800
Facsimile:  303-839-3838
sdickenson@spencerfane.com
jcotter@spencerfane.com
agregg@spencerfane.com

Christian S. Collins (8452)
Christopher S. Hill (9931)
KIRTON McCONKIE
Attorneys for Defendants
36 South State Street, Suite 1900
Salt Lake City, Utah 84111
Telephone: (801) 328-3600
Facsimile: (801) 321-4893
ccollins@kmclaw.com
chill@kmclaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | | |
|---|---|---|
| ROBYN YOUNG, | : | |
| | : | **DEFENDANTS' MOTION FOR** |
| Plaintiff, | : | **PARTIAL SUMMARY JUDGMENT** |
| | : | **ON ACTUAL DAMAGES** |
| v. | : | **AND MEMORANDUM IN** |
| | : | **SUPPORT THEREOF** |
| NPAS, INC., and MEDICREDIT, INC., | : | |
| | : | Case No. 2:16-cv-01104-CW-EFJ |
| Defendants. | : | |
| | | Judge Clark Waddoups |

STL 2606863.2

COME NOW Defendants NPAS, Inc. and Medicredit, Inc. (respectively, "NPAS" and "Medicredit," and collectively, "Defendants") and respectfully move this Court for partial summary judgment in their favor and against Plaintiff Robyn Young ("Plaintiff") on her claim that she sustained actual damages from Defendants' alleged violations of the Federal Debt Collection Practices Act, 15 U.S.C. §§ 1692, et seq. (the "FDCPA") and the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, et seq. (the "UCSPA").[1]

## INTRODUCTION AND RELIEF SOUGHT

Plaintiff claims that Defendants have violated the both the FDCPA and the UCSPA. Both the FDCPA and UCSPA have provisions which authorize this Court to award actual damages, suffered by Plaintiff and which are directly and proximately caused by Defendants' alleged violations.  *See* 15 U.S.C.A. § 1692k(a)(1); Utah Code Ann. § 13-11-19(4)(a).  However, the evidence adduced thus far in this case, from Plaintiff, her friends and family, her former attorney and her medical providers reveals that Plaintiff has no *actual* damage resulting from the conduct undertaken by Defendants, whether in violation of federal and state law or not.  Indeed, the emotional distress (and symptoms manifesting the same) suffered by Plaintiff are from events preceding Defendants' collection efforts.   Specifically, Plaintiff's harms emanate from two attacks she suffered in Spring of 2014 and Spring of 2015.  Plaintiff tries to bootstrap these

---

[1] Contemporaneously herewith, NPAS is also filing its Motion for Partial Summary Judgment and Memorandum in Support Thereof which is solely limited to the issue of whether NPAS is a "debt collector" under the provision of the FDCPA.  Counsel for Defendants is aware of this Court's local rule requesting that parties "should endeavor to address all summary judgment issues in a single issue."  *See* DUCivR 56-1(b)(1).  However, in the present case, NPAS has not solely filed more than one motion for summary judgment.  *Id.*  Nor is this an attempt by NPAS to circumvent the length requirements set forth in the local rules, in that both motions are less than forty (40) pages combined.  *See* DUCivR 56-1(b)(1).  Counsel for Defendants therefore believes these filings comply with the letter and spirit of the local rules.  In the event this Court does not find these filings to be compliant, counsel for Defendants will split and consolidate these motions, delineating between NPAS and Medicredit, as this Court prefers.

continuing damages onto the alleged misconduct of Defendants.  However, Plaintiff can only say (at best) that her emotional damages are "intertwined" with the symptoms and damages she suffered from those former attacks.  Accordingly, Plaintiff cannot specify or prove emotional damages with the requisite certainty required by law.  In light of the foregoing, this Court should enter partial summary judgment in Defendants favor and against Plaintiff on her claim for actual damages for violations of the FDCPA and UCSPA.

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Rule 56-1(b)(3) of the Rules of Practice of the United States District Court for the District of Utah, NPAS submits the following statements for its Statement of Undisputed Material Facts:

**I.     PLAINTIFF IS ATTACKED BY STUDENTS**

1.      Plaintiff was employed with Granite School District as a teacher for special needs children, including children with severe autism.  (*See* First Amended Complaint, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-1, ¶ 5).

2.      In the Spring of 2013, Plaintiff was attacked by one of her students and suffered a concussion.  (*See* First Amended Complaint, D-1, ¶ 7).

3.      In the Spring of 2014, Plaintiff was again attacked by a different student.  (*See* First Amended Complaint, D-1, ¶ 9).

4.      As a result of these two attacks, Plaintiff suffered from intermittent (1) migraine headaches; (2) partial paralysis; (3) sensitivity to light; and (4) blurry vision.  (*See* First Amended Complaint, D-1, ¶ 10).

STL 2606863.2

5.    As a result of these two attacks, Plaintiff filed a worker's compensation claim with the State of Utah against Granite School District.  (*See* First Amended Complaint, D-1, ¶ 12).

## II.    PLAINTIFF SEEKS TREATMENT FROM ST. MARK'S HOSPITAL AND FAILS TO PAY THE AMOUNTS DUE AND OWING

6.    As part of her treatment for the attacks of 2013 and 2014, Plaintiff subsequently sought treatment at St. Mark's Hospital on the following dates: [1] May 23, 2014; [2] June 3, 2014; [3] February 23, 2015; [4] November 2, 2015; [5] February 2, 2016; and [6] May 29, 2016.  (*See* Declaration of Don Wright ("Wright Decl."), a true and accurate copy of which is attached to the accompanying appendix of evidence as D-2, at ¶¶ 14-19).

7.    With regard to each of treatments received by Plaintiff from St. Mark's Hospital on the foregoing dates, Plaintiff failed to pay the entire amount due and owing for such treatment and the resulting debt was placed with NPAS.  (Wright Decl., D-2, ¶¶ 14-19).

## III.    THE ACCOUNTS ARE PLACED WITH NPAS AND THEN MEDICREDIT

8.    For Plaintiff's treatment received from St. Mark's Hospital on May 23, 2014, a debt of $2,539.88 was placed with NPAS on February 27, 2015 and assigned the account number 500924860 (the "May 23, 2014 Debt").  (Wright Decl., D-2, ¶ 15).

9.    For Plaintiff's treatment received from St. Mark's Hospital on June 3, 2014, a debt of $431.76 was placed with NPAS on July 22, 2014 and assigned the account number 500924860 (the "June 3, 2014 Debt").  (Wright Decl., D-2, at ¶ 14).

10.    For Plaintiff's treatment received from St. Mark's Hospital on February 23, 2015, a debt of $181.05 was placed with NPAS on June 11, 2015 and assigned the account number 501451437 (the "February 23, 2015 Debt").  (Wright Decl., D-2, ¶ 16).

STL 2606863.2

11.     For Plaintiff's treatment received from St. Mark's Hospital on November 2, 2015, a debt of $952.04 was placed with NPAS on December 28, 2015 and assigned the account number 501934604 (the "November 2, 2015 Debt").  (Wright Decl., D-2, ¶ 17).

12.     For Plaintiff's treatment received from St. Mark's Hospital on February 2, 2016, a debt of $847.36 was placed with NPAS on February 29, 2016 and assigned the account number 502106966 (the "February 2, 2016 Debt").  (Wright Decl., D-2, ¶ 18).

13.     For Plaintiff's treatment received from St. Mark's Hospital on May 29, 2016, a debt of $713.89 was placed with NPAS on August 2, 2016 and assigned the account number 502361159 (the "May 29, 2016 Debt").  (Wright Decl., D-2, ¶ 19).

14.     On October 11, 2014, the May 23, 2014 Debt was first placed with Medicredit. (*See* Medicredit Account Notes, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-3).

15.     On February 5, 2016, the February 23, 2015 Debt was first placed with Medicredit.  (Medicredit Account Notes, D-3).

16.     On March 4, 2016, the November 2, 2015 Debt was first placed with Medicredit. (Medicredit Account Notes, D-3).

17.     On April 25, 2016, the February 2, 2016 Debt was first placed with Medicredit. (Medicredit Account Notes, D-3).

## IV.    PLAINTIFF FILES SUIT AND DISCLOSES WITNESSES

18.     Plaintiff filed the present lawsuit on October 4, 2016.  (*See* Complaint, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-4).

STL 2606863.2

19.    In her subsequently filed First Amended Complaint, Plaintiff alleged the following with regard to her damages:

    a.    [t]he actions of Medicredit and NPAS caused emotional distress to Ms. Young, increased the number and severity of the migraines suffered by her and caused problems with Ms. Young's relationship with other members of her family;

    b.    [t]he actions of Medicredit and NPAS also caused Ms. Young to suffer from panic attacks, depression, fear, confusion, sadness, a sense of hopelessness that the collections would not stop, a sense of injustice, and a sense of helplessness given that even her attorneys could not stop NPAS and Medicredit from collecting the St. Marks debts from her;

    c.    Ms. Young's emotional distress manifested physically through, among other things, crying, sleeplessness, nausea, withdrawal from loved ones, migraines, and increase in the severity and frequency of her migraines; [and]

    d.    [e]ven upon merely seeing the NPAS or Medicredit information on her caller ID or hearing the recorded announcements from NPAS or Medicredit on her telephone caused Ms. Young to suffer from panic attacks, nausea, fear, confusion, a sense of hopelessness, a sense of helplessness, and other forms of emotional distress.

(*See* First Amended Complaint, D-1, ¶¶ 45-48).

20.    On July 7, 2017, Plaintiff served her Amended Initial Disclosures upon Defendants.  (*See* Plaintiff's Amended Initial Disclosures, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-5 and incorporated herein by reference).

21.    Plaintiff disclosed herself as an individual with knowledge of her damages claim: "She has knowledge about the impact the Defendants' collection actions had on the Plaintiff and the various damages she incurred."  (*See* Plaintiff's Amended Initial Disclosures, D-5, pp. 1-2).

STL 2606863.2

22.     Plaintiff also disclosed eleven (11) additional people to speak about her damages. (*See* Plaintiff's Amended Initial Disclosures, D-5, pp. 2-4).

23.     Plaintiff disclosed [1] Aubrey Broome, [2] Timothy Young, [3] Janet Perry, [4] Melissa Perry, [5] Zach Perry, [6] Shannon Garner, [7] Jesse Solorzano, as family and friends with knowledge and information about her damages: "This witness may have knowledge and information about the impact the Defendants' collection actions had on the Plaintiff."   (*See* Plaintiff's Amended Initial Disclosures, D-5, pp. 2-3).

24.     Plaintiff further disclosed [8] Dawn Atkin, as her attorney with knowledge and information about her damages: "This witness also has information about the various damages Plaintiff has incurred."   (*See* Plaintiff's Amended Initial Disclosures, D-5, p. 3).

25.     Plaintiff also disclosed [9] Katherine Freeman, [10] Dr. David Peterson and [11] Dr. Richard Glines as medical professionals with knowledge and information about her damages: "This witness may have knowledge and information concerning Plaintiff's mental and emotional distress, anxiety, depression, sleeplessness, headaches, nausea, pain, and other various damages Plaintiff has incurred."   (*See* Plaintiff's Amended Initial Disclosures, D-5, p. 3).

## V.     THE SWORN TESTIMONY OF PLAINTIFF

26.     With regard to her alleged damages, Plaintiff testified that none of her treatment at St. Mark's Hospital can be traced solely to the conduct of Defendants:

Q.     Have you had any treatment from St. Mark's Hospital that you would attribute solely to the damages that you say you have suffered as a result of NPAS and Medicredit?

A.     Solely?

STL 2606863.2

7

Q.      That's right.

A.      Just that?

Q.      Just that.

A.      I can't -- I don't know. I can't say. Because I do get treated for migraines and I

        did get hurt. But with the reoccurring migraines and everything, I do have to

        continue with my Botox and procedures with – with St. Mark's.  So for me,

        Granite School District and the collections and everything is intertwined for me.

(*See* Deposition of Robyn E. Young ("Young Dep."), attached to the accompanying appendix of

evidence at D-6, p. 40:1-14).

27.      Accordingly, Plaintiff testified there were no specific dates on which she saw her

therapist, Katherine Freeman solely for the conduct of Defendants.  (Young Dep., D-6, p. 51:15-

18).

28.      Plaintiff further testified there were no specific dates on which she saw her

neurologist, Dr. David Peterson, solely for the conduct of Defendants.  (Young Dep., D-6, p.

52:12-15).

29.      Plaintiff also testified there were no specific dates on which she saw her pain

doctor, Dr. Richard Glines, solely for the conduct of Defendants.   (Young Dep., D-6,

pp. 52:25-53:3).

30.      Plaintiff testified that the physical symptoms manifesting her anxiety "increased"

from the conduct of Defendant:

Q.      It's my understanding that all of these things were happening prior to NPAS and

        Medicredit as well?

STL 2606863.2

A.    Yes. Not -- when -- whenever I get a call or a letter or something, they would
increase. So -- but yes, they were.

(*See* Yong Dep., D-6, p. 45:1-5).

## VI.    THE SWORN TESTIMONY OF THE FAMILY AND FRIENDS

31.    With regard to Plaintiff's alleged damages, Aubrey Broome testified that Plaintiff
was agitated and emotional as a result of Defendants' conduct.  (*See* Deposition of Aubrey B.
Wheat ("Broome Dep."), attached to the accompanying appendix of evidence as D-7, p. 28:13-
24).

32.    However, Ms. Broome could not isolate the stress and agitation, which allegedly
occurred as a result of Defendants' conduct, from other circumstances in Plaintiff's life:

Q.    [W]ere there other things in Ms. Young's life at that time -- so I'm talking in the
2016 area -- that she would complain about that were agitating her?

A.    Agitating or making her emotional? Both -- same word?

Q.    Sure.

A.    Sure.

Q.    And what were those?

A.    I think every -- I think life has, you know, certain things. I mean she was still
getting migraines, she was still, you know, unemployable, of course, you know.
Family, you know, her kids. You know, we all have those little things. So, yes, of
course.

Q.    And is that -- anything else that comes to mind or is that all?

STL 2606863.2

A.      Yeah, I mean the court case and things like that, but as I said, she was able -- she can separate that. Like when I talked about her depression, she copes with it better. She can separate it, where she used to just clump everything together and now she can separate and she can start to get back to a mental state.

(*See* Broome Dep., D-7, pp. 31:18-32:16).

33.     Plaintiff's ex-husband, Tim Young testified about four different issues causing Plaintiff stress from 2014 through the present: health issues, being able to go back to work, financial issues and her marriage.  (*See* Deposition of Tim Young ("T. Young Dep."), attached to the accompanying appendix of evidence as D-8, p. 14:1-11).

34.     Each of these occurred after the 2013/2014 attacks.  (*See* T. Young Dep., D-8, pp. 14:21-15:8).

35.     Moreover, Mr. Young can only recall one collection call received by Plaintiff in his presence and, for that call, he could not even identify whether NPAS or Medicredit had made the call:

Q.      Did you ever observe Ms. Young receiving a phone call from anybody -- from any creditor?

A.      I do, yes. I do remember one occasion, actually, but they called and she just ended up hanging up. And then I asked her what she was mad about and she said somebody was -- it was a collections call.

Q.      And do you know which entity that was?

A.      No, I do not.

Q.      Do you know if it was one of these entities or --

STL 2606863.2

A.      She didn't say.

(*See* T. Young Dep., D-8, p. 21:1-11).

36.     Similarly, Janet Perry testified that she knew "that the phone calls were often and they upset her greatly" but, even for the one call she witnessed, she would not identify whether the call was made by NPAS, Medicredit or a third party:

Q.      Let's focus on that call for a second. Do you know when that was?

A.      I'm going to say the spring -- because we weren't shopping for Christmas or anything like this. Probably the spring of '16. It was after she moved in with us. So '16.

Q.      And do you know which entity made that call?

A.      I do not know.

Q.      Do you know for sure that it was Medicredit or NPAS?

A.      It was the only thing -- they were the only ones calling on collections, from what I've known, what she said.

(*See* Deposition of Janet Perry, attached to the accompanying appendix of evidence as D-9, pp. 22:16-23:4).

37.     Likewise, Shannon Garner testified that the collection activities undertaken by Defendants were "one of the factors" contributing to Plaintiff's anxiety.  (*See* Deposition of Shannon Garner ("Garner Dep."), attached to the accompanying appendix of evidence as D-10, pp. 16:23-17:9).

STL 2606863.2

38.     Moreover, for almost every physical ailment which afflicted Plaintiff following the 2013/2014 attacks. Ms. Garner testified that Plaintiff had gotten better.  (*See* Garner Dep., D-10, pp. 16, 18, 23, 26).

39.     Finally, Jesse Solorzano testified that Defendants' collection activities simply "escalated" the symptoms experience by Plaintiff following the 2013/2014 attacks:

> Q.     Is there any other information, Ms. Solorzano, that you have that is related to defendants' collection actions and the impact they had on the plaintiff?
>
> A.     I think I've said it all. I think it's a point of contention, stress, anxiety and depression for her. And when the calls happen, I know they escalate all the symptoms.

(*See* Deposition of Jesse Solorzano, attached to the accompanying appendix of evidence as D-11, p. 28:4-11).

## VII.   THE SWORN TESTIMONY OF THE FORMER ATTORNEY

40.     With regard to Plaintiff's alleged damages, Dawn Atkin testified that Plaintiff was "stressed out about getting bills that she could not pay."  (*See* Deposition of Dawn Atkin ("Atkin Dep."), attached to the accompanying appendix of evidence as D-12, at p. 38:13-14).

41.     However, Ms. Atkin could not separate this "stress" from other damages, including those resulting from the 2013/2014 attacks, which were covered by Plaintiff's workers' compensation claim against Granite School District:

> Q.     With respect to Robyn being stressed out, how -- how does that result in damages such that that would be something that would come to your mind with respect to the second sentence here?

STL 2606863.2

A.     Robyn being stressed out is part of her Workers Compensation claim. That anxiety and that secondary trauma, basically, that happened because of nothing going right, the way it was supposed to.  If everything had just gone right from the beginning, right, yes, she would still have migraines. Yes, she would still need Botox. Yes, she would still have all of those problems. But there would have been one factor of all of that that would have been lessened, if not alleviated. And that was this high anxiety level that she was under this whole time.

…

Q.     And with respect to a price tag on that, all of her medical bills associated with her migraines, whether caused by stress from anything, any of the number of things we've established in this case, Robyn feels stressed because of, those are all covered financially by Workers Comp; right?

A.     Yeah. I'm just -- I'm just mentally making sure I'm answering correctly. Yeah. Yes.

(*See* Atkin Dep., D-12, pp. 39:17-40:18).

## VIII.   THE SWORN TESTIMONY OF THE MEDICAL PROFESSIONALS

42.     With regard to Plaintiff's alleged damages (e.g., mental and emotional distress, anxiety, depression, sleeplessness, headaches, nausea, pain), Katherine Freeman testified that Plaintiff "reported all of these symptoms… in her sessions."  (*See* Deposition of Katherine M. May ("May Dep."), attached to the accompanying appendix of evidence as D-13, p. 33:24-25).

STL 2606863.2

43.     However, Ms. Freeman could not trace these symptoms to the conduct of Defendants nor separate them from the attacks in 2013 and 2014, Plaintiff's fallout with the Granite School District or her other issues:

Q.      Is it even possible to separate them?

A.      I don't believe so.

Q.      Okay.  And why do you say that?

A.      Both have caused her stress, and we've just been treating these symptoms. So when she reports these symptoms, it's -- yes, she's reported it with Granite and, yes, she's reported it with this lawsuit.

…

Q.      Can you tell me on what date Ms. Young started reporting any of these symptoms with respect to my clients to you?

A.      I'm sorry, I don't – I don't recall a specific date.

(*See* May Dep., D-13, pp. 34:9-34:2).

44.     Similar to Ms. Freeman, Dr. David S. Peterson also could not trace these symptoms to the conduct of Defendants and in fact confused them with Plaintiff's litigation with the Granite School District:

Q.      What do you know about the case?

A.      Uhm, just what the patient has told me, that she is under litigation for something related to her employment. But I don't know any more details than that.

Q.      I will represent to you that this case is different than the workers' comp case that deals with her employment.

STL 2606863.2

A.      Okay.

Q.      And that the two defendants in this case, my clients, are NPAS, Inc., and

Medicredit… Do you know anything about this case with that clarification?

A.      I don't.

Q.      Do you have any recollection of Ms. Young telling you anything about this case

with respect to her treatment?

A.      No.

(*See* Deposition of David S. Peterson ("Peterson Dep."), attached to the accompanying appendix

of evidence as D-14, p. 61:7-23).

45.      In fact, Dr. Peterson testified that Plaintiff never even mentioned debt collection

activities to him during his treatment of Plaintiff:

Q.      Did Ms. Young ever come in and tell you that she received a letter from a debt

collector?

A.      No.

Q.      Did she ever come in and say she was receiving calls from a debt collector?

A.      No.

(*See* Peterson Dep., D-14, p. 67:4-9).

46.      With regard to Plaintiff's alleged mental and emotional distress, anxiety,

depression, sleeplessness, headaches, nausea, pain, and other various damages Plaintiff has

incurred, Dr. Richard Glines testified that he treated Plaintiff "[p]rimarily for migraine headache

… but also the – the other symptoms attendant with that which include the neck pain, the nausea

… and other secondary symptoms."   (*See* Deposition of Richard L. Glines ("Glines Dep."), attached to the accompanying appendix of evidence as D-15, pp. 41:23-42:1).

47.     However, Dr. Glines could not trace these symptoms back to the conduct of Defendants:

Q.     I'm asking for the facts that you have related to your treatment of Ms. Young as it pertains to my clients.

…

A.     The only thing I can provide you is the clinical information, and that's that the patient presented to me in September 2014 with a history of chronic migraine headache that began the year prior, that began after an altercation at work in which she received trauma to the head, with no history of headache or issues prior to that.

(Glines Dep., D-15, pp. 42:23-43:7).

48.     In fact, Dr. Glines actually testified that the headache symptoms improved after September 2014 (when Plaintiff first met with him) which was *after* Plaintiff's first unpaid medical debt had been placed with NPAS:

Q.     And did those migraine or those headaches get worse over the time that you treated her?

A.     No.  The headache symptoms improved but never were completely alleviated.

(Glines Dep., D-15, p. 43:9-12).

STL 2606863.2

## ARGUMENT

## I.   LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment is granted "when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1192-93 (D. Utah 2013) (quoting Fed. R. Civ. P. 56(a)).  A moving party is entitled to summary judgment when the pleadings and record evidence show that "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof."  *Id.*

As the party moving for summary judgment, Defendants bear the initial responsibility of identifying the portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where, as here, the non-moving party bears the burden of proving material facts at trial, Defendants may satisfy their responsibility either by showing Plaintiff's inability to establish such material facts, or merely the absence of evidentiary support in the record for such material facts.  *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011).  Once Defendants satisfy their responsibility, "the burden shifts to [Plaintiff] to create, through significantly probative evidence,

STL 2606863.2

genuine issues of material fact necessitating a trial." *Bivins v. Bruno's, Inc.*, 953 F. Supp. 1558, 1560 (M.D. Ga. 1997).

## II.    ACTUAL DAMAGES UNDER THE FDCPA AND UCSPA

In FDCPA claims, "actual damages are often difficult to establish." *Miranda v. Integrity Sol. Services, Inc.*, 13-CV-02479-RM-KLM, 2014 WL 519239, at *1 (D. Colo. Feb. 10, 2014). "Actual damages may be recovered only if the FDCPA violation caused harm to the plaintiff." *Gillespie v. Blitt & Gaines, P.C.*, 123 F. Supp. 3d 1029, 1032 (N.D. Ill. 2015); *Thomas v. Law Firm of Simpson & Cybak*, 244 Fed. Appx. 741, 743 (7th Cir. 2007) (noting that "only losses flowing from an FDCPA violation are recoverable as actual damages").   Under the FDCPA, a plaintiff seeking actual damages must prove [1] specific loss and [2] that the defendant caused their loss.   *Soren v. Equable Ascent Fin.*, LLC, 2:12-CV-00038, 2012 WL 2317362, at *3 (D. Utah June 18, 2012) ("In contrast to statutory damages, a defendant is not strictly liable for actual damages, as a plaintiff who does not plead or prove any specific loss will not recover actual damages under the FDCPA."); *Sartori v. Steider & Associates, P.C.*, 1:15-CV-00991-JCH-LF, 2017 WL 3602029, at *2 (D.N.M. Jan. 19, 2017) ("In addition to proving specific loss, a FDCPA plaintiff must also prove that the defendant caused his loss in order to recover actual damages."); *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 911 F. Supp. 2d 1, 72 (D. Mass. 2012) (citing 15 U.S.C. § 1692k(a)(1) ("A causal connection is required with respect to an award of actual damages.")).

The onus placed upon an actual-damages plaintiff is especially relevant where, as here, Plaintiff is seeking actual damages, in part, for her emotional distress.  *Alecca v. AMG Managing Partners, LLC*, No. 3:13–CV–163–J–39PDB, 2014 WL 2987702, at *2 (M.D.Fla. July 2, 2014)

STL 2606863.2

("Emotional distress must have a severe impact on the sufferer to justify an award of actual damages.").  In such cases, Plaintiff must supply more than just her own self-serving allegations. *Soren*, 2:12-CV-00038, 2012 WL 2317362, at *3 (finding that "unsupported self-serving statements of emotional distress will not suffice to prove actual damages"); *Goodin v. Bank of Am., N.A.*, 114 F. Supp. 3d 1197, 1211 (M.D. Fla. 2015) (noting that "a number of courts have declined to award damages for emotional distress where the plaintiff's testimony was not supported by medical bills"); *Davis v. Creditors Interchange Receivable Mgmt.*, LLC, 585 F. Supp. 2d 968, 976 (N.D. Ohio 2008) (noting that "an FDCPA damages rule must only award emotional damages for actual, serious emotional distress traceable to proscribed debt collection practices").

A plaintiff seeking actual damages under the UCSPA faces similar hurdles.  *SanMedica Int'l, LLC v. Amazon.com, Inc.*, 2:13-CV-00169-DN, 2015 WL 1786104, at *15 (D. Utah Apr. 15, 2015) ("The plain meaning of the provision at issue in the present case grants a plaintiff the opportunity to elect either to prove actual damages sustained, or to claim a statutory damage award of $2,000.").  As with actual damages under the FDCPA, actual damages under the UCSPA must be specific and "causally connected to the violation."  *Andreason v. Felsted*, 2006 UT App 188, ¶ 10, 137 P.3d 1, 3 (finding that plaintiff's "effort to tie his credit woes to the negative information failed to establish with any degree of certainty or specificity an amount of 'actual damages' that would be compensable under section 13–11–19.").

## III.    PLAINTIFF'S "DAMAGES" ARE VAGUE AND DO NOT FLOW FROM THE ALLEGED VIOLATIONS OF THE FDCPA AND UCSPA

By Plaintiff's own admission, the physical symptoms which supposedly evince her emotional distress, are "intertwined" with the damages Plaintiff suffered from the 2013 and 2014

STL 2606863.2

attacks, from not being able to return to work and from litigation over her worker's compensation claim with Granite School District.  *See* Young Dep., D-5, p. 40:14 ("So for me, Granite School District and the collections and everything is intertwined for me.").  This poses two insurmountable problems for Plaintiff.  First, the allegation that pre-existing symptoms have been "increased" or "exacerbated" cannot be demonstrated on a medical bill and is entirely the kind of self-serving testimony that trial courts reject as evidence of emotional distress.  *Soren*, 2:12-CV-00038, 2012 WL 2317362, at *3 (finding that "unsupported self-serving statements of emotional distress will not suffice to prove actual damages"); *Goodin*,  114 F. Supp. 3d at 1211 ("a number of courts have declined to award damages for emotional distress where the plaintiff's testimony was not supported by medical bills").  Second, that certain symptoms got worse is hardly the "severe impact" upon which trial courts have conditioned an award of FDCPA actual damages.  *Alecca*, 2014 WL 2987702, at *2 ("Emotional distress must have a severe impact on the sufferer to justify an award of actual damages.").

Not only does the nature of Plaintiff's alleged actual damages preclude the existence of any genuine issue of material fact in Plaintiff's favor, but Plaintiff is further thwarted by being unable to prove that her damages—which are bootstrapped onto already-existing damages—are causally linked to Defendants' alleged violations (of the FDCPA/UCSPA).

As an initial matter, Plaintiff's own self-serving testimony cannot create a genuine issue of material fact.  *Soren*, 2:12-CV-00038, 2012 WL 2317362, at *3; *Goodin*,  114 F. Supp. 3d at 1211.  However, in this case, the individuals whom Plaintiff has elected to disclose also fail at providing testimony which creates a genuine issue of material fact.

STL 2606863.2

Indeed, with regard to the friends and family which Plaintiff elected to disclose as having knowledge of her damages: Aubrey Broome testified that Plaintiff was agitated and emotional as a result of Defendants' conduct but could not isolate the stress and agitation, which allegedly occurred as a result of Defendants' conduct, from other circumstances in Plaintiff's life. (Broome Dep., D-7, pp. 28:13-24; 31:18-32:16). Plaintiff's ex-husband, Tim Young, testified about four different issues causing Plaintiff stress from 2014 through the present: health issues, being able to go back to work, financial issues and her marriage. (T. Young Dep., D-8, p. 14:1-11). However, each of these issues following the 2013 and 2014 attacks. (T. Young Dep., D-8, pp. 14:21-15:8). Moreover, Mr. Young can only recall one collection call received by Plaintiff in his presence and, for that call, he could not even identify whether NPAS or Medicredit had made the call. (T. Young Dep., D-8, p. 21:1-11). Janet Perry testified that she knew "that the phone calls were often and they upset her greatly" but, even for the one call she witnessed, she would not identify whether the call was made by NPAS, Medicredit or a third party. (Deposition of Janet Perry, D-9, pp. 22:16-23:4). Likewise, Shannon Garner testified that the collection activities undertaken by Defendants were "one of the factors" contributing to Plaintiff's anxiety. (Garner Dep, D-10, pp. 16:23-17:9). Moreover, for almost every physical ailment which afflicted Plaintiff following the 2013/2014 attacks, Ms. Garner testified that Plaintiff had gotten better. (Garner Dep., D-10, pp. 16, 18, 23, 26). Finally, Jesse Solorzano testified that Defendants' collection activities simply "escalated" the symptoms experienced by Plaintiff following the 2013/2014 attacks. (Deposition of Jesse Solorzano, D-11, p. 28:4-11).

Second, with regard to Plaintiff's attorney which she elected to disclose as having knowledge of her damages, Dawn Atkin testified that Plaintiff was "stressed out about getting

bills that she could not pay." (Atkin Dep., D-12, p. 38:13-14). However, Ms. Atkin could not separate this "stress" from Plaintiff's other damages, including those resulting from the 2013/2014 attacks, which were covered by Plaintiff's  workers' compensation claim against Granite School District. (Atkin Dep., D-12, pp. 39:17-40:18).

49.     Third, with regard to the medical professionals which Plaintiff elected to disclose as having knowledge of her medical damages (e.g., mental and emotional distress, anxiety, depression, sleeplessness, headaches, nausea, pain): Katherine Freeman testified that Plaintiff "reported all of these symptoms… in her sessions" but could not trace these symptoms to the conduct of Defendants nor separate them from the attacks in 2013 and 2014, Plaintiff's fallout with the Granite School District or her other issues. (May Dep., D-13, pp. 33:24-25; 34:9-34:2). Similarly, Dr. David S. Peterson also could not trace these symptoms to the conduct of Defendants and in fact confused them with Plaintiff's litigation with the Granite School District. (Peterson Dep., D-14, p. 61:7-23). In fact, Dr. Peterson testified that Plaintiff never even mentioned debt collection activities to him during his treatment of Plaintiff. (Peterson Dep., D-14, p. 67:4-9). Finally, Dr. Richard Glines testified that he treated Plaintiff "[p]rimarily for migraine headache … but also the – the other symptoms attendant with that which include the neck pain, the nausea … and other secondary symptoms." (Glines Dep., D-15, pp. 41:23-42:1). However, Dr. Glines could not trace these symptoms back to the conduct of Defendants. (Glines Dep., D-15, pp. 42:23-43:7).   In fact, Dr. Glines actually testified that the headache symptoms improved after September 2014 (when Plaintiff first met with him) which was after Plaintiff's first unpaid medical debt had been placed with NPAS. (Glines Dep., D-15, p. 43:9-12).

STL 2606863.2

Each of Plaintiff's disclosed individuals suffers from one (or a combination) of the following: (1) an inability to trace damages to the alleged violations of Defendant; (2) an inability to separate damages from pre-existing causes; or (3) insufficient personal knowledge. These insufficiencies, in isolation or in combination, prevent Plaintiff from demonstrating a genuine issue of material fact regarding the (lack of) causal link between her damages and Defendants' alleged violations of the FDCPA and UCSPA.

## CONCLUSION

Based upon the uncontroverted facts set forth above, Plaintiff is unable to demonstrate that she suffered actual damages as a result of Defendants' alleged violation of the FDCPA and UCSPA.  Because there is no genuine issue of material fact regarding the issue of actual damages, partial summary judgment should be entered in favor of Defendants and against Plaintiff on her claim that she suffered actual damages.

WHEREFORE, Defendants Medicredit, Inc. and NPAS, Inc. respectfully request that the Court enter partial summary judgment in their favor and against Plaintiff Robyn Young on her claim that she suffered actual damages as a result of Defendants' alleged violation of the Federal Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq*. and the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq*.,  and that the Court grant such other or additional relief as it deems just and appropriate.

STL 2606863.2

DATED this 29th day of January, 2018.

Respectfully submitted,

SPENCER FANE LLP

/s/ Jamie N. Cotter
Jamie N. Cotter

*Attorneys for Defendants Medicredit, Inc. and NPAS, Inc.*

## CERTIFICATE OF MAILING

I hereby certify that on the 29th day of January, 2018, I caused a true and correct copy of the foregoing **DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON ACTUAL DAMAGES AND MEMORANDUM IN SUPPORT THEREOF** to be electronically served by the Court on all parties.

Lester A. Perry
HOOLE & KING
4276 South Highland Drive
Salt Lake City, Utah 84124

Eric Stephenson
Stephenson Law Firm
299 S. Main Street, Suite 1300
Salt Lake City, Utah 84111

/s/ Jamie Cotter

STL 2606863.2