David Humphreys (OBA #12346), Appearing *Pro Hac Vice*
Luke Wallace (OBA #16070), Appearing *Pro Hac Vice*
HUMPHREYS WALLACE HUMPHREYS, P.C.
9202 South Toledo Avenue
Tulsa, OK  74137
(918) 747-5300
david@hwh-law.com
luke@hwh-law.com

Eric Stephenson (9779)
STEPHENSON LAW FIRM
299 South Main Street, Suite 1300
Salt Lake City, UT  84111
(844) 529-2112
eric@utahjustice.com

**Attorneys for Plaintiff**

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBYN YOUNG,<br><br>     Plaintiff,<br><br>vs.<br><br>NPAS, INC. and MEDICREDIT, INC.,<br><br>     Defendants. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT NPAS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT (FDCPA)**<br><br>Case Number: 2:16-cv-01104-CW-EJF<br><br>Judge: Clark Waddoups<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Robyn Young, by and through her attorneys,  and pursuant to Rule 56 of the

Federal Rules of Civil Procedure, respectfully submits this response in opposition to Defendant

NPAS, Inc.'s request for partial summary judgment.

1

## I.        INTRODUCTION

Since 2004, Robyn Young taught special needs children until rising to a senior position for Granite School District in 2008 where she was responsible for the education of severely autistic children. In the Spring of 2013, she was severely beaten at work by a student. She suffered concussive trauma to her brain but was able to return to work. In the Spring of 2014, she was again attacked at work, from behind, and experienced brain trauma with the onset of migraine headaches and other symptoms requiring ongoing treatment seeking to gain control over her migraines and resulting symptoms. She continues to live with complex migraines, facial paralysis, vertigo, nausea, sickness, vomiting, sensitivity to light, migraines, numbness, and tingling in her hands, her hands lock into position, her foot clubs, she suffers from depression, tiredness, lethargy, and other similar symptoms.

Because she was injured at work and within the course and scope of her employment, Young's employer is solely responsible for payment of that treatment, including ongoing care. There is not a colorable argument that Young is obligated to pay the debt incurred for treatment of workers compensation injuries.  Under Utah law, the employer, and not the employee, is liable for work related medical treatment. Utah Code Ann. § 34A-2-401(2)

The hospital and both defendants are owned and controlled by publicly traded hospital management enterprise HCA. The treating doctors are ultimately employees of HCA. Both Defendants presented the same person as corporate representative to testify for that party. The employee, Don Wright, isn't even an employee of either defendant but is responsible for debt collection performance of both. The evidence here shows that HCA intended to create separate

entities and draft agreements between entities to evade the protections afforded under the Fair Debt Collections Practices Act.

Young told her care providers that her treatment was needed due to on the job injuries. She told the debt collectors the same thing when she spoke with them. Her workers compensation lawyer wrote and informed the collectors that the medical expenses were due to work injuries and under Utah law were the debt of the employer and not Robyn Young. Her father even wrote to try to stop the collectors. The collectors knew Robyn was represented by counsel. Both defendants turned over records establishing knowledge that Young was represented by counsel. Even so, Defendants persisted in demanding she pay the medical charges that she did not owe. These wrongful collections and violations of the FDCPA and state law and attendant stress caused an increase in symptoms at the time when Robyn Young was at her most vulnerable and while her brain recovering from the traumatic injuries inflicted.

Young challenges the ability of NPAS to use words in contracts set forth in agreements between commonly owned entities to avoid legal responsibilities created by its conduct.  NPAS does not deny here that its conduct violates the FDCPA. Instead, it argues that the contractual scheme HCA created defeats FDCPA coverage by shielding NPAS from scope of federal law.

## II.   RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      NPAS is not a debt collection company or in the business of collecting defaulted medical consumer debts. (*See* NPAS's Answer and Affirmative Defenses to First Amended Complaint, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-1, at ¶¶ 2-3; *see also* Declaration of Don Wright ("Wright Decl."), a true and accurate copy of which is attached to the accompanying appendix of evidence as D-2, at ¶ 2.)

RESPONSE: Objection. Defendants have stated a conclusion, not a fact. Moreover, the undisputed facts rebut the conclusion. "With regard to each of the treatments received by

Plaintiff from St. Mark's Hospital on the foregoing dates, ***Plaintiff failed to pay the entire amount due and owing*** for such treatment and the resulting debt was placed with NPAS." Dkt 88 at p. 4 ¶6 (emphasis added.)    NPAS concedes it only collects accounts after St. Mark's internal collection efforts fail.[1]  NPAS's collection letters suggest the debt is due and payable in full.[2]  NPAS's expectation was that Young would respond to these letters by either paying the account in full or call to discuss and make arrangements to resolve the past due account.[3] NPAS admitted that another, unnamed Parallon entity acted as a front end servicer and extended business office.[4]

Per its own records, accounts were placed with NPAS because other collection protocols had been exhausted.[5] NPAS admits it does not know what occurred with the accounts while these protocols were exhausted and prior to being placed with NPAS.[6]  Because it does not know what happened prior to placement, NPAS is unable to confirm that accounts placed with it were not in default at time of placement.[7]

It is also undisputed that account no. 4683 was in default when it was assigned to NPAS for collection.[8]  This account was first assigned to Medicredit who attempted to collect it but failed. Because NPAS obtained the debt(s) when it was in default, NPAS is in the business of collecting consumer debts and is a debt collector under the FDCPA. 15 U.S.C. § 1692a(6).

NPAS is a "debt collector" under the FDCPA because it collects on other accounts in a

---

[1] Exhibit P-1, NPAS 30(b)(6) depo at 15:19-23; 16:3-17:11
[2] Exhibit P-4, P-5, P-6, P-7, P-8, P-9, P-10, P-14
[3] Exhibit P-1, NPAS 30(b)(6) depo at 97:22-98:3
[4] Exhibit P-1, NPAS 30(b)(6) depo at 15:11-18
[5] Exhibit P-3 at NP0019
[6] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20
[7] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20
[8] Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1, NPAS 30(b)(6) at 73:2-8

name that would indicate a third party and not the creditor is collecting. *Id.* NPAS is not entitled to the creditor exclusion as it did not originate the debts it sought to collect and it collects debts for non-affiliates.[9] 15 U.S.C. § 1692a(4). Under the facts of this case, NPAS is a debt collection company and in the business of collecting defaulted medical consumer debts.

2. NPAS conducts only "early out" collections. "Early out" collections involve attempts to collect on unpaid accounts prior to the time that the account is deemed to be in default. (Wright Decl., D-2, ¶ 2.)

RESPONSE: Objection. Defendants have stated a conclusion, not a fact. Material facts also rebut the conclusion. There is no definition of "early out" collections under the FDCPA. "Early out" is a construct unilaterally created by Defendants in an effort to avoid FDCPA liability while engaging in debt collections. See also response number one, above.

Moreover, NPAS collected account no. 4683 after it was deemed to be in default by St. Mark's who assigned that account to Medicredit on October 11, 2014. Per its own records, account ***0954was "PLACED ACCOUNT WITH NPAS DUE TO PROTOCOL EXHAUSTED."[10] NPAS admitted that another, unnamed Parallon entity acted as a front end servicer and extended business office.[11] NPAS admits it does not know what occurred with accounts prior to being placed with NPAS and has no factual basis or ability to confirm that accounts placed with it were not in default at time of placement.[12]

3. NPAS's performance of "early out" collection services for certain of its clients, including the services provided with regard to the unpaid medical debts of Plaintiff, is governed, in part, by (1) an Intercompany Services Agreement ("ISA") between NPAS, on the one hand, and HSS Systems, LLC ("HSS"), on the other, and (2) an Amended and Restated Master Services Agreement ("MSA") between non-party Parallon Business Solutions, LLC, on behalf of

---

[9] Exhibit D-2 at ¶¶ 2, 13; P-1 NPAS 30(b)(6) depo at 17: 21-18:2, 22:4-10
[10] Exhibit P-3 at NP0019
[11] Exhibit P-1, NPAS 30(b)(6) depo at 15:11-18
[12] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20

itself and certain affiliates, on the one hand, and non-party Mountain Division, Inc., on behalf of itself and as a disclosed agent for certain facilities, on the other. (Wright Decl., D-2, ¶ 3; see also MSA, a true and accurate redacted copy of which is attached to the accompanying appendix of evidence as D-3; ISA, a true and accurate redacted copy of which is attached to the accompanying appendix of evidence as D-4).

RESPONSE: Disputed. The ISA attached by NPAS does not apply to the accounts under collection here. By its terms, the ISA is limited to "early out collection services for <u>non-HCA facilities</u> ('Client-Hospitals')."[13]  The ISA defines "Client Hospital" as "a facility that is not an Affiliate."[14]  Plaintiff objects to the Wright Affidavit to the extent it purports to put forth the terms of any agreement as the content of the contracts must be presented pursuant to FRE 1002 or 1003, and Wright does not meet the exceptions of FRE 1005-1007 for other means to provide content of writings. An "Affiliate" is defined as "those entities . . . that are controlled by, controlling or under common control with a stated entity, including . . .parent corporations and their respective subsidiaries and affiliates . . ."[15]  "Control" is defined as "ownership of more than a majority interest in an entity."  HCA owns and controls, either directly or through its subsidiaries, NPAS and St. Mark's making St. Mark's an affiliate and not a "Client Hospital" receiving services under the ISA.[16]   In fact, NPAS's representative pursuant to FRCP 30(b)(6) testified as follows "Q  You're collecting debts for affiliates, right?  A.  Correct."[17]   The evidence proffered to establish that NPAS is not a debt collector, the ISA, by its express terms does not apply to collections on behalf of St. Mark's.[18]

---

[13] Exhibit D-4 at p. 1
[14] *Id.*
[15] *Id.*
[16] Exhibit P-1, NPAS 30(b)(6) depo at 11:4-17, 14:19-22, 23:21-23, 30:20-22.
[17] Exhibit P-1, NPAS 30(b)(6) depo at 103:15-17.
[18] Exhibit D-2, Wright Decl. at ¶ 3

4.      Under the MSA, NPAS and HSS are both affiliates of Parallon Business Solutions, LLC. (Wright Decl., D-2, ¶ 4; MSA, D-3, § 1.11, p. NP0131).

RESPONSE:  Admitted.  As evidenced above in response to paragraph 3, this affiliation is one of the reasons the ISA does not apply to NPAS's collection efforts on behalf of St. Mark's.

5.      Under the MSA, St. Mark's Hospital is a facility which receives services from NPAS and HSS. (Wright Decl., D-2, ¶ 5; MSA, D-3, p. NP0141).

RESPONSE: This fact is not material to the current motion. Moreover, St. Mark's Hospital is not a signatory to either agreement referenced by NPAS.[19] Otherwise, admitted.

6.      Under the MSA, NPAS provides "Early Out Collections" for St. Mark's Hospital, which are defined as: "Collection of early stage, non-delinquent balances that are due from the patient/guarantor. Unless prohibited by State law, Service Provider performs these services in the name of the hospital or physician." (Wright Decl., D-2, ¶ 6; MSA, D-3, p. NP0147).

RESPONSE: Objection. It is irrelevant how the MSA defines the term "Early Out Collections" since the FDCPA has no such definition or exclusion.[20]

Otherwise, disputed.  Regardless of any self-serving description of "early out collections" in the MSA, the undisputed evidence shows that NPAS engaged in collection of defaulted debts including collection of accounts after St. Mark's own internal collection efforts fail;[21] the collection efforts by NPAS infer that the debt is delinquent and in default[22]; collection of account no. 4683 which was assigned to Medicredit prior to collection by NPAS;[23] and representing that continuing medical treatment would be denied by St. Mark's unless payment on the accounts

---

[19] *Id*.
[20] 15 U.S.C. § 1692a
[21] Exhibit P-1, NPAS 30(b)(6) depo at 16:3-17:11
[22] See response to ¶ 1 above
[23] Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1, NPAS 30(b)(6) depo at 73:2-8

was made.[24] The MSA does not reference, describe, or otherwise indicate that Parallon, NPAS, or any other affiliate is acting as an "Extended Business Office" or "EBO Servicer" for St. Mark's.[25]   NPAS admits it does not know what occurred with accounts prior to being placed with NPAS and has no factual basis or ability to confirm that accounts placed with it were not in default at time of placement.[26]

 7. As part of the services that HSS provides for St. Mark's Hospital, it contracts certain services with NPAS via the ISA. (Wright Decl., D-2, ¶ 7).

RESPONSE: Disputed.  For the reasons addressed above in Response to paragraph 1,-3, the ISA does not apply to NPAS collections for St. Mark's because St. Mark's is an affiliate and not a client hospital under the express terms of the document.

 8. Under the terms of the ISA, NPAS agreed to provide "early out" collection services to facilities, including St. Mark's Hospital. (Wright Decl., D-2, ¶ 8; ISA, D-4, § 3.1, p. NP0120).

RESPONSE: Disputed.  For the reasons addressed above in Response to paragraph 1,-3, the ISA does not apply to NPAS collections for St. Mark's because St. Mark's is an affiliate and not a client hospital. It is also irrelevant how the ISA defines the term "early out" collections services since the FDCPA has no such definition or exclusion.[27] Furthermore, St. Mark's Hospital is not a signatory on the agreement referenced by Defendants.[28]  Finally, as addressed in response to paragraph 6 above, regardless of any self-serving description of "early out" collection in any

---

[24] Robyn Young Decl. ¶¶ 2 – 4 [replace with depo testimony on this issue]; Exhibit P-11 at NP0049, NP0053 – NP0066
[25] Exhibit D-3, see also ¶¶ 9, 20 below
[26] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20
[27] 15 U.S.C. § 1692a
[28] Exhibit D-1,Wright Decl.at ¶ 3

agreement, the evidence shows NPAS collected defaulted accounts.[29]

       Objection. Defendants have stated a conclusion, not a fact.

      9.     The "early out" collection services provided by NPAS pursuant to the ISA are provided "as an extension of the Client Hospital's business office and not as a 'debt collector' as that term is defined under the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") and analogous state laws." (Wright Decl., D-2, ¶ 9; ISA, D-4, § 3.2, p. NP0121).

RESPONSE: Disputed.  For the reasons addressed above in Response to paragraph 1,-3, the ISA

does not apply to NPAS collections for St. Mark's because St. Mark's is an affiliate and not a

client hospital. It is also irrelevant how the ISA defines the term "early out" collections services

since the FDCPA has no such definition or exclusion.[30] Furthermore, St. Mark's Hospital is not a

signatory on the agreement referenced by Defendants.[31]  Finally, as addressed in response to

paragraph 6 above, regardless of any self-serving description of "early out" collection in the ISA

or contractual agreement that NPAS is not a "debt collector" as defined by the FDCPA, the

evidence shows NPAS collected defaulted accounts.[32]

Objection. Defendants have stated a conclusion, not a fact.

      10.    Indeed, the ISA expressly provides that:

> Because NPAS, Inc. is providing services on current patient accounts, which are not in default at the time that they are obtained by NPAS, Inc., NPAS, Inc. is not a debt collector within the meaning of the FDCPA and analogous state laws. HSS understands and agrees that NPAS, Inc. is in the business of servicing accounts that are not in default when NPAS, Inc. takes responsibility for the accounts, and that NPAS, Inc. cannot render services to HSS on Defaulted Accounts.

(Wright Decl., D-2, ¶ 10; ISA, D-4, § 7.1, p. NP0122).

---

[29] Exhibits P-4 – P-10; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1, NPAS 30(b)(6) depo at 73:2-8
[30] 15 U.S.C. § 1692a
[31] Exhibit D-1, Wright Decl. at ¶ 3
[32] Exhibits P-4 – P-10; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1, NPAS 30(b)(6) depo at 73:2-8

RESPONSE: Disputed.  For the reasons addressed above in Response to paragraph 3, the ISA does not apply to NPAS collections for St. Mark's because St. Mark's is an affiliate and not a client hospital. It is also irrelevant how the ISA defines the term "early out" collections services since the FDCPA has no such definition or exclusion.[33] Furthermore, St. Mark's Hospital is not a signatory on the agreement referenced by Defendants.[34]  NPAS admits it does not know what occurred with accounts prior to being placed with NPAS and has no factual basis or ability to confirm that accounts placed with it were not in default at time of placement.[35] Finally, as addressed in response to paragraph 6 above, regardless of any self-serving description of "early out" collection in the ISA or contractual agreement that NPAS is not a "debt collector" as defined by the FDCPA, the evidence shows NPAS collected defaulted accounts as described above in response to paragraphs 1-2. [36]

Objection. Defendants have stated a conclusion, not a fact.

11.     In order to ensure NPAS's status as solely a provider of "early out" collection services, HSS warranted that "it will not place with, transmit to, assign, or otherwise provide to NPAS, Inc. for servicing any Defaulted Accounts" and that HSS would not establish or maintain any practices or procedures "that are inconsistent with the exclusion of NPAS, Inc. as a debt collector, as defined in the FDCPA…" (Wright Decl., D-2, ¶ 11; ISA, D-4, § 7.2, p. NP0122).

RESPONSE: Disputed.  For the reasons addressed above in Response to paragraph 3, the ISA does not apply to NPAS collections for St. Mark's because St. Mark's is an affiliate and not a client hospital. It is also irrelevant how the ISA defines the term "early out" collections

---

[33] 15 U.S.C. § 1692a
[34] Exhibit D-1, Wright Decl.at ¶ 3
[35] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20
[36] Exhibits P-4 – P10; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1, NPAS 30(b)(6) depo at 73:2-8

services since the FDCPA has no such definition or exclusion.[37] Furthermore, St. Mark's

Hospital is not a signatory on the agreement referenced by Defendants.[38]  NPAS admits it does

not know what occurred with accounts prior to being placed with NPAS and has no factual basis

or ability to confirm that accounts placed with it were not in default at time of placement.[39]

Finally, as addressed in response to paragraph 6 above, regardless of any self-serving description

of "early out" collection in the ISA or contractual agreement that NPAS is not a "debt collector"

as defined by the FDCPA, the evidence shows NPAS collected defaulted accounts.[40] See,

Response to ¶¶ 1-2 above.

Objection. Defendants have stated a conclusion, not a fact.

12.     As part of the ISA, NPAS "relie[s] upon HSS's representations that any accounts
transmitted to NPAS, Inc. for servicing are not in default at the time they are transmitted to
NPAS, Inc." (Wright Decl., D-2, ¶ 12; ISA, D-4, § 7.3, p. NP0123).

RESPONSE: Disputed.  For the reasons addressed above in Response to paragraph 3, the ISA

does not apply to NPAS collections for St. Mark's because St. Mark's is an affiliate and not a

client hospital. It is also irrelevant how the ISA defines the term "early out" collections services

since the FDCPA has no such definition or exclusion.[41] Furthermore, St. Mark's Hospital is not a

signatory on the agreement referenced by Defendants.[42]  NPAS admits it does not know what

occurred with accounts prior to being placed with NPAS and has no factual basis or ability to

---

[37] 15 U.S.C. § 1692a
[38] Exhibit D-1, Wright Decl. at ¶ 3
[39] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20
[40] Exhibits P-4 – P-10; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1,
NPAS 30(b)(6) depo at 73:2-8
[41] 15 U.S.C. § 1692a
[42] Exhibit D-1, Wright Decl. at ¶ 3

confirm that accounts placed with it were not in default at time of placement.[43]   Finally, as addressed in response to paragraph 6 above, regardless of any self-serving description of "early out" collection in the ISA or contractual agreement that NPAS is not a "debt collector" as defined by the FDCPA, the evidence shows NPAS collected defaulted accounts.[44] See, Response to ¶¶ 1-2 above.

Objection. Defendants have stated a conclusion, not a fact.

13.     As a result, NPAS is not a "debt collector" and not subject to the requirements of the FDCPA. (See NPAS's Answer and Affirmative Defenses to First Amended Complaint, D-1, at ¶ D.)

RESPONSE: Objection. Defendants have stated a conclusion, not a fact. The undisputed facts also rebut that conclusion. NPAS is a debt collector under the FDCPA because it obtained the 4683 account for collections after it was in default.[45] NPAS is also a debt collector because its principal business purpose "is the collection of any debts" and it is not eligible for any exclusion from that definition because it collected in a name that indicated a third party was collecting.[46] Further NPAS acted as a "debt collector" here as described above in response to paragraphs 1-2. NPAS admits it does not know what occurred with accounts prior to being placed with NPAS and has no factual basis or ability to confirm that accounts placed with it were not in default at time of placement.[47]

14.     Accordingly, NPAS is not required to comply with the FDCPA because it does not meet the definition of a "debt collector" under the FDCPA. (See NPAS, Inc.'s Responses to

---

[43] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20
[44] Exhibits P-4 – P-10; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1, NPAS 30(b)(6) depo at 73:2-8
[45] *Id.*
[46] Exhibit P-1, NPAS 30(b)(6) depo at 22:24-23:6
[47] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20

Plaintiff's First Set of Interrogatories, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-5, Response to Interrogatory No. 19.)

RESPONSE: Objection. Defendants have stated a conclusion, not a fact. The undisputed facts also rebut that conclusion. NPAS meets the definition of a debt collector and is required to comply with the FDCPA because it obtained the 4683 account for collections after it was in default.[48] NPAS is also a debt collector because its principal business purpose "is the collection of any debts" and it is not eligible for any exclusion from that definition because it collected in a name that indicated a third party was collecting.[49]   Further NPAS acted as debt collector here as described above in response to paragraphs 1-2.

15.     On May 23, 2014, Plaintiff signed a "Conditions of Admission and Consent for Outpatient Care" in connection with medical services received from St. Mark's Hospital that same date. (See Conditions of Admission and Consent for Outpatient Care dated May 23, 2014, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-6).

RESPONSE:   No dispute.

16.     On June 3, 2014, Plaintiff's husband, as a representative of Plaintiff, signed a "Conditions of Admission and Consent for Outpatient Care" in connection with medical services received from St. Mark's Hospital that same date. (See Conditions of Admission and Consent for Outpatient Care dated June 3, 2014, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-7).

RESPONSE:   No dispute.

17.     On November 2, 2015, Plaintiff signed a "Conditions of Admission and Consent for Outpatient Care" in connection with medical services received from St. Mark's Hospital that same date. (See Conditions of Admission and Consent for Outpatient Care dated November 2, 2015, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-8).

RESPONSE:   No dispute.

---

[48] Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11; Exhibit P-1, NPAS 30(b)(6) depo at 73:2-8
[49] Exhibit P-1, NPAS 30(b)(6) depo at 22:24-23:6

18.     On February 2, 2016, Plaintiff signed a "Conditions of Admission and Consent for Outpatient Care" in connection with medical services received from St. Mark's Hospital that same date. (See Conditions of Admission and Consent for Outpatient Care dated February 2, 2015, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-9).

RESPONSE:   No dispute.

19.     On May 29, 2016, Plaintiff signed a "Conditions of Admission and Consent for Outpatient Care" in connection with medical services received from St. Mark's Hospital that same date. (See Conditions of Admission and Consent for Outpatient Care dated May 29, 2016, a true and accurate copy of which is attached to the accompanying appendix of evidence as D-10).

RESPONSE:   No dispute.

20.     Each of the Conditions of Admission and Consent for Outpatient Care agreements (the "CoT Agreements"), signed by Plaintiff in connection with each of the foregoing dates of service, contained the following provision:

> I acknowledge that the Providers may utilize the services of a third party Business Associate or affiliated entity as an extended business office ("EBO Servicer") for medical account billing and servicing. **During the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default**, and shall not be reported to a credit bureau or subject to collection legal proceedings. … Upon return to the Provider by the EBO Servicer, the Provider may place the account back with the EBO Servicer, or, **at the option of the Provider, may determine the account to be delinquent, past due and in default**.

(*See* CoT Agreements, D-6, D-7, D-8, D-9, and D-10).

RESPONSE:   Disputed in part. There is evidence the agreements described by NPAS were

structured to evade the scope of the FDCPA and the underlying conduct of NPAS should be

evaluated based on its substance as described above in response to above paragraphs 1-19 rather

than the form structured by HCA.

NPAS admitted that another, unnamed Parallon entity acted as a front end servicer and

extended business office.[50]

NPAS admitted it did not receive the CoT Agreements from St. Mark's.[51]   In fact, NPAS's counsel vehemently objected to the use of the CoT Agreements at the deposition as "unfair surprise," "beyond the pale," and "trying to sandbag witnesses" because the witness had never seen the documents before.[52] Instead, NPAS relies on data feeds to provide accurate amounts owed on accounts regardless of "whether in default or non-defaulted states." [53]   St. Mark's choice to not provide these contracts to NPAS creates an inference that St. Mark's was not treating NPAS as an EBO under its terms.

In addition, St. Mark's is not required by the CoT Agreements to use an "EBO Servicer" rather such use is permitted. When St. Mark's chooses to use an EBO Servicer, it is required to provide a final notice letter to the patient.[54] Defendant's incomplete quote ignores this requirement.

Such final notice demand was not provided by NPAS to Young (it did not even know it was required to do so) nor was such a letter produced in this matter.

The CoT Agreements do not define payment default other than to state that St. Mark's can unilaterally declare one at its option but "With regard to each of the treatments received by Plaintiff from St. Mark's Hospital on the foregoing dates, ***Plaintiff failed to pay the entire amount due and owing*** for such treatment and the resulting debt was placed with NPAS."[55]   On July 22, 2014, a debt of $431.76 was placed with NPAS for the services performed by St. Mark's

---

[50] Exhibit P-1, NPAS 30(b)(6) depo at 15:11-18
[51] Exhibit P-1, NPAS 30(b)(6) depo at 99:1-100:1
[52] Exhibit P-1, NPAS 30(b)(6) depo at 100:6-103:6
[53] *Id.* at 104:19-105:2.
[54] Exhibits D-6, D-7, D-8, D-9, and D-10 (all at pp 1, 3 ¶ 6)
[55] Dkt 88 at p. 4 ¶6 (emphasis added.); Exhibits D-6, D-7, D-8, D-9, and D-10 (all at p 3 ¶ 6)

Hospital for Plaintiff on June 3, 2014 and assigned the account number 500924860 ("Acct. 500924860"). (See Wright Decl., D-2, ¶ 14).

21.    On July 22, 2014, a debt of $432.76 was placed with NPAS for the srvices performed by St. Mark's Hospital for Plaintiff on June 3, 2014 and assigned the account number 500924860 ("Acct. 500924860"). (See Wright Decl., D-2, ¶14).

RESPONSE:   No Dispute.

22.    On February 27, 2015, a debt of $2,539.88 was placed with NPAS for the services performed by St. Mark's Hospital for Plaintiff on May 23, 2014 and assigned the account number 500904683 ("Acct. 500904683"). (See Wright Decl., D-2, ¶ 15).

RESPONSE:   Dispute the inference that this account was not subject to debt collection efforts prior to the referenced placement. This account was placed with Medicredit in October of 2014, and thereafter was placed with NPAS in February of 2015, recalled from NPAS and then placed with NPAS again in August of 2015.[56]

23.    On June 11, 2015, a debt of $181.05 was placed with NPAS for services performed by St. Mark's Hospital for Plaintiff on February 23, 2015 and assigned the account number 501451437 ("Acct. 501451437"). (See Wright Decl., D-2, ¶ 16).

RESPONSE:   No Dispute.

24.    On December 28, 2015, a debt of $952.04 was placed with NPAS for the services performed by St. Mark's Hospital for Plaintiff on November 2, 2015 and assigned the account number 501934604 ("Acct. 501934604"). (See Wright Decl., D-2, ¶ 17).

RESPONSE:   Disputed. The amount of debt placed, was $952.84.[57]

25.    On February 29, 2016, a debt of $847.36 was placed with NPAS for the services performed by St. Mark's Hospital for Plaintiff on February 2, 2016 and assigned the account number 502106966 ("Acct. 502106966"). (See Wright Decl., D-2, ¶ 18).

RESPONSE:   No dispute.

---

[56] Exhibit P-1, NPAS 30(b)(6) depo at 90:17-92:4
[57] Exhibit P-11 at NP0043

26.    On August 2, 2016, a debt of $713.89 was placed with NPAS for the services performed by St. Mark's Hospital for Plaintiff on May 29, 2016 and assigned the account number 502361159 ("Acct. 502361159"). (See Wright Decl., D-2, ¶ 19).

RESPONSE:   No dispute.

## III.    STATEMENT OF ADDITIONAL MATERIAL FACTS PRECLUDING ENTRY OF SUMMARY JUDGMENT

1.  Robyn Young is an individual alleged by defendants to be obligated to pay for medical services rendered by HCA affiliate St. Mark's.[58]

2.  NPAS uses the mails in the collection of debts.[59]

3.  NPAS admits its principal purpose is the "early out" collection of obligations by individuals for the provision of medical services making its principal purpose the collection of debts.[60]

4.  NPAS admits it regularly collects or attempts to collect debts owed another, in this instance St. Mark's, but also for other affiliated and unaffiliated hospitals.[61]

5.  NPAS continues to take the following position "With regard to each of the treatments received by Plaintiff from St. Mark's Hospital on the foregoing dates, ***Plaintiff failed to pay the entire amount due and owing*** for such treatment and the resulting debt was placed with NPAS."[62]

6.  NPAS does not rely on St. Mark's, the ISA, the MSA or its CoT Agreements to determine payment default on any particular account. Instead it relies on automated processes and business rules established by another HCA affiliate, Parallon Business

---

[58] Exhibits D-6 to D-10
[59] Exhibits P-4 – P-11
[60] Exhibit D-2 at ¶ 2
[61] Exhibit D-2 at ¶¶ 2, 13; Exhibit P-1, NPAS 30(b)(6) depo at 17:21-18:2
[62] Dkt 88 at p. 4 ¶ 6 (emphasis added.)

Services, to determine if an account is in default.[63]   In fact, NPAS had not seen the

CoT's presented to Young for signature by St. Mark's until produced by Young in this

litigation.[64]

7.   It is undisputed that Medicredit collects defaulted debt.[65]   Medicredit even admits its

communications are from a debt collector in an attempt to collect a debt and collects all

of the St. Mark's balances under a single account number, 29169038.[66]

8.   Debts are generally placed with NPAS between 45 and 90 days after services are

provided depending on a variety of factors, including completion of initial collection

activity, well before the accounts are assigned to NPAS.[67]

9.   HCA facility charges are either collected by the facility (here St. Mark's) or placed for

collection with an unknown HCA affiliate for collection before the 45 to 90 day period

described above.   [68]These entities exhaust their efforts to collect the debt prior to

placement with NPAS, but NPAS does not know what occurred with accounts during this

period and has no procedure to confirm that accounts placed with it were not treated as in

default prior to placement.[69]

10.   Beginning with services provided in February of 2016, Young was required to make

payments to receive continued treatment for her work related injury due to the

---

[63] Exhibit P-1, NPAS 30(b)(6) depo at 60:2-7, 60:23-61:15, 62:18-63:13
[64] Exhibit P-1, NPAS 30(b)(6) depo at 99:6-102:11
[65] Exhibit P-1, NPAS 30(b)(6) depo at 23:1-6; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8
[66] Exhibit P-12, Medicredit Collection Notes at MC 80, 82, 84, & 86
[67] Exhibit P-1, NPAS 30(b)(6) depo at 15:19-23; 16:3-25; 17:12-20
[68] Exhibit P-1, NPAS 30(b)(6) depo at 15:19-23; 16:3-25; 17:12-20
[69] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20

outstanding defaulted balance for her treatment going back to May 23, 2014.[70]

11. The alleged debts had considerable collection activity prior to placement with NPAS and placement did not occur until these protocols were exhausted without success in collecting the amounts due. [71]

12. NPAS repeatedly demanded payment in full by a date certain of past due balances for services rendered indicating "Attention Required" and "strongly" urging Young to take advantage of the opportunity to resolve her balance[72] when in fact no amount was ever due from her.

13. NPAS admits that St. Mark's could have placed Young's debt(s) with NPAS as active worker's compensation cases and to follow up with worker's compensation instead of pursuing collections but that did not happen here.[73]   St. Mark's placed the account for collections from Young.

## IV.   ARGUMENT AND AUTHORITIES

### A.   NPAS Meets the FDCPA Definition of Debt Collector

NPAS is a debt collector as defined by the FDCPA, which provides the following

definitions relevant to status as a "debt collector":

> The term "consumer" means any natural person obligated or allegedly obligated to pay any debt
> The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

---

[70] Exhibit P-13, YNG00083-00084
[71] Exhibit P-1, NPAS 30(b)(6) depo at 16:3-17:11; Exhibit P-11 at NP 11-42, 46-72
[72] Exhibit P-11 at NP 75, 77, 79, 83, 87, 94, 115
[73] Exhibit P-1, NPAS 30(b)(6) depo at 43:17-44:5

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 USCA § 1692a(3), (5) & (6).

Ms. Young is a natural person. NPAS claimed her to be obligated to pay medical charges of St. Mark's Hospital, making her a "consumer" under the FDCPA. The alleged obligation to pay money arose out of a transaction, medical care, which was primarily for personal purposes making the alleged obligation a debt under the FDCPA.

Finally, NPAS (1) uses the mails in a business whose principal purpose is the collection of debts and (2) NPAS regularly collects or attempts to collect debts owed another.[74]

Because Ms. Young is a consumer, the alleged obligation is a debt and NPAS's business operation is to collect such obligations using the mails and does so for obligations owed another (including St. Mark's), NPAS is a debt collector as defined by the FDCPA unless it fits into one or more of the exceptions under the FDCPA. NPAS does not argue or dispute that it meets this definition of a debt collector, instead it argues that it meets a single exception to this definition.[75]

### B.   NPAS Does Not Fit Any Exception to the Definition of Debt Collector.

If a person, such as NPAS, meets the base definition of a debt collector discussed above, the FDCPA applies to its conduct unless it can show it fits into one of the exceptions to the FDCPA.[76]   NPAS's sole argument is that it satisfies the following exception [Dkt 91 at p. 10]:

> **(F)** any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . .  (iii) concerns a debt which was not in default at the time it was obtained by such person

---

[74] Exhibit D-2 at ¶ 2 , P-4, P-5, P-6, P-7, P-8, P-9, P-10, P-14
[75] Dkt 91 at pp 9-17.
[76] 15 USC § 1692a(6)(A)-(F)

15 USCA § 1692a(6)(F)(iii).

Utah state law does not specifically define the term default in case law with identical facts. In the context of a contract for sale of real estate, "default" has been defined as failure to pay amounts due when due. *Selvig v. Blockbuster Enterprises, LC*, 266 P. 3d 69, 2011 UT 39, fn 7, citing *Mgmt. Servs. Corp. v. Dev. Assocs*., 617 P.2d 406, 408 (Utah 1980) (discussing the relevant "default" under the election of remedies provision of a standard real estate purchase contract as the party's failure to pay purchase price when due); see also *Mahmood v. Ross*, 1999 UT 104, ¶ 11, 990 P.2d 933(describing default as failure to pay amounts due under an agreement); *Timm v. Dewsnup*, 851 P.2d 1178, 1179 (Utah 1993) (describing a "default" under a real estate purchase agreement as the failure to pay the price due under the contract); *Imlay v. Gubler*, 77 Utah 547, 298 P. 383, 384-86 (1931) (describing a party's default under a standard real estate purchase contract as failure to pay amounts when due).

"Because the FDCPA . . . is a remedial statute it should be construed liberally in favor of the consumer." *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002).  Other Circuit Courts agree.  *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3rd Cir. 2006); *Hamilton v. United Healthcare of Louisiana, Inc.,* 310 F.3d 385, 392 (5th Cir. 2002).  As a remedial statute and following traditional canons of statutory interpretation, exceptions to the FDCPA should be construed narrowly.  *Shultz v. Adair's Cafeterias, Inc.,* 420 F.2d 390, 393 (10th Cir. 1969)(citing, *A. H. Phillips, Inc. v. Walling*, 324 U.S. at 493, 65 S.Ct. at 808.  See also, *Bonkowski v. Oberg Industries, Inc.,* 787 F.3d 190, 195 (3rd Cir. 2015); *Simonoff v. Expedia, Inc.,* 643 F.3d 1202, 1210 (9th Cir. 2011); *In re Carter*, 553 F.3d 979, 985 (6th Cir. 2009); *Stekloff v. St. John's Mercy Health Sys.,* 218 F.3d 858, 862 (8th Cir.2000) (each holding that exceptions to remedial statutes

must be narrowly construed.)  Whether or not the debt was in default at the time NPAS obtained

the debt for collection should be narrowly construed to effectuate Congress' intent to provide

remedial protections to consumers faced with debt collection. NPAS asks the Court to narrowly

define "default" as used in the statute thereby construing the exception as broadly as possible to

allow it to escape liability under the FDCPA.

For the reasons set out below, NPAS does not satisfy this exception because the

account(s) are in default, NPAS is a debt collector, and the FDCPA applies to its conduct.

### 1.    The ISA Does Not Support NPAS's Contention that the Debt Was Not in Default

In order to claim the debt was not in default, NPAS relies on the ISA but the ISA

produced by it, according to its express terms, does not even apply to Young or obligations owed

St. Mark's. The ISA governs the relationship between NPAS and Client Hospitals and has no

application to the relationship between NPAS and HCA owned facilities such as St. Mark's. [77]

In fact, NPAS's representative pursuant to FRCP 30(b)(6) testified as follows "Q  You're

collecting debts for affiliates, right?  A.  Correct."[78]   Further, all of the contracts drafted by and

entered into between affiliated companies owned and controlled by HCA were to avoid FDCPA

regulation of NPAS.  See, § IV.B.3. below.  Such manipulation of the form is not conclusive of

the issue of default; a jury must look at the facts and decide whether in substance NPAS collects

debts in default.  The evidence proffered by NPAS to support its contention that the debt was not

---

[77] Exhibit P-1, NPAS 30(b)(6) depo at 11:4-17 (HCA owns Parallon and Parallon owns
Medicredit and NPAS), 14:19-22 (HCA owns St. Mark's), 23:21-23 (same), 30:20-22 (HCA
owns and controls Parallon and St. Mark's). Ex. D-4 at p.1
[78] Exhibit P-1, NPAS 30(b)(6) depo at 103:15-17

in default does not apply to NPAS collections on behalf of St. Mark's.[79]

**2.      NPAS Collects Accounts in Default Regardless of the Approach Used to Define Default**

Congress did not specify the meaning of when an account is "in default" when it enacted the FDCPA. *Magee v. AllianceOne, Ltd.*, 487 F.Supp.2d 1024, 1027 (S.D. Ind. 2007); *see also Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 82, 86 (2d Cir. 2003). Over time, Courts have applied four different approaches for defining/determining if an account was in default. As discussed below, the alleged debt was in default regardless of the approach used to determine/define default here.

**a.      The debt was in default using the dictionary definition.**

Where a word is not defined by the statute, it should be given its ordinary meaning but in a remedial statute this meaning should be construed broadly in favor of the consumer. (Statutory Construction Rule plus 10th cir above on remedial). Webster's Dictionary defines "default" as "a failure to pay financial debts." https://www.merriam-webster.com/dictionary/default. In *Magee v. AllianceOne, Ltd.,* 487 F.Supp.2d 1024, 1027-28 (S.D.Ind.2007), the court adopted such a definition of default. The debt in question is at least delinquent and frequently more than overdue with placement with NPAS occurring between forty-five and ninety days past due.[80] Construed broadly in Young's favor, NPAS alleged that Young had failed to pay a financial debt that was due to St. Mark's prior to placement with NPAS and the debt was in default.

---

[79] Exhibit D-4 at NP0119

[80] Exhibit P-1, NPAS 30(b)(6) depo at 15:19-23; 16:3-25; 17:12-20. See also, Defendant's Statement of Undisputed Facts re: placement at ¶¶ 21-26. Account500904683 is an exception as it had previously been placed with Medicredit for collections and Account502106966 is an exception to this rule but its accelerated placement for collection can be attributed to the continuing default status of the debt for services provided on four prior occasions. Id.; see also Exhibit P-1, NPAS 30(b)(6) depo at 90:17-92:4

NPAS now relies on contracts, the CoT Agreements, it had not seen prior to engaging in collection activity. [81]   NPAS did not rely on the CoT Agreements to determine if the debt was in default when it obtained it.  Instead, NPAS relies on data feeds to provide accurate amounts owed on accounts regardless of "whether in default or non-defaulted states." [82]   It also relies on automated processes and business rules for determining default established by Parallon instead of relying on St. Mark's. [83]

> **b.      The Debt was in Default under the terms of the contract and St. Mark's state of mind**

"Although the [FDCPA] does not define `in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at issue." *De Dios v. Int'l Realty & Invs.,* 641 F.3d 1071, 1074 (9th Cir.2011).  In addition, the FDCPA's "legislative history is consistent with construing `in default' to mean a debt that is at least delinquent, and sometimes more than overdue." *Id.* at 1075 n. 3.  The debt in question was at least delinquent and frequently more than overdue with placement with NPAS occurring between forty-five and ninety days past due. [84]   Under one approach, where the contract does not clearly define the terms of default the Courts determine default based on the state of mind of the Creditor. *Roberts v. NRA Grp., LLC,* 2012 WL 3288076, at *6, (M.D.Pa. 2012).

---

[81] Exhibit P-1, NPAS 30(b)(6) depo at 99:1-100:1
[82] *Id.* at 104:19-105:2.
[83] Exhibit P-1, NPAS 30(b)(6) depo at 60:2-7, 60:23-61:15, 62:18-63:13
[84] Exhibit P-1, NPAS 30(b)(6) depo at 15:19-23; 16:3-25; 17:12-20.  See also, Defendant's Statement of Undisputed Facts re: placement at ¶¶ 21-26.  Account500904683 is an exception as it had previously been placed with Medicredit for collections and Account502106966 is an exception to this rule but its accelerated placement for collection can be attributed to the continuing default status of the debt for services provided on four prior occasions. Id.; see also Exhibit P-1, NPAS 30(b)(6) depo at 90:17-92:4

Accepting the CoT Agreements terms as written, St. Mark's treated the account in default rather than utilizing NPAS as an EBO.  The CoT Agreements[85] state the following:

> I acknowledge that the Providers **may** utilize the services of a third party Business Associate or affiliated entity as an extended business office ("EBO Servicer") for medical account billing and servicing. During the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default, and shall not be reported to a credit bureau or subject to collection legal proceedings. **When the EBO Servicer's efforts to obtain payment have been exhausted** due to a number of factors [examples factors omitted], the EBO Servicer **will** send a final notice letter which will include the date that the medical account may be returned from the EBO Servicer to the Provider.  Upon return to the Provider by the EBO Servicer, the Provider may place the account back with the EBO Servicer, or, **at the option of the Provider, may determine the account to be delinquent, past due and in default**.

 (*See* CoT Agreements, D-6, D-7, D-8, D-9, and D-10 (emphasis added).  These agreements do not provide any meaningful conditions or timing for declaring a default, stating only that St. Mark's can determine a default at its option in those instances where it utilized an EBO but the EBO's efforts failed.

At the same time, accepting the CoT Agreements as written, they do not require St. Mark's to use an EBO.  Instead, it allows St. Mark's to use an EBO if it chooses to do so.  *Id*.  If St. Mark's utilized an EBO, the CoT Agreements placed certain restrictions on a declaration of default.  *Id*.  These restrictions include exhausting the EBO's efforts and a final notice from the EBO that the account will be returned to St. Mark's.  *Id*.

NPAS's records indicate that efforts were exhausted and protocols completed prior to placement with NPAS. [86]  This indicates that St. Mark's did not use an EBO and assigned the

---

[85] To the extent the CoT Agreements are used as evidence that Young could be responsible for these worker's comp related debts, Utah has clearly stated that an employee cannot contract away their rights under Utah Ann Stat. 34A-2-108.  T*ouchard v. LA-Z-Boy, Inc*. 2006 UT 71at ¶ 16, 148 P.3d 945.

defaulted debt to NPAS after St. Mark's failed to collect the amounts due. Alternatively, it indicates that St. Mark's assigned the debt to some other entity as the EBO and, when it exhausted its efforts and failed to collect, St. Mark's assigned the defaulted debt to NPAS for collection.

This pre-NPAS assignment exhaustion of protocols coupled with NPAS's ignorance of the contract term requiring it, if it was an EBO, to provide notice that the account was being placed back with St. Mark's for a determination that the account was in default[87], makes it clear that St. Mark's was not treating NPAS as an EBO. St. Mark's state of mind was to deem the account in default prior to placing the account with NPAS.

In addition, on February 27, 2015, a debt of $2,539.88 was placed with NPAS for the services performed by St. Mark's Hospital for Plaintiff on May 23, 2014 and assigned the account number 500904683 ("Acct. 500904683"). (See Wright Decl., D-2, ¶ 15). This account was placed with Medicredit in October of 2014, recalled from Medicredit, and placed with NPAS in February of 2015, recalled from NPAS, and then placed with NPAS again in August of 2015.[88]

It is undisputed that Medicredit collects defaulted debt.[89] Medicredit even admits its communications are from a debt collector in an attempt to collect a debt and collects all of the St. Mark's balances under a single account number, 29169038.[90]

---

[86] Exhibit P-1, NPAS 30(b)(6) depo at 15:11-23; 16:3-17:11, 72:16-20; 73:2-8; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8, 48:1-11;Exhibit P-3 at NP0019
[87] Exhibit P-1, NPAS 30(b)(6) depo at 99:1-100:1; Exhibits D-6, D-7, D-8, D-9, and D-10
[88] Exhibit P-1, NPAS 30(b)(6) depo at 90:17-92:4
[89] Exhibit P-1, NPAS 30(b)(6) depo at 23:1-6; Exhibit P-2, Medicredit 30(b)(6) depo at 35:3-8
[90] Exhibit P-12, at MC 80, 82, 84, & 86

In *Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 82 (2d Cir. 2003), the Second Circuit rejected the dictionary definition of default but this did not end its consideration.  *Id*. at 87.  As occurred in the present matter, the *Alibrandi* debt had been placed with a prior collector that included "warnings and disclaimers required of debt collectors by the [FDCPA]" and underscored the seriousness of the collection efforts.  *Id*.  The creditor's act of hiring a clear debt collector to collect the debt was a declaration by the creditor that the account was in default.  *Id*. at 87-88.  The Second Circuit then held that the subsequent debt collector could not change the status of the debt.  *Id.* at 88.  The account would continue in default while it collected the debt regardless of its agreement to "act only 'as a service provider and not a collection agency.'"  *Id*.

In *Fausz v. NPAS, Inc.*, 237 F.Supp.3d 559, 568–69 (W.D.Ky., 2017), the Western District of Kentucky examined different approaches to determine if NPAS, Inc. was a debt collector collecting an account that was in default.  Ultimately, it relied on *Alibrandi*, to hold that NPAS was a debt collector because Fausz's debt had been sent first "to United Collections Bureau, Inc., a debt collection agency, who mailed Fausz a dunning letter in which it identified itself as a debt collector and included the information required by the FDCPA.  Therefore, this Court finds that the hospital, in referring the patient account to a debt collection agency, deemed her patient account to be in default."  *Fausz*, 237 F.Supp.3d 569.

Medicredit is an admitted debt collector that identifies itself as a debt collector in its letters.  St. Mark's placed the debt with Medicredit first thereby indicating its position that the account was in default.  Therefore NPAS is also a debt collector collecting defaulted debt.

      **c.**      **The Debt was in Default Using the Reasonable Debtor Approach**

The District of Arizona examined the approaches described above to define default on an obligation for emergency room treatment. *Mavris v. RSI Enterprises Inc.*, 86 F.Supp.3d 1079, (D.Ariz. 2015). Like NPAS in the present matter, the debt collector sought summary judgment arguing that it was not a debt collector because the account was not in default when it obtained the debt. *Id.* at 1084. The *Mavris* Court examined and rejected both the dictionary definition approach and the state of mind of the creditor approach to determining if an account was in default. *Id.* at 1084-85.

Dissatisfied with flaws it found in those approaches, the *Mavris* Court crafted a new method, following the Ninth Circuit's guidance in defining whether a debt was for personal, family or household use as opposed to a commercial debt. *Id.* at 1085-86 (citing , *Slenk v. Transworld Sys.,* 236 F.3d 1072, 1074 (9th Cir.2001). Under this approach, the dispositive question is "at the time a third party obtains a debt for collection, would a reasonable person in the debtor's position believe that the creditor viewed the debt as being in default?" *Id.* at 1086.

      To answer this question, the *Mavris* Court stated:

> The relevant factors might include [1] the number of times a creditor has requested payment, [2] the time that has elapsed since the first request, [3] the urgency of the language used in those requests, [4] the debtor's knowledge that she has been referred to a third party, [5] the creditor's internal policies, [6] any representations made by or on behalf of the creditor—either publicly or to a specific debtor—about how it collects debts, and [7] apparent attempts by the creditor or third party to circumvent the FDCPA's consumer protections. This list is not exhaustive; it necessarily captures only a subset of the factors that could impact objective perceptions of default in any given case.

*Id.* at 1086(numbering added to help identify factors).

### [1] the number of times a creditor has requested payment,

"With regard to each of the treatments received by Plaintiff from St. Mark's Hospital on the foregoing dates, ***Plaintiff failed to pay the entire amount due and owing*** for such treatment and the resulting debt was placed with NPAS."  Dkt 88 at p. 4 ¶6 (emphasis added.) NPAS admits that each account was assigned to it after St. Mark's or some other affiliate had exhausted its collection efforts.[91]  NPAS admitted that another, unnamed Parallon entity acted as a front end servicer and extended business office conducting collections.[92]  Per its own records, accounts were placed with NPAS because these other collection protocols had been exhausted,[93] but NPAS also admits it does not know what occurred with the accounts while these protocols were exhausted and prior to being placed with NPAS.[94]  It is clear that efforts to exact payment on past due billing that Young "failed to pay" had been completed and the account was now being placed with NPAS to increase the pressure of collections.

### [2] the time that has elapsed since the first request

Debts are generally placed with NPAS between 45 and 90 days after services are provided depending on a variety of factors, including completion of initial collection activity, well before the accounts are assigned to NPAS.[95]

There are two exceptions to this general rule here.  The first was account 500904683 which was placed with NPAS for the first time on February 27, 2015, some 288 days after the May 23, 2014 medical care.  (See Wright Decl., D-2, ¶ 15).  The second is account 502106966

---

[91] Exhibit P-1, NPAS 30(b)(6) depo at 15:19-23; 16:3-17: 20; Exhibit P-11 at NP 11-42, 46-72
[92] Exhibit P-1, NPAS 30(b)(6) depo at 15:11-18
[93] Exhibit P-3 at NP0019
[94] Exhibit P-1, NPAS 30(b)(6) depo at 72:16-20
[95] Exhibit P-1, NPAS 30(b)(6) depo 15:19-23; 16:3-25; 17:12-20

which was placed on February 29, 2016, only 27 days after the February 2, 2016 medical

treatment. (See Wright Decl., D-2, ¶ 18).  This account was the fifth account placed with NPAS,

was accompanied by threats of withholding treatment if Young did not make at least a $100.00

payment (which Young paid), and by inference, was placed quickly because of the overall

arrears and default of other accounts related to her workers compensation treatment.

**[3] the urgency of the language used in those requests, [4] the debtor's knowledge that she has been referred to a third party,**

All of the letters sent by NPAS indicated that she was being contacted by NPAS, a third-

party.[96]  These letters clearly stated either "the balance is your responsibility" or "you are

obligated to pay for the services provided.  We strongly urge you to take advantage of this

opportunity to resolve your balance."[97]  Each letter also included a demand for payment *in full*

with such payment due within days of being received.[98]  NPAS intended to create a sense of

urgency and its expectation was that Young would respond to these letters by either paying the

account in full or call to discuss and make arrangements to resolve the past due account(s).[99]

In addition, these letters were accompanied by frequent calls and voicemails collecting the debt

and affirming the urgency of the need to pay.

Beginning with services provided in February of 2016, Young was required to make

payments to receive continued treatment for her work related injury due to the outstanding

---

[96] Exhibit P-14 at NP 75, 77, 79, 83, 87, 94, 115
[97] *Id.*
[98] *Id.*
[99] Exhibit P-1, NPAS 30(b)(6) depo at 97:22-98:3

defaulted balance for her treatment going back to May 23, 2014.[100]   This created further

urgency to pay.

 NPAS was collecting debt incurred for Young's treatment for this work related injury

from July 22, 2014 until July of 2016.[101]   Medicredit also collected debt incurred for Young's

treatment for this work related injury from October 11, 2014 (MC 74-76 left message on

recorder, multiple dialer calls to home, sent letter final notice) until July 21, 2016 (MC 79 Dialer

call).  Both NPAS and Medicredit were concurrently calling and sending letters attempting to

collect a debt incurred by Young for continuing treatment of the same work related head injury.

 As is addressed more fully in the concurrently filed response to Defendant's Motion for

Summary Judgment regarding damages, Young's injury made her more susceptible to NPAS's

and Medicredit's collection abuse.  *Bach v. First Union National Bank*, 149 Fed.Appx. 354, 363

(6th Cir.2005)(finding a stroke made consumer particularly vulnerable to FCRA violations);

*Whaley v. Asset Management Services Group, LLC*, 2016 WL 6134169, at *1–2 (S.D.Ohio,

2016)(finding Whaley's testimony that head trauma caused by a motorcycle accident causes him

to react to stress with great anxiety sufficient to show damages for FDCPA violations).

 As is demonstrated in her deposition, the concurrent collections by two debt collectors for

what she perceived as a single debt to St. Mark's for continuing treatment for her worker's

compensation injury continues to confuse her but also make her believe the entire amount

(whether a single debt or several accounts representing different debts) was in default and being

collected from her despite no liability for the care under Utah law.  Utah Code Ann. § 34A-2-

401(2).

---

[100] Exhibit P-13, YNG 83-84
[101] Exhibit P-11, NP 1-4; Exhibit P-1, NPAS 30(b)(6) depo at 111:4-1

**[5] the creditor's internal policies, [6] any representations made by or on behalf of the creditor—either publicly or to a specific debtor—about how it collects debts,**

Per the CoT Agreements, St. Mark's policies allowed it to use an EBO but did not require it to do so.  When an EBO was used, the EBO was required to provide a final notice that the account would be treated as in default.  St. Mark's failure to provide the CoT Agreements to NPAS and its failure to notify NPAS that a final notice was required, indicate that St. Mark's was not using NPAS as an EBO but rather as a debt collector.

**[7] apparent attempts by the creditor or third party to circumvent the FDCPA's consumer protections.**

As discussed below in section IV. B. 3, the entire contractual scheme created by HCA and its affiliates to define "early out" collections is an effort to contractually avoid the obligations of the FDCPA.  Defendant relies fully upon this scheme in its effort here to avoid liability through summary judgment.

Based on the *Mavris* factors, a reasonable debtor in Young's position would believe that St. Mark's thought the debt was in default when it sent the debt to NPAS for collections.

### d.      The Debt was in Default Based on NPAS's Treatment of the Account

In *Bridge v. Ocwen Federal Bank*, *FSB*, the Sixth Circuit held that the "the definition of debt collector pursuant to §1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default or *has treated the debt as if it were in default* at the time of acquisition. It matters not whether such treatment was due to a clerical mistake, other error, or intention." 681 F.3d 355, 362 (6th Cir. 2012)(emphasis added).

For the same reasons set forth in section IV. B. 2 c. above including the content of the letters, the quantity of calls, the time passed since services were provided, the concurrent collection, the threats of refusal of care if some payment was not made, and the placement with Medicredit (an admitted debt collector) prior to placement with NPAS all demonstrate that NPAS treated the account as in default at the time it obtained the account.

### 3.    NPAS and Its Parents/Affiliates Cannot Internally Contract Away NPAS's Obligations Under the FDCPA

Even if the ISA were to apply to obligations owed to St. Mark's, NPAS cannot contract away obligations owed consumers under the FDCPA. Defendant asks the Court to ignore how NPAS treated the account(s), undisputed evidence that the accounts were not placed with NPAS until other efforts to get paid had failed, and undisputed evidence that at least one account was placed with NPAS after Medicredit had attempted to collect the defaulted debt and failed. Instead, the Court is asked to rely on self-serving assurances and contract terms between affiliated and commonly controlled entities claiming that NPAS is not a debt collector and defaulted debt will not be placed with NPAS.

If it is this easy to contract out of obligations under federal law, with a little creativity any federal law is subject to contractual evasion. To allow individuals and businesses, legitimate or otherwise, to contract their way out of application of federal law undermines the very premise that we are a nation of laws. "Although our role is always to do justice, we do not have unlimited latitude; '[o]urs is a nation of laws, not judges.'" *U.S. v. Salinas*, 580 Fed.Appx. 113, 115 (3rd Cir. 2014)(quoting, *U.S. v. Higdon,* 638 F.3d 233, 247 (3rd Cir. 2011)); *McDowell v. Calderon*, 116 F.3d 364, 370 (9th Cir. 1997)("In a country that prides itself on being a nation of laws rather than just a nation of leaders."); *Osthus v. Whitesell Corp.*, 639 F.3d 841, 853 (8th Cir.

2011)("ours is a nation of laws not bureaucrats"); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1229 (11th Cir. 2005)(same).

In *Shah v. Racetrac Petroleum Co*., 338 F.3d 557 (6th Cir. 2003), the Court examined whether a contractual disclaimer was effective to avoid application of the Tennessee Petroleum Trade Practices Act.  The *Shah* Court determined that it would defeat the purposes of the statute and many other statutes "if parties could simply 'opt-out' of otherwise applicable legislation by declaring that the law would not apply to their particular transaction."  *Id.* at 575.  Instead, it was the actual nature of the relationship and not disclaimers that controlled.  *Id.*  The Eastern District of Arkansas, the District of Connecticut and the Middle District of Florida adopted the reasoning of Shah to determine that a contractual label or disclaimer was ineffective to avoid application of other laws.  *Britelink, Inc. v. TeleCorp PCS, Inc.*, 2004 WL 5509416, at *8 (E.D.Ark.,2004); *Petereit v. S.B. Thomas, Inc.,* 853 F.Supp. 55, 60 (D.Conn.1993), *aff'd in relevant part,* 63 F.3d 1169 (2d Cir.1995); *Ministri Family, LLC v. Bell*, 2015 WL 6445954, at *12 (M.D.Fla., 2015).

Similarly, Utah has held that where an issue is of such importance to public interest it should be beyond the reach of contract to relieve oneself of statutory duties.  *Touchard v. LA-Z-Boy, Inc.*, 2006 UT 71 at ¶16, 148 P.3d 945

NPAS admitted in its deposition that these contracts do not control whether the account is in default.[102]  NPAS relies instead on automated processes established by Parallon to decide if an account is in default.[103]  NPAS does not rely on any agreement between the patient and hospital to determine if there is a default as it does not even receive the agreements for the accounts it is

---

[102] Exhibit P-1, NPAS 30(b)(6) depo at 62:18-63:3
[103] Exhibit P-1, NPAS 30(b)(6) depo at 60:2-61:15

collecting.[104]   NPAS's efforts to internally contract its way out of default does not defeat the approaches discussed above and should not be allowed to defeat the purposes of the FDCPA as a matter of public policy.

### 4.   NPAS Does NOT Meet the Requirements of Any Other Exception.

NPAS is not a creditor as defined by the FDCPA, is not an employee or officer of NPAS, is not an officer or employee of the United States, was not serving legal process, and was not providing bona fide consumer credit counseling at the request of a consumer making exceptions found in (A) and (C) to (E) inapplicable.   15 U.S.C. § 1692a(4) & (6)(A)-(E)

NPAS does not argue that it is collecting for an entity related by common ownership or affiliated by corporate control.  Even if it did attempt to make this argument, it fails to fit this final exception to being a debt collector because it also collects for entities to which it is not related or affiliated[105] and its principal business is the collection of debts.[106]   15 U.S.C. §1692a (6)(B).

## V.   CONCLUSION

For the reasons set forth herein, NPAS is a debt collector who uses the mails in a business the principal purpose of which is the collection of debts and NPAS regularly collects or attempts to collect debts owed another (in this matter St. Mark's Hospital).  NPAS does not fit the limited exception to being a debt collector because under any process used by courts to determine if a debt was in default at the time NPAS obtained it, the St. Mark's debts were in default.  This is

---

[104] Exhibit P-1, NPAS 30(b)(6) depo at 99:1-100:1
[105] Exhibit P-1 NPAS 30(b)(6) depo at 17:21-18:2, 22:4-10
[106] See, Section IV(A) above.

especially true of account 4683 which was placed with Medicredit, an admitted collector of defaulted debt, first.

Wherefore, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

**HUMPHREYS WALLACE HUMPHREYS, P.C.**

By: */s/ R. David Humphreys*_____

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of February, 2018, I caused the foregoing document to be electronically transmitted to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Arthur D. Gregg
agregg@spencerfane.com
Jamie N. Cotter
jcotter@spencerfane.com
Scott J. Dickenson
sdickenson@spencerfane.com
Megan D. Meadows
mmeadows@spencerfane.com
Erik O. Solverud
esolverud@spencerfane.com
SPENCER FANE LLP

Christian S. Collins
ccollins@kmclaw.com
Christopher S. Hill
chill@kmclaw.com
KIRTON MCCONKIE
*Attorneys for Defendants*

       /s/ R. David Humphreys