IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBYN YOUNG,<br><br>  Plaintiff,<br><br>v.<br><br>NPAS, INC. and MEDICREDIT, INC.,<br><br>  Defendants. | MEMORANDUM DECISION AND<br>ORDER<br><br><br>Case No. 2:16-cv-01104<br><br>Judge Clark Waddoups |

## Introduction

Before the court are (I) Plaintiff Robyn Young's Motion for Summary Judgment against Defendant Medicredit for violations of the FDCPA (ECF No. 32); (II) Ms. Young and Defendant NPAS' Cross Motions regarding whether NPAS violated the FDCPA (ECF Nos. 32 and 91); (III) Defendants' Motion on Actual Damages (ECF No. 88); and (IV) Ms. Young's Motion to Amend the Complaint (ECF No. 75). The court heard oral argument on September 19, 2018. (ECF No. 114.)

For the reasons stated herein, the court GRANTS, in part, Ms. Young's Motion against Medicredit for violations of the FDCPA; GRANTS, in part, Ms. Young's Motion against NPAS for violations of the FDCPA; DENIES Defendants' Motion on actual Damages; and DENIES Ms. Young's Motion to Amend Complaint.

## Facts

Plaintiff Robyn Young (Ms. Young) was employed with Granite School District as a teacher for special needs children, including children with severe autism. (ECF No. 100 at 4.) In

the Spring of 2013, Ms. Young was attacked at work by one of her students and suffered a concussion. (ECF No. 100 at 4.) In the Spring of 2014, Plaintiff was again attacked at work by a different student. (ECF No. 100 at 4.) As a result of these attacks, Ms. Young suffered from migraine headaches, partial paralysis, sensitivity to light, and blurry vision. (ECF No. 100 at 4.) Ms. Young filed a worker's compensation claim with the State of Utah against Granite School District to recover for her injuries. (ECF No. 100 at 4.)

As part of her treatment for the injuries suffered in 2013 and 2014, Ms. Young sought medical care, on six different dates,[1] from St. Mark's Hospital. St. Mark's Hospital is owned by Hospital Corporation of America (HCA). (See ECF No. 99-1 at 10.[2]) HCA also owns an entity named "Parallon." (ECF No. 99-1 at 5.[3]) Parallon, in turn, owns Defendants NPAS, Inc. and Medicredit, Inc. (ECF No. 99-1 at 5.[4]) NPAS, Inc., Medicredit, Inc., and HSS Systems LLC are all Parallon Affiliates. (ECF No. 93-2 at 4.)

According to NPAS, Inc., NPAS conducts "early out" collections "for St. Mark's Hospital." (ECF No. 93-1 at 3.) NPAS claims that "early out" collections involve "attempts to collect unpaid accounts prior to the time that the account is deemed to be [in] default." (Wright Decl., ¶ 3, ECF No. 93-1 at 3.) According to NPAS, Inc., its collection services for St. Mark's Hospital are governed, "in part," by two agreements: (1) an Intercompany Services Agreement (Intercompany Agreement) and (2) an Amended and Restated Master Services Agreement

---

[1]  [1] May 23, 2014; [2] June 3, 2014; [3] February 23, 2015; [4] November 2, 2015; [5] February 2, 2016; and [6] May 29, 2016." (ECF No. 100 at 5.)

[2] (See ECF No. 99-1 at 10, Wright Depo. 30:20–22 (**Q.** Okay. We've already established that St. Mark's is owned and controlled by HCA, right?" **A.** Right.").)

[3] (See ECF No. 99-1 at 5, Wright Depo. 10:16–20 ("**Q.** And Parallon is owned by HCA, a publicly traded company; is that true? **A.** I'm not sure how all the intercompany agreements go. I mean, high level from my perspective, yeah, Parallon is one of the entities owed by HCA." ).)

[4] (See ECF No. 99-1 at 5, Wright Depo. 11: 15–17 ("Generally my understanding is that HCA owns Parallon, and Parallon—Medicredit and NPAS, Inc. are entities owned by Parallon.").

(Master Agreement). (Wright Decl., ¶ 3, ECF No. 93-1 at 3.) The Intercompany Agreement is "between NPAS on the one hand, and HSS Systems, LLC" on the other. (Wright Decl., ¶ 3, ECF No. 93-1 at 3.) The Master Agreement is between Parallon and "non-party Mountain Division, Inc." (Wright Decl., ¶ 3, ECF No. 93-1 at 3.) Ms. Young was not a party to either agreement.

The Intercompany Agreement provides that "HSS desire[d] to contract with NPAS . . . to provide . . . early-out collection services for its **Client-Hospitals**." (ECF No. 93-3 at 2 (emphasis in original).) The Intercompany Agreement further provides that "NPAS . . . shall use commercially reasonable efforts to obtain the amounts owed . . . ." (ECF No. 93-3 at 3–4.) The Intercompany Agreement also provides that "NPAS . . . shall maintain its own employees to provide Early-Out Collection Services for HSS." (ECF No. 93-3 at 4.) And the Agreement provides that "NPAS . . . possesses experience and expertise in providing early-out collection services for hospital facilities." (ECF No. 93-3 at 2.)

According to NPAS, "[u]nder the [Master Agreement,] St. Mark's Hospital is a facility which receives services from NPAS and HSS." (Wright Decl., ¶ 5, ECF No. 93-1 at 3.) "As part of the services that HSS provides for St. Mark's Hospital, it contracts certain services with NPAS via the [Intercompany Agreement]." (Wright Decl., ¶ 7, ECF No. 93-1 at 4.)

On four of six dates on which Ms. Young received treatment from St. Mark's Hospital, she "signed a 'Conditions of Admission and Consent for Outpatient Care,' [Consent for Care Agreement] in connection with medical services received . . . ." (*See* ECF No. 98 at 13–14.) On one date, June 3, 2014, Ms. Young's husband signed one of the Consent for Care Agreements. (*See* ECF No. 98 at 13.) It is unclear from the record whether Ms. Young signed a Consent for Care Agreement on February 23, 2015. (*See* ECF No. 98 at 13–14.) Each of these Consent for Care Agreements contained the following provision:

I acknowledge that the Providers may utilize the services of a third party Business Associate or affiliated entity as an extended business office ("EBO Servicer") for medical account billing and servicing. During the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default, and shall not be reported to a credit bureau or subject to collection legal proceedings. When the EBO Servicer's efforts to obtain payment have been exhausted due to a number of factors (for e.g., Patient of Guarantor's failure to pay or make a payment arrangement after insurance adjustments and payments have been credited, and/or the insurer's denial of claim(s) or benefits is received), the EBO Servicer will send a final notice letter which will include the date that the medical account may be returned from the EBO Servicer to the Provider. Upon return to the Provider by the EBO Servicer, the Provider may place the account back with the EBO Servicer, or, at the option of the Provider, may determine the account to be delinquent, past due and in default. Once the medical account is determined to be delinquent it may be subject to late fees, interest as stated, referral to a collection agency for collection as a delinquent account, credit bureau reporting and enforcement by legal proceedings.

(*See* ECF No. 92-6 at 3–4.)

As a result of the treatment she received from St. Mark's Hospital, six different accounts were placed with NPAS, and four were placed with Medicredit.

NPAS Accounts

Six different accounts were placed with NPAS as shown in the following chart.[5]

| Placement Date | Date of Service | Amount | Account Number |
| --- | --- | --- | --- |
| 7/22/14 | 6/3/14 | $431.76 | 4860 |
| 2/27/15 | 5/23/14 | $2,539.88 | 4683 |
| 6/11/15 | 2/23/15 | $181.05 | 1437 |
| 12/28/15 | 11/2/15 | $952.84 | 4604 |
| 2/29/16 | 2/2/16 | $847.36 | 6966 |
| 8/2/16 | 5/29/16 | $713.89 | 1159 |

---

[5] (ECF No. 98 at 15–17.)

NPAS maintained records of these accounts in its Collection Notes. (*See* ECF No. 32-17 at 1–73.) The court first discusses Account 4683 and then the remaining accounts placed with Medicredit.

Account 4683

On or around October 26, 2015, NPAS sent Ms. Young a letter stating, in part, that "[d]espite [its] efforts," it had "been unable to secure payment on" Account 4683. It also stated: "You are obligated to pay for the services provided." (ECF No. 82-2 at 2.) On or around May 17, 2016, NPAS sent Ms. Young another letter regarding Account 4683 in which it requested that Ms. Young send NPAS her attorney's information. (ECF No. 32-3 at 2.) Ms. Young's attorney, Lester Perry replied on July 5, 2016 with reference to this account, and accounts 6966 and 4604, requesting certain information from NPAS and informing NPAS that there could be other accounts that NPAS was attempting to collect on. (*See* ECF No. 32-4 at 2.)

Medicredit Accounts

Account 4683 was first placed with Medicredit on October 11, 2014. (Wright Decl., ¶ 21, ECF No. 62-2 at 6; *see also* ECF No. 32-16 at 2 (Medicredit's Account Notes indicate that the "placement date" of this account was "10/11/2014.").) Four months later, on February 27, 2015, Account 4683 "was placed with NPAS . . . ." (*See* ECF No. 98 at 16.) Three additional debts were placed with Medicredit on three different dates for the services that St. Mark's Hospital performed for Ms. Young. (*See* ECF No. 62 at 15.) All of these debts were assigned different "reference ID" numbers: 4683, 1437, 4604, and 6966. (*See* ECF No. 101-5 at 2.) Even though the four accounts were each assigned a different reference ID number, Medicredit had a single "consumer ID" that was specifically tied to Ms. Young and all four of her accounts. (*See* ECF No. 101-5 at 2.)

Medicredit maintained records of these four accounts in its "Medicredit Account Notes" and in its "Noble System" call history log.  (Wright Decl., ¶ 20, ECF No. 62-2 at 6.) The Medicredit Account Notes are comprised, at least in part, of "notes from St. Mark's [hospital]" and "notes from NPAS." (*See* ECF No. 101-2 at 17, Wright Depo. 59: 7–14.) The Medicredit Account Notes also include some entries from the Noble System Call Log.

Medicredit's Account Notes do not clearly delineate between accounts—if it all. (*Compare* ECF No. 32-16 *with* ECF No. 32-17[6].) In other words, the Medicredit Account Notes appear to be one large, amorphous, omnibus account. In his deposition, Medicredit's 30(b)(6) witness, Mr. Wright, described the Medicredit Account Notes as "a Consumer Fact Sheet out of the system we have at Medicredit." (ECF No. 101-2, Wright Depo. 30: 1–2.) He then stated that "[i]t's called DM9, it's a collection system." (ECF No. 101-2 at 10, Wright Depo. 30:4.) The following line of questioning then ensued between Ms. Young's counsel and Mr. Wright:

> **Q.** What type of information is in the Consumer Fact Sheet?
>
> **A**. This is the record of the history of accounts that were placed, demographic information, and notes associated, related to those accounts.
>
> **Q**. So if I wanted to go into the system there at Medicredit and look up, for instance, Mrs. Young's information, how would you do that at Medicredit?
>
> **A.** There's lots of ways to do it, but the best way to do it would just be to pull the accounts up by the consumer ID number, the upper left-hand corner.
>
> **Q.** So this ID number would have every account that Medicredit has worked on that -- Mrs. Young?
>
> **A.** As long as the -- as long as all of the information from subsequent accounts matched in the merging rules, then all those accounts would merge together and belong to one single consumer number for Robyn Young.

(ECF No. 101-2 at 10, Wright Depo. 30:10–22.)

---

[6] *See also* ECF No. 101-2 at 13, Wright Depo. 44:20–23 ("**Q.** So Medicredit doesn't separate out the notes on the accounts, they're all kind of put together in chronological order?" **A.** Yes.").)

Mr. Wright explained that when an account is placed with Medicredit, no one at Medicredit independently verifies that the consumer actually owes money before Medicredit contacts the consumer. (ECF No. 101-2 at 15, Wright Depo. 52: 6–14.[7]) Mr. Wright also clarified that the information contained in the "Consumer Fact Sheet" would have been available to Medicredit representatives, but that it would not have been in the same format as has been presented to the court. (*See* ECF No. 101-2 at 12, Wright Depo. 38: 23–25; 39: 1–6,[8] *see also* ECF No. 101-2 at 13, Wright Depo. 44: 7–9.[9])

Medicredit Treatment of Account 4683

As noted, Account 4683 was placed first with Medicredit.[10] (Wright Decl., ¶ 21, ECF No. 62-2 at 6; *see also* ECF No. 32-16 at 2.) Medicredit assigned Ms. Young with the "Consumer ID" "48159461" at this time. (*See* ECF No. 32-16 at 73.)

After receiving Account 4683, Medicredit called Ms. Young six times in October 2014— on October 13, 15, 16, 17, 20 and 21. (*See* ECF No. 32-16 at 78; *see also* ECF No. 32-16 at 73.)

Account 4683 was then removed from Medicredit, and placed with NPAS on February 27, 2015. (Wright Decl., ¶ 15, ECF No. 62-2 at 5.) Almost a year later, on February 5, 2016,

---

[7] **Q.** "Is there anything done at Medicredit to evaluate the account to determine whether or not the consumer actually owes any money before Medicredit sends a letter, like we're speaking of this validation notice?"

**A.** "Based on our agreements, the balances that are placed, there's an assumption that the balance due is owed to the consumer. Other than that, there's no validation that occurs."

[8] **Q.** "So the version that we're seeing here of these Consumer Fact Sheet, is this how representatives of Medicredit see the information?"

**A.** No, they—I don't—They wouldn't see it—I mean, they—they would see this information that's tied together in this document by looking in different screens, but all those screens tie into this document. So they wouldn't see it like we see it, *but they see the information we see*."

[9] **Q.** "Would it show up like what we see here at the top of the page, of Exhibit 2, the first page of Exhibit 2, MC1?"

**A.** "Again, they don't see it exactly like this, but they would easily see in the middle of their screen all five accounts associated with this consumer."

[10] As discussed above, this account was placed with Medicredit before it was placed with NPAS. (*Compare* Wright Decl., ¶ 21, ECF No. 62-2 at 6 *with* Wright Decl., ¶ 15, ECF No. 62-2 at 5 (indicating that account 4683 was placed with NPAS on February 27, 2015).)

Medicredit "merged" Ms. Young's previous Consumer ID, "48159461" with the most recent Consumer ID, "29169038." (ECF No. 32-16 at 73.) Again, the Consumer ID allowed Medicredit employees to see all accounts associated with Ms. Young. (*See* ECF No. 101-2 at 10, Wright Depo. 30:10–22.)

On July 4, 2016, Account 4683 was placed with Medicredit for a second time. (ECF No. 32-16 at 2.) At the same time, NPAS' Collection Notes for Account 4683 were transferred to Medicredit's Account Notes. (*Compare* ECF No. 32-17 at 32–43 *with* ECF No. 32-16 at 7–36.) Many of the entries in NPAS' Collection Notes for Account 4683 are nearly identical to Medicredit's Account Notes dated "7/4/2016". For example, a June 3, 2016 entry from NPAS' Collection Notes providing "LETTER FROM K DAWN ATLAN . . . STATING THAT THEY REPRSESENT PT" can be found in Medicredit's Account Notes timestamped "7/4/2016." (*Compare* ECF No. 32-17 at 42 *with* ECF No. 101-5 at 27.) As another example, NPAS' collection notes from 11/23/15 provides "NOTES: ATTN WORK COMP . . . GN STTD THIS ACCT IS WORK COMP RELATED AND IS CURRENTLY UNDER LITIGATION." (ECF No. 32-17 at 34.) Medicredit's Account Notes for 7/4/2016 similarly provide "ATTN WORK COMP . . . ." and also provide "[T]HIS ACCT IS WORK COMP REL . . . ." (ECF No. 101-5 at 29.) The similarities between the NPAS Collection Notes and Medicredit's Account Notes demonstrate that NPAS' Collection Notes for Account 4683 were imported into Medicredit's Account Notes on 7/4/2016—the date that Account 4683 was placed with Medicredit for the second time.

On the very next day, Lester Perry sent Medicredit a letter asking for information. (*See* ECF No. 32-14 at 2.) This letter also referenced Ms. Young's Consumer ID number, 29169038.

On or around July 11, 2016, notwithstanding the letter from Lester Perry, Medicredit sent Ms. Young a further letter about Account 4683, informing her that Medicredit had "the full intention of collecting on this account(s)" and stating that "this office will assume this debt is valid" unless Ms. Young disputed the debt within 30 days of receiving the letter. (*See* ECF No. 32-10 at 2; Young Decl. ¶ 17, ECF No. 101-4 at 4.)

One of Medicredit's Account Note entries confirms that Medicredit had received an attorney letter, at the latest, on July 20, 2016. For example, one of Medicredit's Account Notes, timestamped on 7/20/2016, provides "RECV ATTY REP LETER." (ECF No. 32-16 at 5.) Another entry, timestamped on 7/21/2016 provides "RCVD CORR FROM HOOLE & KING LAW OFFICES STATING THAT THEY REPRESENTS TO CONS AND REQUESTING I/S FOR ACCT# 67838544, 69726746 & 73736726 . . . ." (ECF No. 32-16 at 5.)

In addition to the July 11 letter, Medicredit also called Ms. Young four more times after July 4, 2016—on July 5, 7, 15, and 21 of 2016. (ECF No. 32-16 at 80.) Importantly, Medicredit called Ms. Young on July 21, 2016—after Medicredit's time stamp from July 20, 2016 revealed that, at least by that date, Medicredit had received a letter from Ms. Young's attorney. (*See* ECF No. 32-16 at 5.)

Account 1437

"On February 5, 2016," Account 1437 "was first placed with Medicredit." (Wright Decl., ¶ 22, ECF No. 62-2 at 6; *see also* ECF No. 32-16 at 2.) Just like Account 4683, NPAS' Collection Notes for Account 1437 were imported into Medicredit's Account Notes on this placement date. (*Compare* ECF No. 32-17 at 19–31 *with* ECF No. 32-16 at 59–73.) For example, a July 29, 2015 entry from NPAS' Collection Notes providing "ATTN WORKERS COMP: RPLS REVIEW, AND DETERMINE ORDER OF INSR. THANK YOU" can be found in

Medicredit's Account Notes timestamped on 2/5/2016. (*Compare* ECF No. 32-17 at 24 *with* ECF No. 32-16 at 65.) As another example, NPAS' collection notes from 10/13/15 for Account 1437 provides "CHKD CORRES SAYS CLM IN LITIGATION . . . ." (ECF No. 32-17 at 26.) The identical entry is found in Medicredit's Account Notes, timestamped on 2/5/2016. (*See* ECF No. 32-16 at 67.)

After Account 1437 was placed with Medicredit, Medicredit called Ms. Young five times before March 4, 2016 (the date that the next account, Account 4604, was placed with Medicredit). Medicredit called Ms. Young on February 11, 16, 19, 25 of 2016 and on March 3, 2016. (*See* ECF No. 32-16 at 78.)

On May 13, 2016, Ms. Young's then attorney, Dawn Atkin, sent St. Mark's Hospital a letter regarding Account 1437. (*See* ECF No. 32-13 at 2.) She informed St. Mark's Hospital that she represented Ms. Young, and that based on "Utah Code. Ann. 34-2-401(b)," Ms. Young "dispute[d] the validity of this debt . . . ." (ECF No. 32-13 at 2.) An entry from Medicredit's Account Notes, timestamped on 5/27/2016, provides in part, "ATKIN & ASSOC SENT LTR STTN WC HAS BEEN FILED." (ECF No. 101-5 at 37.)

Account 4604

"On March 4, 2016," Account 4604 "was first placed with Medicredit." (Wright Decl., ¶ 22, ECF No. 62-2 at 6; *see also* ECF No. 32-16 at 2.) Just like Account 4683 and Account 1437, NPAS' Collection Notes for Account 4604 were imported into Medicredit's Account Notes on this placement date. (*Compare* ECF No. 32-17 at 44–46 *with* ECF No. 32-16 at 51–57.) For example, a December 28, 2015 entry from NPAS' Collection Notes providing "ATTY INVOLVED ON ASSOC ACCT CHECK VALIDITY" can be found in Medicredit's Account Notes timestamped on 3/4/2016. (*Compare* ECF No. 32-17 at 45 *with* ECF No. 32-16 at 57.)

On or around March 8, 2016, Medicredit sent Ms. Young a letter about Account 4604, informing her that Medicredit had "the full intention of collecting on this account(s)" and stating that "this office will assume this debt is valid" unless Ms. Young disputed the debt within 30 days of receiving the letter. (*See* ECF No. 32-8 at 2; Young Decl. ¶ 15, ECF No. 101-4 at 4.)

After account 4604 was placed with Medicredit, Medicredit called Ms. Young eight times before April 25, 2016 (the date that the next account, Account 6966, was placed with Medicredit). Medicredit called Ms. Young on March 8, 14, 21, 28, and April 6, 11, 19, and 22, 2016. (ECF No. 32-16 at 78–79.)

As noted above, on July 5, 2016, Ms. Young's attorney, Lester Perry, sent Medicredit a letter regarding this account, and accounts 4683 and 6966, requesting certain information from Medicredit and informing Medicredit that Ms. Young was represented by his firm, Hoole & King. (*See* ECF No. 32-14 at 2.)

Account 6966

On April 25, 2016, Account 6966 was placed with Medicredit. (ECF No 32-16 at 2.) Just like Account 4683, Account 1437, and Account 4604, NPAS' Collection Notes for Account 6966 were imported into Medicredit's Account Notes on this placement date. (*Compare* ECF No. 32-17 at 47–69 *with* ECF No. 32-16 at 39–51.) For example, a February 2, 2016 entry from NPAS' Collection Notes providing "PT. STATES THIS IS IN LITIGATION THRU WCF" can be found in Medicredit's Account Notes timestamped on 4/25/2016. (*Compare* ECF No. 32-17 at 49 *with* ECF No. 32-16 at 39.)

After Account 6966 was placed with Medicredit, Medicredit called Ms. Young twenty-five times before July 4, 2016 (the date that Account 4683 was placed with Medicredit for the second time). (*See* ECF No. 32-16 at 79–80.) These calls were made on April 25, 26, 27, 28,

May 2, 4, 5, 9, (twice on May 10,) 11, 17, 23, 25, June 2, 7, 9, 13, 14, 15, 21, 22, 27, 28, and 29. (*See* ECF No. 32-16 at 79–80.)

On or around May 1, 2016, Medicredit sent Ms. Young another letter on this account informing her that Medicredit had "the full intention of collecting on this account(s)" and stating that "this office will assume this debt is valid" unless Ms. Young disputed the debt within 30 days of receiving the letter. (*See* ECF No. 32-9 at 2; Young Decl. ¶ 16.)

## Standard

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* The nonmoving party may not rest solely on allegations on the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

## Analysis

In her First Amended Complaint, Ms. Young alleges that NPAS and Medicredit violated both the Fair Debt Collection Practices Act (FDCPA) and the Utah Consumer Sales Practices Act (UCSPA). (FAC ¶¶ 49–67, ECF No. 26 at 9–12.) For the alleged FDCPA violations, Ms.

Young alleges that NPAS and Medicredit violated Sections 1692a, 1692c, 1692d, 1692e, (FAC ¶¶ 51–54, ECF No. 26 at 9) and 1692f (FAC ¶ 58, ECF No. 26 at 10.)

In her Motion for Partial Summary Judgment, Ms. Young argues that both NPAS and Medicredit violated sections [1] 1692f(1), [2] 1692e(2)(A), [3] 1692e(10), [4] 1692c(a)(2), and [5] 1692c(c) of the FDCPA. (*See* ECF No. 32 at 15, 19, 21, and 22.) Ms. Young reserves the "determination of other FDCPA" violations "for trial by jury." (ECF No. 32 at 22.) And Ms. Young reserves the "determination" of "state law violations," "tort claims," "and the question of appropriate actual damages" for trial. (ECF No. 32 at 22.)

In Opposition to Ms. Young's Motion, Defendants argue that Ms. Young "has failed to demonstrate the absence of any genuine issue of material fact regarding whether Defendants have violated the FDCPA." (ECF No. 62 at 34.) Defendants further argue that Ms. Young is not entitled to summary judgment because she "failed to demonstrate the absence of any genuine issue of material fact regarding whether NPAS is a 'debt collector' under the FDCPA." (ECF No. 62 at 28.) On this issue, NPAS argues, in its Motion for Partial Summary Judgment, that it is entitled to summary judgment "in its favor and against" Ms. Young because "NPAS does not meet the definition of a 'debt collector' under the FDCPA" and cannot "be sued for violating the FDCPA." (ECF No. 91 at 2.) Additionally, Defendants move the court "for partial summary judgment in their favor and against" Ms. Young "on her claim that she sustained actual damages from Defendants' alleged violations of the" FDCPA and UCSPA. (ECF No. 88 at 2.)

The court addresses (**I**) Ms. Young's Motion for Summary Judgment against Medicredit; (**II**) Ms. Young and NPAS' Cross Motions regarding whether NPAS violated the FDCPA, (**III**) Defendants' Motion on actual damages; and (**IV**) Ms. Young's Motion to Amend Complaint.

I.    Ms. Young Is Entitled to Summary Judgment Against Medicredit

"To establish a violation of the FDCPA, Plaintiff must prove . . . four elements." *Rhodes*

*v. Olson Assocs., P.C.*, 83 F. Supp. 3d 1096, 1103 (D. Colo. 2015). There is no disputed material

fact that as to each of the accounts at issue Plaintiff has satisfied the first three elements against

Medicredit.

First, that Plaintiff is a "consumer"—meaning "any natural person obligated or allegedly

obligated to pay any debt." 15 U.S.C. § 1692a(3). It is undisputed that Ms. Young is a natural

person. And it is undisputed that Medicredit contacted Ms. Young alleging she was obligated to

pay debts for services she received from St. Mark's Hospital. (*See e.g.,* ECF No. 32-10 at 2.)

Ms. Young is a "consumer" under the FDCPA. The first element is met.

Second, that "[t]he 'debt' arises out of a transaction entered primarily for personal,

family, or household purposes." *Rhodes*, 83 F. Supp. 3d at 1103. It is undisputed that the debts

relate to services that St. Mark's provided to Ms. Young for treatment relating to injuries she

sustained at work. The second element is met.

Third, that "Defendant collecting the debt is a 'debt collector' within the meaning of 15

U.S.C. § 1692a(6)." *Id.* Medicredit's counsel conceded at oral argument that Medicredit is a debt

collector. Additionally, the letters to Ms. Young received from Medicredit also identify

Medicredit as a "debt collector." (*See e.g.,* ECF No. 32-10 at 2 ("This communication is from a

debt collector and is an attempt to collect a debt.") The third element is met.

The fourth element a plaintiff must prove to establish a violation of the FDCPA is that the

defendant "violated, by act or omission, a provision of the FDCPA." *Rhodes v. Olson Assocs.,*

*P.C.*, 83 F. Supp. 3d 1096, 1103 (D. Colo. 2015). As noted above, Ms. Young argues that

Medicredit violated sections [A] 1692f(1),  [B] 1692e(2)(A), [C] 1692e(10), [D] 1692c(a)(2),

and [E] 1692c(c) of the FDCPA. (*See* ECF No. 32 at 15, 19, 21, and 22.) The fourth element is disputed and the court addresses Medicredit's violations below.

A. Medicredit Violated 1692(f)(1)

Ms. Young argues that Medicredit "violated the FDCPA by collecting or attempting to collect debts that were not permitted by law." (*See* ECF No. 32 at 14.) Section 1692f(1) provides that "[t]he collection of any amount" of debt is "a violation of this section" "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). Ms. Young argues that Medicredit's efforts to collect the debts at issue were not permitted under Utah law because "Young never owed the debts" Medicredit "tried to collect." (ECF No. 82 at 10.) Rather, Ms. Young argues that her employer, Granite School District, owed the debts.

Ms. Young argues that "[u]nder Utah law," her "employer [was] solely responsible for" the payments relating to "medical expenses incurred within the course and scope of [her] employment." (ECF No. 82 at 10.) Here, Ms. Young relies on Utah's Workers Compensation Act, Utah Code Ann. § 34A-2-401. That statute provides that an employee of a school district "who is injured . . . by accident arising out of and in the course of the employee's employment . . . shall be paid . . . for . . . medical, nurse, and hospital services." Utah Code Ann. § 34A-2-401(1)(b)(i). The statute further provides that "[t]he responsibility for compensation and payment of medical, nursing, and hospital services and medicines . . . provided under this chapter shall be . . . on the employer and the employer's insurance carrier," and "***not on the employee***." Utah Code Ann. § 34A-2-401(2)(a–b) (emphasis added).

Defendants argue that Ms. Young "provides no actual evidence that the unpaid medical debts . . . are actually debts regarding which the law prohibits Defendants from taking certain

actions." (ECF No. 62 at 34.) But there is no dispute that Ms. Young was employed with Granite School District when she was attacked by students and injured on the job. (*See* ECF 100 at 4.) Nor is there any dispute that "[a]s a result of these attacks," Ms. Young "filed a worker's compensation claim with the State of Utah against Granite School District." (ECF No. 100 at 4.) Further, at oral argument, Ms. Young's counsel stated that a Utah "administrative decision" confirmed that the debts at issue were not Ms. Young's debts. Defendants did not dispute these facts.

Ms. Young's counsel's representation is supported by a March 10, 2017 Order issued by the Utah Labor Commission Appeals Board. In that Order, Granite School District "ask[ed] the Utah Labor Commission to review" an administrative law judge's "award of benefits to" Ms. Young under the Utah Workers' Compensation Act. *Young v. Granite School District*, 2017 UT Wrk. Comp. Lexis 20 at *1. The Appeals Board explained that "Ms. Young [had] claim[ed] workers' compensation benefits for ongoing symptoms of a head injury she sustained while working for Granite . . . ." *Id*. The administrative law judge had "awarded medical benefits and temporary disability compensation to Ms. Young . . . ." *Id*. The Appeals Board ultimately "concur[red] with the administrative law judge's "decision awarding benefits to Ms. Young." *Id*. at *9. The debts at issue were Granite School District's responsibility to pay—not Ms. Young's.

"To evaluate whether" Medicredit's efforts to collect the medical debts at issue were "'permitted by law,'" "it is necessary to determine which 'law' the [collection efforts] must be 'permitted by.'" *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002) (quoting 15 U.S.C. § 1692f(1)). "At the most basic level, this is an issue of Utah law rather than federal law." *C.f. Johnson*, 305 F.3d at 1117–18. "[E]very circuit court decision that has applied the 'permitted by law' standard has asked . . . whether state substantive law permitted the FDCPA defendant to

collect the money that it demanded." *Id*. at 1118. The Tenth Circuit has held that "an amount is 'permitted by law' within the meaning of the FDCPA if state supreme court holdings establish that collection of the amount is lawful." *Id*. at 1119. "Absent state supreme court holdings on point, [the Tenth Circuit] follow[s] [the] familiar *Erie* analysis by predicting what the state supreme court would hold . . . ." *See id*. at 1119.

Neither party points the court to any Utah Supreme Court case addressing whether, under the FDCPA, a debt collector is permitted to attempt to collect medical debt from an employee for medical expenses arising from injuries sustained in the course of her employment, where the responsibility to pay is on the employer—not the employee.[11] Nor has the court found any Utah Supreme Court case in its own research. The court notes, however, that the statute is clear— "[t]he responsibility for . . . payment of medical . . . expenses" for an "employee's" work-related injuries are "on the employer" and "**not on the employee.**" Utah Code Ann. § 34A-2-401(2)(b) (emphasis added). Because the statute is clear, the court concludes that the Utah Supreme Court would not allow a debt collector to attempt to collect medical debt from an employee when the responsibility to pay for that debt is on the employer.

The court next addresses an argument that Defendants made at oral argument that it is "a disputed fact" about whether Medicredit had knowledge that the accounts at issue were subject to worker's compensation. Defendants' counsel stated that Medicredit's representatives "didn't look at" the "client notes" "when they came over." An underlying assumption of Defendants' argument is that Plaintiff must show that Medicredit had knowledge that the accounts at issue

---

[11] "Employee" means "any . . . person" "in the service of . . . a school district within the state [of Utah]." Utah Code Ann. § 34A-2-104

A school district is an "employer" under this statute. *See* Utah Code Ann. § 34A-2-103(1)(a) ("The state, and each county, city town, *and school district* in the state are considered employers under this chapter . . . ." (emphasis added).)

were subject to worker's compensation in order to be liable under the FDCPA. In her reply, Ms. Young argues that "it . . . does not matter whether Defendants had notice [that she] was not responsible for the debts" (ECF No. 82 at 2) because the "FDCPA is a strict liability statute that" does not require proof of an intentional violation. (*See* ECF No. 82 at 11.) The court proceeds in two steps. First, the court addresses whether Medicredit can be charged with knowledge that the accounts at issue were subject to worker's compensation. Second, the court addresses whether this knowledge is even required to show a violation of 15 U.S.C. § 1692f(1).

   1. Medicredit Is Charged With Knowledge

   As noted above, Medicredit's counsel argues that it is "a disputed fact" about whether Medicredit had knowledge that the accounts at issue were subject to worker's compensation because Medicredit's representatives "didn't look at" the "client notes" "when they came over." Here, Defendants' counsel relied on Medicredit's 30(B)(6) representative, Don Wright. (*See* ECF No. 101-2 at 3, Wright Depo. 5: 2–4.) Mr. Wright testified that it is "not part of the process" at Medicredit to review the account notes that Medicredit receives to collect on. (*See* ECF No. 101-2 at 17, Wright Depo. 60: 2–6.)  Mr. Wright further explained that when an account is placed with Medicredit, no one at Medicredit independently verifies that the consumer actually owes money before Medicredit contacts the consumer. (ECF No. 101-2 at 15, Wright Depo. 52: 6–14.[12]) Mr. Wright also explained that the information contained in the "Consumer Fact Sheet" would have been available to Medicredit representatives, but that it would not have been in the

---

[12] **Q.** "Is there anything done at Medicredit to evaluate the account to determine whether or not the consumer actually owes any money before Medicredit sends a letter, like we're speaking of this validation notice?"

**A.** "Based on our agreements, the balances that are placed, there's an assumption that the balance due is owed to the consumer. Other than that, there's no validation that occurs."

same format as has been presented to the court. (*See* ECF No. 101-2 at 12, Wright Depo. 38: 23–25; 39: 1–6,[13] *see also* ECF No. 101-2 at 13, Wright Depo. 44: 7–9.[14])

The court rejects Medicredit's arguments that it should not be charged with knowledge of its own records. Mr. Wright's deposition reveals that Medicredit's representatives had access to the Medicredit Account notes. Medicredit is a corporation. (ECF No. 27 at 2.) "[C]orporations are charged with knowledge of information known to their officers . . . ." *Helton v. AT & T Inc.*, 709 F.3d 343, 356 (4th Cir. 2013). "[O]fficers are charged with knowledge of information in corporate . . . records . . . ." *Id.* It is for this reason that "corporate entities . . . have constructive knowledge of the contents of their records." *Id.* Therefore, even though Medicredit's representatives claim not to have reviewed Medicredit's records, Medicredit is still charged with knowledge of the information in the Medicredit Account Notes. As explained, Medicredit had knowledge that each of the four accounts at issue was not Ms. Young's responsibility to pay.

Medicredit Had the Required Knowledge for Account 4683

An entry from Medicredit's Account Notes from October 11, 2014 states "PT CI V HIPAA STATES THIS IS **WORK COMP**." (ECF No. 32-16 at 77 (emphasis added).) This is the same date Account 4683 was placed with Medicredit. Because Medicredit's Account Notes indicated that this account was associated with worker's compensation, it is charged with knowledge that this account was not Ms. Young's responsibility to pay under Utah Code Ann. §

---

[13] **Q.** "So the version that we're seeing here of these Consumer Fact Sheet, is this how representatives of Medicredit see the information?"

**A.** No, they—I don't—They wouldn't see it—I mean, they—they would see this information that's tied together in this document by looking in different screens, but all those screens tie into this document. So they wouldn't see it like we see it, *but they see the information we see*."

[14] **Q.** "Would it show up like what we see here at the top of the page, of Exhibit 2, the first page of Exhibit 2, MC1?"

**A.** "Again, they don't see it exactly like this, but they would easily see in the middle of their screen all five accounts associated with this consumer."

34A-2-401(2)(b). Medicredit nevertheless called Ms. Young six times in October 2014 regarding this account. (*See* ECF No. 32-16 at 78; *see also* ECF No. 32-16 at 73.) Because Medicredit was not permitted under Utah law to contact Ms. Young, each of these phone calls was a violation of 15 U.S.C. § 1692f(1).

As noted above, on July 4, 2016, Account 4683 was placed with Medicredit for a second time. (ECF No. 32-16 at 2.) An entry from Medicredit's Account Notes on that same date from July 4, 2016 provides "ATTN **WORK COMP**" and also provide "[T]HIS ACCT IS **WORK COMP** REL . . . ." (ECF No. 101-5 at 29 (emphases added).) This is further evidence that Medicredit is charged with knowledge that this account was not Ms. Young's responsibility to pay. Medicredit nevertheless sent Ms. Young a letter regarding Account 4683, informing her that Medicredit had "the full intention of collecting on this account(s)" and stating that "this office will assume this debt is valid" unless Ms. Young disputed the debt within 30 days of receiving the letter. (*See* ECF No. 32-10 at 2; Young Decl. ¶ 17, ECF No. 101-4 at 4.) And Medicredit called Ms. Young on July 5, 7, 15, and 21 of 2016. (ECF No. 32-16 at 80.) Each of those phone calls, and the July 11, 2016 letter, were violations of 15 U.S.C. § 1692f(1).

Medicredit Had the Required Knowledge for Account 1437

Account 1437 was first placed with Medicredit on February 5, 2016. (Wright Decl., ¶ 22, ECF No. 62-2 at 6; *see also* ECF No. 32-16 at 2.) An entry from Medicredit's Account Notes from that same date provides "**ATTN WORKERS COMP**; PLS REVIEW, AND DETERMINE ORDER OF INSR. THANK YOU." (ECF No. 32-16 at 65 (emphasis added).) Medicredit nevertheless called Ms. Young five times before March 4, 2016 (the date that the next account, Account 4604, was placed with Medicredit). Medicredit called Ms. Young on February 11, 16, 19, 25 of 2016 and on March 3, 2016. (*See* ECF No. 32-16 at 78.) Because Medicredit was not

permitted under Utah law to contact Ms. Young, each of these phone calls was a violation of 15 U.S.C. § 1692f(1).

Medicredit Had the Required Knowledge for Account 4604

Account 4604 was first placed with Medicredit on March 4, 2016. (Wright Decl., ¶ 22, ECF No. 62-2 at 6; *see also* ECF No. 32-16 at 2.) An entry from Medicredit's Account Notes from that same date March 4, 2016 provides "**WORKERS COMP**." (ECF No. 32-16 at 55 (emphasis added).) Again, because Medicredit's Account Notes indicated that this account was associated with worker's compensation, it is charged with knowledge that this account was not Ms. Young's responsibility. Nevertheless, on or around March 8, 2016, Medicredit sent Ms. Young a letter regarding Account 4604, informing her that Medicredit had "the full intention of collecting on this account(s)" and stating that "this office will assume this debt is valid" unless Ms. Young disputed the debt within 30 days of receiving the letter. (*See* ECF No. 32-8 at 2; Young Decl. ¶ 15, ECF No. 101-4 at 4.)  Additionally, after account 4604 was placed with Medicredit, Medicredit called Ms. Young eight times before April 25, 2016 (the date that the next account, Account 6966, was placed with Medicredit). Medicredit called Ms. Young on March 8, 14, 21, 28, and April 6, 11, 19, and 22, 2016. (ECF No. 32-16 at 78–79.) Because Medicredit was not permitted under Utah law to contact Ms. Young, each of these phone calls and the March 8, 2016 letter were violations of 15 U.S.C. § 1692f(1).

Medicredit Had the Required Knowledge for Account 6966

Account 6966 was placed with Medicredit on April 25, 2016. (ECF No 32-16 at 2.)  An entry from Medicredit's Account Notes from the same date provides "PT. STATES THIS IS IN LITIGATION THRU **WCF** . . . ." (ECF No. 32-16 at 39 (emphasis added).) As to this account, Medicredit is also charged with knowledge that this account was not Ms. Young's responsibility.

Medicredit called Ms. Young twenty-five times before July 4, 2016 (the date that Account 4683 was placed with Medicredit for the second time). (*See* ECF No. 32-16 at 79–80.) Medicredit called Ms. Young on April 25, 26, 27, 28, May 2, 4, 5, 9, (twice on May 10,) 11, 17, 23, 25, June 2, 7, 9, 13, 14, 15, 21, 22, 27, 28, and 29. (*See* ECF No. 32-16 at 79–80.) And on May 1, 2016, Medicredit sent Ms. Young a letter on this account informing her that Medicredit had "the full intention of collecting on this account(s)" and stating that "this office will assume this debt is valid" unless Ms. Young disputed the debt within 30 days of receiving the letter. (ECF No. 32-9 at 2.) Because Medicredit was not permitted under Utah law to contact Ms. Young, each of these phone calls and the May 1, 2016 letter were violations of 15 U.S.C. § 1692f(1).

To summarize, Medicredit is charged with knowledge of the information in the Medicredit Account Notes. The Medicredit Account Notes demonstrate that each of the medical debts owed to St. Mark's hospital were subject to worker's compensation. Because they were subject to worker's compensation, they were not Ms. Young's responsibility to pay under Utah Code Ann. § 34A-2-401(2)(b). Because they were not Ms. Young's responsibility to pay, Medicredit was not permitted under Utah law to contact Ms. Young about any of the accounts. Each time Medicredit contacted Ms. Young, it violated 15 U.S.C. § 1692f(1).

### 2. Medicredit Has Strict Liability

In her reply, Ms. Young argues that "it . . . does not matter whether Defendants had notice [that she] was not responsible for the debts" (ECF No. 82 at 2) because the "FDCPA is a strict liability statute that" does not require proof of an intentional violation. (*See* ECF No. 82 at 11.) "While the Tenth Circuit has not ruled definitively that the FDCPA is a strict liability statute, it is true that 'courts generally treat the FDCPA as a strict liability statute . . . .'" *Sartori v. Steider & Assocs., P.C.*, No. 1:15-CV-00991-JCH-LF, 2017 WL 3602029, at *2 (D.N.M. Jan.

19, 2017), *report and recommendation adopted*, No. 1:15-CV-00991-JCH-LF, 2017 WL 4542882 (D.N.M. Feb. 8, 2017) (quoting *Soren v. Equable Ascent Fin., LLC*, 2012 WL 2317362, at *2 (D. Utah June 18, 2012)). "The fact that the FDCPA is a strict liability statute . . . means that one does not need to act knowingly or intentionally to violate the statute." *Id*. "Strict liability means that a plaintiff who can prove a violation of the FDCPA is entitled to statutory damages of up to $1000, 'irrespective of the ability to prove actual damages.'" *Id*. (quoting *Soren,* 2012 WL 2317362, at *2.).

Thus, in the alternative, even if Medicredit were not charged with knowledge that the four accounts at issue were subject to worker's compensation and not Ms. Young's responsibility to pay, it still violated 15 U.S.C. § 1692f(1) because the FDCPA is a strict liability statute. Because Medicredit was not permitted to contact Ms. Young under Utah Code Ann. § 34A-2-401(2)(b), it violated the FDCPA each time if called her or sent her a letter.

B. Medicredit Violated 1692e(2)(A)

Ms. Young argues that Medicredit "violated the FDCPA by making false representations about the character, amount, or legal status of the debt . . . ." (ECF No. 32 at 16.) 15 U.S.C. § 1692e provides that "the false representation of . . . the character, amount, or legal status of any debt" "is a violation" of the FDCPA. 15 U.S.C. § 1692e(2)(A).

Ms. Young argues that "attempting to collect a debt from a non-debtor 'constitutes a false representation as to the character or status of the debt in violation of 1692e.'" (ECF No. 32 at 18 (citing *Stuart v. AR Res., Inc.*, No. CIV.A. 10-3520, 2011 WL 904167, at *4 n. 2 (E.D. Pa. Mar. 16, 2011)).) Ms. Young's cited authority, *Stuart*, provides that "an attempt to collect a debt from a non-debtor is best characterized as a misrepresentation as to 'the character, amount, or legal status of any debt' in violation of 1692e(2)(A)." *Stuart*, 2011 WL 904167 at *4 n. 2. As

discussed at length above, Medicredit repeatedly attempted to collect money from Ms. Young on debts that she did not owe. These efforts constitute attempts to collect a debt from a non-debtor. Medicredit violated 15 U.S.C. § 1692e(2)(A).

### C.  Medicredit Violated 1692e(10)

Ms. Young argues that Medicredit violated 15 U.S.C. § 1692e(10). (*See* ECF No. 32 at 19.) That provision provides that "[t]he use of any false representation or deceptive means to . . . attempt to collect any debt or to obtain information concerning a consumer" "is a violation" of the FDCPA. 15 U.S.C. § 1692e(10). Medicredit sent Ms. Young at least three letters, each requesting that she "give the past due account(s) the attention it deserves." (*See* ECF Nos. 32-8, 32-9, and 32-10.) As noted above, Ms. Young did not owe on any of these accounts. Medicredit's letters create the false impression that she was obligated to pay these accounts. Medicredit's letters to Ms. Young constituted the use of a "false representation or deceptive mean" to attempt to collect a debt. Medicredit violated 15 U.S.C. § 1692e(10).

### D.  Medicredit Violated 1692c(a)(2)

Ms. Young argues that Medicredit "violated" § 1692c(a)(2) of "the FDCPA by communicating with Young after [it] knew she was represented by an attorney." (*See* ECF No. 32 at 19.)  That provision provides, in relevant part, that "a debt collector may not communicate with a consumer in connection with the collection of any debt" "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address . . . ." 15 U.S.C. § 1692c(a)(2). At least with respect to Account 4683, Medicredit violated § 1692c(a)(2).

On July 5, 2016, Ms. Young's attorney, Lester Perry, sent Medicredit a letter regarding Account 4683—in addition to Account 4604 and Account 6966. (*See* ECF No. 32-14.) The letter

stated that Mr. Perry's firm represented Ms. Young. (ECF No. 32-14 at 2 ("Our firm represents

Ms. . . . Young, a patient of St. Mark's Hospital in Salt Lake City, Utah. You have acted as a

debt collector seeking to collect monies from Ms. Young for services provided by the

Hospital.").)  The letter also provided the firm's phone number and address. (ECF No. 32-14 at

2.) An entry from the Medicredit Account Notes, timestamped 7/20/2016 indicates that

Medicredit received the letter by that date. (*See* ECF No. 32-16 at 5 ("RECV ATTY REP

LETTER.").) On July 21, 2016, Medicredit called Ms. Young. (*See* ECF No. 32-16 at 80.)

Medicredit violated 15 U.S.C. § 1692c(a)(2) because they contacted Ms. Young after knowing

she was represented by an attorney.

E.   Ms. Young Has Failed to Prove that Medicredit Violated 1692c(c)

Ms. Young argues that Medicredit "violated" § 1692c(c) of "the FDCPA by failing to

cease communicating with Young after receiving her refusal to pay the alleged debts." (*See* ECF

No. 32 at 21.) That provision provides, in relevant part, that "[i]f a consumer notifies a debt

collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt

collector to cease further communication with the consumer, the debt collector shall not

communicate further with the consumer with respect to such debt . . . ." 15 U.S.C. § 1692c(c).

Ms. Young argues that her "attorneys informed Defendants that she did not owe the

alleged debts because the Worker's Compensation Fund was solely responsible for payment."

(ECF No. 32 at 21.) Here, Ms. Young appears to be referring to the two letters from Dawn Atkin

to NPAS, (ECF No. 32-15 at 2–3.) Those letters were regarding Accounts 6966 and 4604. (ECF

No. 32-15 at 2–3.) In each of those letters, Dawn Atkin wrote: "based on" "Utah Code Ann.

34A-2-401(b)" "we dispute the validity of this debt as it applies to Robyn Young." (ECF No. 32-

15 at 2–3.) The Medicredit Account Notes from July 5, 2016 provide, in relevant part, that "SHE

DOES HAVE AN ATTORNEY, DAWN ATKIN," and also provide "LETTER #2002 VA WC:PAT ND ATY INFO." (ECF No. 32-16 at 15.)

Despite this evidence, an issue of fact remains as to whether the letters should have informed Medicredit that it must cease its collection efforts. First, the attorney letters mentioning "workers compensation claim[s]," (ECF No. 32-15 at 2–3) were sent to NPAS, not Medicredit. While there is evidence that Medicredit was aware that Dawn Atkin had sent letters, (*See* ECF No. 32-16 at 15) Ms. Young has not presented evidence that Medicredit received the content of those letters. Second, even if Medicredit did receive the contents of those letters, those letters were regarding Accounts 6966 and 4604. An issue of fact exists as to whether that notice should have informed Medicredit that it must cease its collection efforts in Ms. Young's accounts that were not specifically referenced in the letters. Because issues of material fact exist, Ms. Young is not entitled to summary judgment as to whether Medicredit violated § 1692c(c).

Summary as to Medicredit

To summarize, Ms. Young is entitled to summary judgment against Medicredit for violations of Sections 1692f(1), 1692e(2)(A), 1692e(10), and 1692c(a)(2) of the FDCPA. Ms. Young is not entitled to summary judgment against Medicredit for violating section 1692c(c). Ms. Young's Motion for Partial Summary Judgment against Medicredit is therefore GRANTED in part and DENIED in part.

II.     Cross-Motions On Whether NPAS Violated the FDCPA

As already discussed, "[t]o establish a violation of the FDCPA, Plaintiff must prove . . . four elements." *Rhodes v. Olson Assocs., P.C.*, 83 F. Supp. 3d 1096, 1103 (D. Colo. 2015). As is the case against Medicredit, there is no dispute as to NPAS that Ms. Young satisfies the first and second elements. There is, however, a dispute as to the third and fourth elements.

NPAS argues that Ms. Young cannot meet the third element—that the "Defendant collecting the debt is a 'debt collector' within the meaning of 15 U.S.C. § 1692a(6)." *Id*. The term "debt collector" means "[1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, *or* [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due *another*." 15 U.S.C. § 1692a(6) (emphases added). Thus, "[t]he FDCPA establishes two alternative predicates for 'debt collector status': 1) engaging in debt collection as the 'principal purpose' of the entity's business; or 2) engaging in debt collection [for another] 'regularly.'" *See James v. Wadas*, 724 F.3d 1312, 1316 (10th Cir. 2013) (emphases added) (citation omitted).

NPAS Regularly Engages in Debt Collection for Another

The evidence in the record supports that NPAS "regularly collects or attempts to collect" "debts owed" "or asserted to be owed or due another." 15 U.S.C. § 1692a(6). "The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the . . . services which are the subject of the transaction are primarily for personal . . . purposes." 15 U.S.C. § 1692a(5). The Intercompany Agreement between NPAS and HSS provides that "HSS desires to contract with NPAS . . . to provide . . . early-out collection services for its **Client-Hospitals**." (ECF No. 93-3 at 2 (emphasis in original).) Under a section of the Intercompany Agreement titled "Early-Out Collection Services," the Agreement provides that "NPAS . . . shall use commercially reasonable efforts to obtain ***the amounts owed*** . . . ." (ECF No. 93-3 at 3–4 (emphasis added and removed).) NPAS sent Ms. Young a letter on or around November 5, 2015 regarding Account 4683 stating "[d]espite our best efforts, we have been unable to secure payment on this account. You are obligated to pay for the services [St.

Mark's] provided." (ECF No 82-2 at 2.) It is undisputed that NPAS has contracted to collect "amounts owed" for services provided by hospitals. On the evidence presented, a reasonable jury could only find NPAS collects or attempts to collect "debts owed" for "another"—hospitals.

The next question is whether there is undisputed evidence in the record that NPAS "regularly" attempts to collect these debts owed. The Tenth Circuit has noted that "[t]he term 'regularly' means 'at fixed and certain intervals, regular in point in time. In accordance with some consistent or periodical rule or practice.'" *James v. Wadas*, 724 F.3d 1312, 1316 (10th Cir. 2013) (quoting *Black's Law Dictionary* 1286 (6th Ed.1990)). But the Tenth Circuit has also noted that "it is evident that Congress intended the 'principal purpose' prong to differ from the 'regularly' prong of its definition of 'debt collector.'" *Id*. at 1317. The Tenth Circuit provided that the plain meaning of the term "regularly" "does not by itself differentiate the amount or frequency of debt collection that is a 'regular' part of debt collection from an amount or frequency of debt collection that is a 'principal purpose' of debt collection." *Id*.

In *James v. Wadas*, the Tenth Circuit directed lower courts to look to certain factors in determining whether law firms "regularly" engage in debt collection. NPAS is clearly not a law firm. But the court nevertheless finds many of the factors discussed in *James v. Wadas* to be helpful in determining whether NPAS "regularly" attempts to collect debts.

The first factor is "the absolute number of debt collection communications issued . . . over the relevant period." *James v. Wadas*, 724 F.3d at 1317 (citation omitted). It is undisputed that between October 6, 2014 and April 12, 2017, NPAS called Ms. Young 21 times regarding the six accounts at issue. (*Compare* ECF No. 32 at 6–7 *with* ECF No. 62 at 13–14.) And it is undisputed that NPAS sent Ms. Young at least five letters. (*Compare* ECF No. 32 at 4–6 *with*

ECF No. 62 at 7–13.) This factor weighs in favor of NPAS having "regularly" attempted to collect debt.

The second factor is "the frequency of such communication . . . including whether any patterns of such activity are discernible." *James v. Wadas*, 724 F.3d at 1317. In the month of July, 2015, NPAS called Ms. Young six times. In September of 2016, it again called her six times. This factor also weighs in Ms. Young's favor.

The third factor is "whether the entity has personnel specifically assigned to work on debt collection activity." *James*, 724 F.3d at 1317. The Intercompany Agreement provides that "NPAS . . . shall maintain its own employees to provide Early-Out Collection Services for HSS." (ECF No. 93-3 at 4.) This factor also weighs in Ms. Young's favor.

The fourth factor is "whether the entity has systems . . . in place to facilitate such activity." *James*, 724 F.3d at 1317. NPAS' 30(B)(6) witness testified that NPAS "track[s] collection activity" and agreed that NPAS' "metrics" include "collections." (ECF No. 101-1 at 7, Wright Depo. 18: 18–24.) This factor again weighs in Ms. Young's favor.

The fifth factor is "whether the activity is undertaken . . . in connection with ongoing client relationships . . . to assist in the collection of outstanding consumer debt obligations." *See James*, 724 F.3d at 1317. The Intercompany Agreement establishes that NPAS contracted with HSS to provide "early-out collection services" for "Client-Hospitals." This factor weighs in Ms. Young's favor.

The Tenth Circuit also held that "whether" the alleged debt collector "market[s] itself as having debt collection expertise may also be an indicator of the regularity of collection . . . ." *James*, 724 F.3d at 1318. The Intercompany Agreement provides that "NPAS . . . possesses

experience and *expertise* in providing early-out collection services for hospital facilities." (ECF No. 93-3 at 2 (emphasis added).) This weighs in Ms. Young's favor.

All factors weigh in favor of NPAS "regularly" collecting debts. The court holds that on undisputed facts NPAS qualifies as "debt-collector" under the second prong of 15 U.S.C. § 1692a(6). NPAS regularly engages in debt collection for others—hospitals. On these facts, no reasonable jury could find otherwise and NPAS meets the Tenth Circuit factors to be found as a matter of law to be a debt collector.

Principal Purpose

Under the first prong, "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" is a debt-collector. 15 U.S.C. § 1692a(6). It is undisputed that NPAS uses the mails to collect debts. The question for the court is whether NPAS' "principal purpose" is debt collection. "'Principal,' in relevant part, is defined as 'most important, consequential, or influential.'" *McAdory v. M.N.S & Assocs., LLC*, No. 3:17-CV-00777-HZ, 2017 WL 5071263, at *3 (D. Or. Nov. 3, 2017) (quoting *Webster's Third New Int'l Dictionary of the English Language Unabridged* 1802 (2002)).

As discussed above, NPAS contracted with HSS to provide collection services for hospitals. (*See* ECF No. 93-3 at 2 (emphasis in original).) And NPAS maintains its own employees to provide Early-Out Collection Services for HSS. (*See* ECF No. 93-3 at 4.) NPAS also "track[s] collection activity," and its "metrics" include "collections." (ECF No. 101-1 at 7, Wright Depo. 18: 18–24.) NPAS presented no evidence that its efforts to collect amounts owed its clients is incidental or secondary to any other aspect of its business. On these facts the court

must conclude that NPAS' principal purpose is debt collection. The court holds that NPAS is also a "debt-collector" under the first prong of 15 U.S.C. § 1692a(6).

<u>At Least Account 4683 Is in Default Under 15 U.S.C. § 1692a(6)(F)(iii)</u>

The term "debt collector" "does not include" "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(iii). NPAS may therefore "be excluded from the statutory definition [of debt collector]—and therefore from regulation under the FDCPA—if the debt it was collecting was not in default." *Morrison v. Clear Management Solutions*, No. 1:17-CV-51, 2019 WL 122905, at *8 (D. Utah Jan. 7, 2019). "Unfortunately, the FDCPA does not define so key a term as 'default.'" *Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003). "Without clarity from Congress, the determination of whether a debt is in default is to be made by the court on a case-by-case basis." *Head v. Ocwen Loan Servicing, LLC*, No. 14-CV-1363-EFM-KMH, 2015 WL 4276148, at *4 (D. Kan. July 14, 2015); *see also Cleary v. Hertz Rent-A-Car*, No. CIV.A. 13-1824, 2013 WL 3915217, at *2 (E.D. Pa. July 29, 2013) ("the issue of when a debt is in default . . . should be determined on a 'case by case basis.'").

NPAS' Motion for Partial Summary Judgment "is limited to the argument that NPAS is not a 'debt collector' as defined in the FDPCA because it limits its activities to debt which was not in default at the time it was obtained by NPAS." (ECF No. 110 at 9.) In support of this argument, NPAS relies on the Intercompany Agreement, the Master Agreement, and the Consent for Care Agreements.

The court first addresses the Intercompany Agreement and the Master Agreement. As noted above, Ms. Young was not a party to the Intercompany Agreement. Nor was she a party to

the Master Agreement. As explained above, the Intercompany Agreement is "between NPAS on the one hand, and HSS Systems, LLC" on the other. (Wright Decl., ¶ 3, ECF No. 93-1 at 3.) The Master Agreement is between Parallon and "non-party Mountain Division, Inc." (Wright Decl., ¶ 3, ECF No. 93-1 at 3.) NPAS relies on these agreements to support its position that NPAS only serviced accounts that were not in default. (*See* ECF No. 91 at 13.) The court is unpersuaded by NPAS' argument that it should defer to the definition of default in the agreements between NPAS and HSS and between Parallon and Mountain Division. Permitting these entities to "define default without knowledge and input from the debtor . . . because the debtor is not a party to the contract . . . would controvert the purpose of the FDCPA." *Morrison v. Clear Management Solutions*, No. 1:17-CV-51, 2019 WL 122905, at *8 (D. Utah Jan. 7, 2019).

NPAS' argument under the Consent for Care Agreements also fails. In its Reply, NPAS relies primarily on the Consent for Care Agreements that Ms. Young did sign[15] to support its argument that it is not bound by the FDCPA. (*See* ECF No. 110 at 12 ("a straightforward reliance on the [Consent for Care] Agreements confirms that NPAS is not bound by the FDCPA . . . .").) The Consent for Care Agreements provided that "[d]uring the time that the medical account is being serviced by the [Extended Business Office] Servicer, the account shall not be considered . . . in default . . . ." (ECF No. 92-6 at 3.) The Consent for Care Agreements allowed the "Provider," St. Mark's Hospital, to unilaterally determine when the debt was "in default." (*See* ECF No. 92-6 at 3–4 ("Upon return to the Provider by the EBO Servicer, the Provider . . . may determine the account to be . . . in default.").) The Agreements further provided that "[o]nce

---

[15] As noted above, Ms. Young only signed four of the six Consent for Care Agreements at issue.

the medical account is determined to be delinquent it may be subject to . . . referral to a collection agency as a delinquent account . . . ." (ECF No. 92-6 at 4.)

According to NPAS, the Consent for Care Agreements "contractually define the periods of default on any debt resulting from [Ms. Young's] receipt of medical services," and Ms. Young, "as a party" to those agreements, is bound by them for the purposes of determining whether her debt was "in default" under the FDCPA. NPAS' position is that until Congress ends its silence regarding the definition of the term "default," parties may contractually define their own periods of default—and that under the Consent for Care Agreement, the debt NPAS was attempting to collect on was not in "default." (*See* ECF No. 110 at 10.)

This court acknowledges that some courts have looked to "contractual provisions between" "creditors and debtors to determine whether a debt is in default at any given time." *See Barbato v. Greystone All., LLC*, No. 3:13-CV-2748, 2017 WL 1193731, at *8 (M.D. Pa. Mar. 30, 2017) (citation omitted) (internal quotation marks omitted). But "other courts have stated that, in view of the FDCPA's purpose of eliminating abusive debt collection practices by debt collectors . . . this standard is sometimes too lenient towards the potential debt collector." *See id.* (citation omitted) (internal quotation marks omitted). "This purpose would be contravened if a creditor were unilaterally able to determine when and if an account was in default for FDCPA purposes and therefore whether the provisions of the FDCPA applied to the debt collection activities of the collection agency it hires." *Id.* at 1027–28. *Magee v. AllianceOne, Ltd.*, 487 F. Supp. 2d 1024, 1027–28. (S.D. Ind. 2007). Indeed, this approach "would allow for the creditor to set the date in which a debt goes into default immediately after the transfer to the debt collector, allowing an entity that would otherwise be governed by the statute to avoid statutory accountability."

*Morrison v. Clear Management Solutions*, No. 1:17-CV-51, 2019 WL 122905, at *8 (D. Utah Jan. 7, 2019). Under the facts of this case the court finds the later cases persuasive.

The Consent for Care Agreements do not define an objective period of default. Rather, they allow St. Mark's to unilaterally determine when an account is in default. The record reveals that St. Mark's Hospital did not place accounts with NPAS in any consistent manner. For example, Account 6966 was placed with NPAS just 22 days after Ms. Young received services. (*See* ECF No. 91 at 15.) Account 4683, on the other hand, was placed with NPAS 280 days after Ms. Young received services from St. Mark's. (*See* ECF No. 91 at 15.) The agreements place no constraints on St. Mark's ability to declare a debt in default and any supposed agreement with a patient on this issue would be illusory and not enforceable. Allowing St. Mark's to unilaterally determine the date an account has defaulted would contravene the FDCPA's purpose. Based on the facts of this case the court holds that the Consent for Care Agreements do not dictate when the accounts at issue are "in default" for FDCPA purposes.

As discussed above, "the determination of whether a debt is in default is to be made by the court on a case-by-case basis." *Head v. Ocwen Loan Servicing, LLC*, No. 14-CV-1363-EFM-KMH, 2015 WL 4276148, at *4 (D. Kan. July 14, 2015). Based on the facts of this case, the court holds that "the guiding principle" to determine whether the debts at issue were "in default" is whether "a reasonable person in the debtor's position [would] believe that the creditor viewed the debt as being in default." *Mavris v. RSI Enterprises Inc.*, 86 F. Supp. 3d 1079, 1086 (D. Ariz. 2015). "The relevant factors . . . include the number of times a creditor has requested payment, the time that has elapsed since the first request, the urgency of the language used in those requests, the debtor's knowledge that she has been referred to a third party, the creditor's internal policies, any representations made by or on behalf of the creditor—either publicly or to a specific

debtor—about how it collects debts, and apparent attempts by the creditor or third party to circumvent the FDCPA's consumer protections." *Id*. The court addresses Account 4683 separately from the rest of the accounts.

Account 4683 Was in Default

It is undisputed that St. Mark's treated Account 4683 in default when NPAS obtained it. St. Mark's performed services relating to this account on May 23, 2014. (ECF No. 62-2 at 53.) "On October 11, 2014," Account 4683 was then "placed with Medicredit." (Wright Decl., ¶ 21, ECF No. 62-2 at 6; *see also* ECF No. 32-16 at 2.) Medicredit then called Ms. Young six times in October 2014—on October 13, 15, 16, 17, 20 and 21. (*See* ECF No. 32-16 at 78; *see also* ECF No. 32-16 at 73.) Later, on "February 27, 2015," Account 4683 was withdrawn from Medicredit and "placed with NPAS for services performed by St. Mark's Hospital . . . ." (Wright Decl., ¶ 15, ECF No. 62-2 at 5.) "This means that the debt was placed with NPAS two hundred eighty . . . days after services were rendered to Plaintiff by St. Mark's Hospital." (ECF No. 91 at 15.)

Because it is undisputed that Medicredit is a debt collector, St. Mark's treated the account as in default when Medicredit attempted to collect on Account 4683 prior to NPAS obtaining the debt. Based on this fact alone, a reasonable person would have believed that St. Mark's viewed Account 4683 as already being in default when NPAS obtained it.

Other factors discussed in *Mavris* support this conclusion. The urgency of the language used in NPAS' request weighs in Ms. Young's favor. NPAS sent Ms. Young a letter on or around November 5, 2015 stating: "you are obligated to pay for the services provided. We strongly urge you to take advantage of this opportunity to resolve your balance." (ECF No. 82-2 at 2.) The use of the word "obligated" is strong language that weighs against NPAS. Ms. Young's "knowledge that she ha[d] been referred to a third party" also weighs in her favor.

*Mavris*, 86 F. Supp. 3d at 1086. Based on Medicredit having already called Ms. Young six times prior to NPAS obtaining Account 4683, Ms. Young would have believed that she had been referred to a third party for collections. Additionally, the "apparent attempt[ ] by the creditor or third party to circumvent the FDCPA's consumer protections" factor weighs in Ms. Young's favor. St. Mark's Hospital is owned by Hospital Corporation of America. (*See* ECF No. 99-1 at 10.) Hospital Corporation of America owes Parallon. (ECF No. 99-1 at 5.) Parallon, in turn, owns Defendant NPAS, Inc. and Defendant Medicredit, Inc. (ECF No. 99-1 at 5.) The Intercompany Agreement itself provides that "[t]he services provided by NPAS . .. are as an extension of the Client Hospital's business office and not as a 'debt collector' as that term is defined under the . . . FDCPA . . . ." (ECF No. 93-3 at 4.) This by itself is evidence that NPAS' intent was to circumvent the protections of the FDCPA.

The court concludes that the Account 4683 was in default by the time NPAS obtained it because any reasonable person in Ms. Young's position would have believed that St. Mark's viewed the debt as being in default. On these facts no reasonable jury could find otherwise. *Mavris*, 86 F. Supp. 3d at 1086. Even assuming the "reasonable person" standard does not govern, the 280 day period between St. Mark's providing the service and placing the account with NPAS provides further support for the conclusion that Account 4683 was in default when NPAS obtained it. *See Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 87 (2d Cir. 2003) ("various other federal regulations have defined default as commencing anywhere between thirty and 270 days after a debt becomes due.").

Alternatively, even assuming that the Consent for Care Agreements could dictate when the accounts at issue were "in default" for FDCPA purposes, the fact that Account 4683 was placed with Medicredit before it was placed with NPAS provides an alternative basis for the

court to hold that Account 4683 was "in default" when NPAS obtained it. To prevail on her motion for partial summary judgment, Ms. Young must prove that NPAS is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6). Ms. Young has pointed to undisputed facts demonstrating that St. Mark's Hospital placed Account 4683 with NPAS after it had already placed that account with Medicredit. It is undisputed that Medicredit is a debt collector. And it is undisputed that Medicredit called Ms. Young six times in October 2014 regarding this account. (*See* ECF No. 32-16 at 78; *see also* ECF No. 32-16 at 73.) If St. Mark's hospital placed Account 4683 with Medicredit, that is undisputed evidence that St. Mark's considered Account 4683 to be "in default" under the Consent for Care Agreement. If Account 4683 was "in default" prior to being placed with NPAS, that is evidence that NPAS serviced defaulted accounts. If NPAS serviced defaulted accounts, it is a "debt collector" under the FDCPA—at least with respect to Account 4683.

The fourth element a plaintiff must prove to establish a violation of the FDCPA is that the defendant "violated, by act or omission, a provision of the FDCPA." *Rhodes v. Olson Assocs., P.C.*, 83 F. Supp. 3d 1096, 1103 (D. Colo. 2015). As noted above, Ms. Young argues that NPAS violated sections [1] 1692f(1), [2] 1692e(2)(A), [3] 1692e(10), [4] 1692c(a)(2), and [5] 1692c(c) of the FDCPA. (*See* ECF No. 32 at 15, 19, 21, and 22.) At this point of the analysis, the court holds only that Ms. Young has established for purposes of summary judgment that Account 4683 was in default when NPAS obtained it. As such, the violations discussed immediately below relate only to Account 4683. The court will discuss the other NPAS accounts separately below.

1. NPAS' Actions As to Account 4683 Violated 1692(f)(1)

Ms. Young argues that NPAS "violated the FDCPA by collecting or attempting to collect debts that were not permitted by" Utah law. (*See* ECF No. 32 at 14.) Ms. Young argues that under Utah's Workers Compensation Act, her employer, Granite School District, owed the debts. (*See* ECF No. 32 at 14.) As discussed above, because that statute is clear, the court concludes that the Utah Supreme Court would not allow a debt collector to attempt to collect medical debt from an employee when the responsibility to pay for that debt is on the employer. And, as discussed above, "[t]he fact that the FDCPA is a strict liability statute . . . means that one does not need to act knowingly or intentionally to violate the statute." *Sartori v. Steider & Assocs., P.C.*, No. 1:15-CV-00991-JCH-LF, 2017 WL 3602029, at *2 (D.N.M. Jan. 19, 2017). Because the FDCPA is a strict liability statute, NPAS violated section 1692f(1) when it sent her a letter on or around October 26, 2015 attempting to collect a debt that was not her duty to pay.

2. NPAS' Actions As to Account 4683 Violated 1692e(2)(A)

Ms. Young argues that NPAS "violated the FDCPA by making false representations about the character, amount, or legal status of the debt . . . ." (*See* ECF No. 32 at 16.) NPAS attempted to collect money from Ms. Young on Account 4683 when it sent her a letter stating "[y]ou are obligated to pay for the services provided." (*See* ECF No. 82-2.) She did not owe this money. NPAS' letter violated 15 U.S.C. § 1692e(2)(A).

3. NPAS' Actions As to Account 4683 Violated 1692e(10)

Ms. Young argues that NPAS violated 15 U.S.C. § 1692e(10). (*See* ECF No. 32 at 19.) That provision provides that "[t]he use of any false representation or deceptive means to . . . attempt to collect any debt or to obtain information concerning a consumer" "is a violation" of the FDCPA. 15 U.S.C. § 1692e(10). NPAS' letter sent on or around October 26, 2015, provides

that she was "obligated to pay for the services" St. Mark's provided. (*See* ECF No. 82-2 at 2.)

Because Ms. Young was not obligated to pay the debt associated with Account 4683, NPAS'

letter constituted a false representation and a violation of 15 U.S.C. § 1692e(10).

    4.  <u>As to Account 4683, Ms. Young's Motion for Summary Judgment Fails Against NPAS for Violating 1692c(a)(2)</u>

Ms. Young argues that NPAS "violated" § 1692c(a)(2) of "the FDCPA by

communicating with Young after [it] knew she was represented by an attorney." (*See* ECF No.

32 at 19.)  That provision provides, in relevant part, that "a debt collector may not communicate

with a consumer in connection with the collection of any debt" "if the debt collector knows the

consumer is represented by an attorney with respect to such debt and has knowledge of, or can

readily ascertain, such attorney's name and address, unless the attorney fails to respond within a

reasonable period of time to a communication from the debt collector . . . ." 15 U.S.C. §

1692c(a)(2).

Ms. Young's former attorney, Dawn Atkin, first wrote to NPAS on May 13, 2016. Dawn

Atkin wrote two letters to NPAS on this date. (*See* ECF No. 32-15 at 2–3.) Neither letter

referenced Account 4683. (*See* ECF No. 32-15 at 2–3 (the first letter referenced Account 6966;

the second letter referenced Account 4604.).) On or around May 17, 2016, NPAS sent Ms.

Young a letter regarding Account 4683. (ECF No. 32-3 at 2.) This letter, titled "Attorney

Representation Form," stated: "[y]ou or the patient/responsible party have informed us that you

are representing the patient/responsible party on the above listed account." (ECF No. 32-3 at 2.)

On July 5, 2016, Ms. Young's attorney, Lester Perry, sent NPAS a letter regarding Account 4683

stating that his firm represented Ms. Young. (*See* ECF No. 32-4 at 2.) On or around August 26,

2016 NPAS sent Ms. Young a "request for payment" regarding Account 1159. (ECF No. 32-5 at

2.) NPAS sent Ms. Young another "payment request" regarding this account on or around

September 23, 2016. (ECF No. 32-6 at 2.) NPAS sent Ms. Young a similar letter on or around

October 24, 2016. (ECF No. 32-7 at 2.) This timeline presents two issues.

First, whether NPAS' "Attorney Representation Form" letter constitutes a

communication "with a consumer in connection with the collection of [a] debt." 15 U.S.C. §

1692c(a). NPAS argues that the letter was not "an attempt to collect a debt" but merely sought

"to obtain confirmation about Plaintiff's attorney so that NPAS could thereafter communicate

with Plaintiff's attorney." (ECF No. 62 at 38.) A reasonable jury could find that this letter was a

communication with a consumer in connection with the collection of a debt in violation of 15

U.S.C. § 1692c(a)(2). But a reasonable jury could also find that this communication was not in

connection with debt collection. Ms. Young is not entitled to summary judgment against NPAS

on Account 4683 based on the May 17, 2016 letter.

Second, whether the attorney letters NPAS received regarding Accounts 6966, 4604, and

4683 put NPAS on notice that Ms. Young was "represented by an attorney with respect to"

Account 1159. Again, this is a question better answered by a jury. As to Account 4683, Ms.

Young's Motion for Summary Judgment fails against NPAS for violating 1692c(a)(2).

5.  As to Account 4683, Ms. Young's Summary Judgment Fails Against NPAS for Violating
    1692c(c)

Ms. Young argues that NPAS "violated" § 1692c(c) of "the FDCPA by failing to cease

communicating with her after receiving her refusal to pay the alleged debts." (*See* ECF No. 32 at

21.) That provision provides, in relevant part, that "[i]f a consumer notifies a debt collector in

writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to

cease further communication with the consumer, the debt collector shall not communicate further

with the consumer with respect to such debt . . . ." 15 U.S.C. § 1692c(c). Ms. Young has not

presented evidence that NPAS communicated with her about Account 4683 after she informed

NPAS in writing that she refused to pay. Absent such evidence her motion for summary judgment as to that account fails.

Summary as to NPAS

To summarize, regarding Account 4683, Ms. Young is entitled to summary judgment against NPAS for violations of sections 1692f(1), 1692e(2)(A), and 1692e(10). Ms. Young is not entitled to summary judgment against NPAS for violating sections 1692c(a)(2) and 1692c(c). Regarding Account 4683, Ms. Young's Motion for Partial Summary Judgment against NPAS is therefore GRANTED in part and DENIED in part. NPAS' Motion for Partial Summary Judgment is DENIED.

Disputed Issues of Fact Preclude Partial Summary Judgment Against NPAS as to the Other Accounts

Ms. Young's Motion for Summary Judgment against NPAS on accounts other than Account 4683 fails. There are disputed facts as to whether the other accounts were in default when NPAS obtained them from St. Mark's Hospital. Under the factors set out in *Mavris v. RSI Enterprises Inc.*, 86 F. Supp. 3d 1079, 1090 (D. Ariz. 2015), a reasonable jury may find the accounts were in default at the time NPAS attempted to collect them. A reasonable jury may also, however, reject those findings and rule in favor of NPAS. Ms. Young's and NPAS' cross motions regarding the other five accounts at issue are both DENIED.

III.     Defendants' Motion on Actual Damages

In her First Amended Complaint, Ms. Young alleges that "[p]ursuant to Section 1692k, each of the defendants are liable . . . for the actual damage caused by their collection actions plus additional damages not exceeding $1,000 for each defendant." (Am. Compl. ¶ 60, ECF No. 26 at 10.) Section 1692k provides that "any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum

of . . . any actual damage sustained by such person as a result of such failure." 15 U.S.C. §

1692k(a)(1).

Ms. Young also alleges that she is entitled to "damages" from the defendants "pursuant to

Utah Code Ann. § 13-11-19(2)." (Am. Compl. ¶ 47, ECF No. 26 at 12.) That statute provides

that "[a] consumer who suffers loss as a result of a violation of this chapter may recover . . .

actual damages or $2,000, whichever is greater, plus court costs." Utah Code Ann. § 13-11-

19(2).

Ms. Young specifically alleges that Defendants "caused emotional distress" to her and

caused her "to suffer from panic attacks, depression, fear, confusion, sadness, [and] a sense of

hopelessness that the collections would not stop . . . ." (Am. Compl. ¶¶ 45-46, ECF No. 26 at

10.) She also alleges that her "emotional distress manifested physically through, among other

things, crying, sleeplessness, nausea, withdrawal from loved ones, migraines, and increase in the

severity and frequency of her migraines." (Am. Compl. ¶¶ 47, ECF No. 26 at 8.)

Defendants move the court "for partial summary judgment in their favor and against" Ms.

Young "on her claim that she sustained actual damages from Defendants' alleged violations of

the" FDCPA and UCSPA. (ECF No. 88 at 2.) Defendants argue that "Plaintiff's 'damages' are

vague and do not flow from the alleged violations of the FDCPA and UCSPA." (ECF No. 88 at

19.) In response, Ms. Young argues that Defendants' motion "should be denied because

causation here, as it almost always is, remains a question of fact to be decided by the fact finder."

(ECF No. 100 at 1.) .

Under the FDCPA, "[a]ctual damages may include recovery for mental anguish or

emotional distress." *Soren v. Equable Ascent Fin., LLC*, No. 2:12-CV-00038, 2012 WL 2317362,

at *3 (D. Utah June 18, 2012); *see also Davis v. Fid. Info. Corp.*, No. 4:18-CV-00441-AGF,

2018 WL 6171438, at *3 (E.D. Mo. Nov. 26, 2018) ("Mental pain and anxiety can constitute

actual damages under . . . the FDCPA . . . ."). "There is a split amongst the courts, however, as to whether a plaintiff's claim will be evaluated under the state law standard governing the tort of intentional infliction of emotional distress (IIED) or some lower standard." *Soren*, 2012 WL 2317362 at *3.

"Some courts have held that a plaintiff must prove a claim for intentional infliction of emotional distress ("IIED") under state law to collect damages for emotional distress under a suit brought pursuant to FDCPA." *Alonso v. Blackstone Fin. Grp. LLC*, 962 F. Supp. 2d 1188, 1199 (E.D. Cal. 2013) (citations omitted). "Other courts have concluded that a plaintiff does not need to meet the state law standards for IIED in order to recover emotional distress and have adopted a lower standard of proof." *Burns v. Anderson, Crenshaw & Assocs., L.L.C.*, No. 07-CV-01192-WYD-BNB, 2008 WL 8834614, at *3 (D. Colo. Aug. 15, 2008) (citation omitted). "Under the latter approach, courts have analogized the FDCPA to the Fair Credit Reporting Act ('FCRA')." *Id*. "Under the FCRA, if a plaintiff proves a violation of the act he is entitled to actual damages for emotional distress without proving the elements of the state tort claim." *Id*.

One case that analogized FDCPA to the FCRA is *Smith v. Law Offices of Mitchell N. Kay*, 124 B.R. 182, 188 (D. Del. 1991). In *Smith*, the court noted that that it was "unlikely that Congress intended to limit a plaintiff's award of actual damages [under the FDCPA] to those damages which he could have collected under existing state law." *Id*. at 188–89. The court in *Smith* gave three reasons to support this conclusion.

First, the court in *Smith* concluded that Congress intended to supplement inadequate state law remedies when it created the FDCPA. The court cited to Congressional Findings concluding that "[e]xisting laws and procedures for redressing" consumer's injuries at the hands of debt collectors were "inadequate." *See id*. at 188 (quoting 15 U.S.C. § 1692(b)). The court in *Smith*

noted that a Congressional committee "believe[d] that the serious and widespread abuses in [the area of debt collection] and the inadequacy of existing State and Federal laws" made the FDCPA necessary. *Id.* (quoting 1977 U.S.Code Cong. & Admin.News 1695, 1697.); *see also id.* ("the [Congressional] committee flatly added: 'Existing State laws are inadequate to curb these abuses.'") (quoting 1977 U.S.Code Cong. & Admin.News at 1701)).

Second, the court in *Smith* concluded that Congress intended to create a uniform law governing debt collection. The court noted that "[t]he FDCPA states that 'it is the purpose of this subchapter . . . *to promote consistent State action* to protect consumers against debt collection abuses." *Smith*, 124 B.R. at 189 (quoting 15 U.S.C. § 1692(e) (emphasis in original)). The court in *Smith* noted that the "elements that must be proved in order to establish a cause of action for the intentional infliction of emotional distress" "vary from state to state." *Id.* The *Smith* court concluded that "the uniformity intended by Congress" would be "undermine[d]" if a plaintiff were to have to prove a claim for intentional infliction of emotional distress ("IIED") under state law to collect damages for emotional distress under a suit brought pursuant to FDCPA. *See id.*[16]

Third, the court in *Smith* reasoned that Congress was aware of judicial interpretations of the FCRA when it enacted the FDCPA. The court reasoned:

> Since the FCRA was enacted seven years before the FDCPA, the Court concludes that Congress must have been aware of those decisions that predate the FDCPA. Despite its awareness of these decisions, Congress still enacted the FDCPA using nearly identical enforcement language. The Court recognizes this as some evidence that Congress intended actual damages under the FDCPA to be awarded

---

[16] *See also Alonso v. Blackstone Fin. Grp. LLC*, 962 F. Supp. 2d 1188, 1200–01 (E.D. Cal. 2013) ("States have different elements and requirements when it comes to the application of the law of emotional distress and themselves lack a uniform application. . . . As a result, federal courts sitting in a particular forum could arrive at different decisions in defining actual damages when applying the forum state's law. This problem could be further exacerbated when dealing with a class action application as to the choice of law applicable in a given class action case. The Court sees no reason for Congress to enact a statute of this nature which looks to the state forum where the federal court sits for the answer, especially absent clear Congressional intent or guidance. A stronger rationale exists for having a uniform interpretation when it comes to defining 'actual damages' under the FDCPA.")

in the same manner as under the FCRA, that is, without reference to state tort law.

*Id*. at 189.

This court finds the reasoning of *Smith* persuasive. The court holds that when a violation of the FDCPA has been established, actual damages for emotional distress can be proved independent of state law requirements.[17] Tenth Circuit precedent regarding what evidence is sufficient to support a claim for actual damages for emotional distress under the FCRA is therefore directly relevant to the present question—whether Ms. Young has produced sufficient evidence in response to Defendants' motion for summary judgment to create at least a genuine dispute as to the existence of actual damages for Defendants' FDCPA violations. The Tenth Circuit's decision in *Llewellyn* is instructive.

In *Llewellyn*, the Plaintiff asserted a claim under the FCRA, among other claims. *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178 (10th Cir. 2013). The district court

---

[17] In order to determine whether the Defendants' collection efforts were "permitted by law" under 15 U.S.C. § 1692f(1), this court relied on *Johnson* for the proposition that "every circuit court decision that has applied the 'permitted by law' standard has asked simply whether state substantive law permitted the FDCPA defendant to collect the money that it demanded." *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002). The court recognizes that—at first blush—there may appear to be an incongruity in looking to state law on this issue while simultaneously holding that actual damages for emotional distress can be proved independent of state law requirements. But Congress made its intent regarding state laws clear in 15 U.S.C. § 1692n, which provides:

> [t]his subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

15 U.S.C. § 1692n.

Utah Code Ann. § 34A-2-401(2)(a–b) is not inconsistent with the FDCPA because, when read in conjunction with the FDCPA, it affords consumers greater protections from unfair collection practices than the FDCPA alone. Looking to state law standards for intentional infliction of emotional distress in order to recover actual damages for emotional distress would afford consumers fewer protections than the standard adopted by those courts that analogize the FDCPA to the FCRA. Affording fewer protections to consumers was not Congress' intent. "Because the FDCPA" "is a remedial statute" that should be "construed liberally in favor of the consumer," *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002) the court holds that when a violation of the FDCPA has been established, actual damages for emotional distress can be proved independent of state law requirements.

"concluded [that] Plaintiff failed to provide evidence of actual damages . . . to support his FCRA claim . . . ." *Id*. Plaintiff appealed, maintaining that "he produced sufficient evidence in response to the . . . Defendants' motion for summary judgment to create at least a genuine dispute as to the existence of" emotional damages "and whether they were caused by the . . . Defendants' alleged FCRA violation." *Id*. at 1179. To support his claim for emotional damages, Plaintiff had "submitted his own affidavit and records from medical evaluations . . . ." *Id*. at 1181. "Plaintiff explained that before the . . . Defendants began issuing negative credit reports, his preexisting Crohn's disease and depression were under control." *Id*. But after discovering that Defendants had issued negative credit reports, Plaintiff's "health began to rapidly deteriorate with symptoms of his Crohn's disease returning with great force." *Id*. at 1182 (internal quotation marks omitted).

"The . . . Defendants contend[ed] [that] Plaintiff's affidavit, without more, [was] insufficient to create a genuine dispute as to whether their actions *caused* Plaintiff to suffer emotional damages." *Id*. at 1182 (emphasis in original). The Tenth Circuit, [v]iewing Plaintiff's affidavit in the light most favorable to him and drawing all reasonable inferences in his favor," conclude[d] Plaintiff ha[d] provided sufficient evidence he suffered emotional damages as a result of the . . .Defendants' actions." *Id*. "Contrary to the . . . Defendants' assertion, Plaintiff was not required to produce evidence to corroborate his detailed and specific testimony in order to survive summary judgment." *Id*. at 1183.

As discussed in detail above, Defendants called Ms. Young dozens of times in their effort to collect debt. And they sent her numerous letters. In her deposition, Ms. Young testified that when she received a letter or a phone call from Medicredit or NPAS, she would "get more anxiety, more stress," and would sometimes cry. (ECF No. 89-6, Young Depo. 38: 12–21 ("if I received a letter or a telephone call from Medicredit . . . or NPAS . .. [t]hat causes me to get

more anxiety, more stress *and crying*.") (emphasis added).) Further, unlike the plaintiff in *Llewellyn*, Ms. Young did provide corroborating evidence.

Ms. Young's testimony was corroborated by her sister, Ms. Wheat. Ms. Wheat testified that Ms. Young was "sick and tired of [the Defendants] calling." (ECF No. 89-7, Wheat Depo. 23: 24–25.) Ms. Wheat also testified that the phone calls "wore on" Ms. Young. (ECF No. 89-7, Wheat Depo. 24: 1–2.) Ms. Wheat also testified about a specific time that Ms. Young went to her office to talk about one of the phone calls she received from a debt collector. (ECF No. 89-7, Wheat Depo. 28: 14–22 ("She walked in and we started talking and she –it was a fine day and she wasn't having a migraine or anything like that. She was fine. And then she goes, 'I got another call. And I know when they call me, I see their number,' and made her – *it agitated her. She started to get emotional.* She started to get – 'I just don't understand. I don't know why they're trying to collect from me,' especially at the time that they knew she had filed a Workers Compensation claim.") (emphasis added).) Ms. Wheat further testified that the debt collectors "coming after her" (ECF No. 89-7, Wheat Depo. 30: 24) "ma[d]e her emotional" and "*would make her cry*." (ECF No. 89-7, Wheat Depo. 32: 2–5 (emphasis added).).

The court agrees with Defendants that Ms. Young is required to explain "her injury in reasonable detail and not rely on conclusory statements." *Llewellyn*, 711 F.3d at 1182. But viewing allegations in the light most favorable to Ms. Young, and drawing all reasonable inferences in her favor, the court concludes that she has provided sufficient evidence to create a genuine dispute of fact as to whether the Defendants actions caused her to suffer emotional damages. Defendants Motion for Summary Judgment on Actual Damages is DENIED.

IV.    <u>Ms. Young's Motion to Amend Complaint</u>

The scheduling order in this case established May 3, 2017 as the deadline to file a motion to amend the pleadings.  (ECF No. 18 at 2.) Plaintiffs filed their motion to amend on December 4, 2017. (ECF No. 75.) Because Ms. Young seeks to amend her complaint after the time for amendment under the court's scheduling order has expired, she must demonstrate both "(1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014). Ms. Young does not even address Rule 16's good cause standard. The court holds that Ms. Young has failed to establish good cause and DENIES her Motion.

<u>**Conclusion**</u>

For the foregoing reasons, the court orders as follows:

I.     Ms. Young's Motion for Partial Summary Judgment against Medicredit, (ECF No. 32) is GRANTED in part.

II.    Ms. Young's Motion for Partial Summary Judgment against NPAS, (ECF No. 32) is GRANTED in part.

III.   NPAS' Motion for Partial Summary Judgment, (ECF No. 91) is DENIED.

IV.    Defendants' Motion for Partial Summary Judgment on Actual Damages, (ECF No. 88) is DENIED.

V.     Ms. Young's Motion to Amend Complaint, (ECF No. 75) is DENIED.

DATED this 5th day of February, 2019.

BY THE COURT:

_Clark Waddoups_
_____
Clark Waddoups
United States District Judge